ORIGINAL

ECF

FILED
APR 9 2004
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

INFORMATION SYSTEMS &
NETWORKS CORPORATION,

Plaintiff,

v.

THE UNITED STATES

Defendant.

Case No. 04-632C

## COMPLAINT

Plaintiff, Information Systems & Networks Corporation ("plaintiff" or "ISN"), by its undersigned attorneys, as and for its Complaint, alleges as follows, based on personal knowledge as to its own actions as verified by its President and CEO, and upon information and belief as to the actions of others. For those matters alleged based on ISN's information and belief, such matters are based upon, among other things, the investigation of ISN's attorneys, publicly available documents, and other documents presently available to ISN and its attorneys.

### Nature of Action

1. Plaintiff brings this action to appeal multiple claims submitted to the cognizant Administrative Contracting Officer ("ACO")on August 1, 2003 pursuant to

the Contracts Disputes Act of 1978, 41 U.S.C. §601-612 as amended ("CDA") ("the CDA Claim"). The CDA Claim sought, inter alia, amounts due ISN which were independent from an earlier CDA claim and appeal which resulted in a payment made to ISN by the defendant.

2. As set forth in the CDA Claim, ISN had earlier appealed a deemed denial of a CDA claim to the Armed Services Board of Contract Appeals ("ASBCA"). That appeal addressed only the issue of ISN's entitlement to certain specific claims asserted in the certified claim that ISN had previously filed. On July 11, 2002, the ASBCA issued its Opinion and Decision addressing the entitlement of ISN to only the specific claims appealed to the ASBCA. The ASBCA Opinion and Decision in resolving only the issue of entitlement, remanded to the parties to negotiate quantum on the specific claims asserted in the case. As a result, the ASBCA Opinion and Decision was not final. The claims which are the subject of this Complaint were not part of or encompassed by the ASBCA case.

**Jurisdiction**

3. This Court has jurisdiction over ISN's causes of action in that they are derived from the deemed denied decision by the ACO of ISN's CDA Claim. Thus, jurisdiction

lies in this Court pursuant to 28 U.S.C. § 1491(a)(1)(2), Contract Disputes Act of 1978 (as amended) 41 U.S.C. §601-612, as well as FAR 52.216-1,et.seq. The cognizant ACO has failed to issue a final decision within either the prescribed time period or any other reasonable time period and thus, ISN's CDA Claim is deemed denied.

**The Parties**

4. The plaintiff is a small, minority-owned business, incorporated under the laws of the State of Maryland having its corporate headquarters at 10411 Motor City Drive, Bethesda, MD 20817. ISN is an experienced company in the field of computer/telecommunications/ security systems integration engineering and has been since its inception in 1980. Until recently, it provided services and supplies to the various agencies of the Department of Defense and the United States Government as well as to commercial clients.

5. Defendant is the Government of the United States of America, acting by and through its designated ACO and other authorized representatives, including but not limited to, the Defense Contract Management Agency, the Defense Logistics Agency, and the Defense Contract Audit Agency.

## **Factual Allegations**

**Background - The IWAC Project**

6. In September, 1988, the Joint Chiefs of Staff ("JCS") entered into a memorandum of agreement with the Assistant Secretary of Defense regarding funding for an Interneted Warfighting Analysis Capability ("IWAC") Project, which would link by a network the commanders of the unified and specified commands to participate, realtime, in wargaming and analysis. The new network would build upon existing Modern Aids to Planning Programming ("MAPP") analysis capabilities which existed at each command.

7. As a result, effective September 22, 1988, the Air Force District of Washington,("AFDW") entered into an indefinite-quantity contract, No. F49642-88-D-0054, with the Small Business Administration ("SBA") for provision of "all labor, tools, supervision and other services necessary to design, install, certify and manage the integration of 7CG computers, computer system and networks including local and wide area networks 7CG Air Force Communications, Pentagon, Washington, D.C., and other Air Force departments in the Washington, D.C. metropolitan area, in accordance

with Statement of Work, dated September 1, 1988." Simultaneously, and pursuant to Section 8(a) of the Small Business Act, 15 U.S.C.§ 637(a), the SBA entered into a contract, No. 3-88-1-2885, with ISN for the performance of that work ("the JCS Contract").

8. Pursuant to the JCS Contract, ISN was then issued Delivery Order No. 6009 on or about September 14, 1989 ("the Delivery Order"). The Delivery Order followed receipt by ISN of the IWAC SOW along with the 42-page technical and budgetary proposal for the 13-site network. ISN estimated its costs for the project at $6,454,054 and adding the costs for twelve months of recurring communications circuit services, the estimated total was $10,789,447. ISN represented in its proposal that it would design a network that would provide T1 connectivity between the IWAC subscribers along with the network installation at the three designated prototype sites as soon as possible after an agreed upon network design.

9. As later decided by the ASBCA, the Delivery Order was not fixed-price.

**Termination of Delivery Order 6009**

10. The Department of Air Force terminated for convenience part of the Delivery Order on or about May 31,

1990. The Air Force then contended that the terminated Delivery Order was for work at four sites at the fixed-price of $3,400,379 (as modified) and that ISN was precluded from recovering costs exceeding that amount, less $158,315 for equipment the Air Force asserted was not delivered and $170,000 the Air Force asserted was added to the Delivery Order to preserve "end-of-year" funds and for which no work was to be performed.

11. ISN, in contrast, claimed that the Delivery Order was for work at 13 sites and was being funded incrementally. ISN asserted that, due to the Air Force reduction of work from 13 to 4 sites, it was entitled to recover its lost vendor volume discounts, expenses incurred for 1-year leases of communications circuits, and other costs relating to the termination.

12. ISN also claimed that under the Prompt Payment Act, 31 U.S.C. §§3901-07, it was entitled to interest on two unpaid invoices for the terminated Delivery Order. ISN asserted that the two invoices were not "disputed" but the Air Force contended otherwise.

**The ASBCA Litigation**

13. ISN invoiced the Air Force for all work it had performed on the Delivery Order and also submitted a

termination proposal on January 22, 1991. The defendant failed to make any payment on either the invoices or the termination proposal.

14. On or about October 23, 1991, ISN submitted a certified CDA Claim for $1,383,111 which requested payment of claimed amounts plus CDA interest. The claimed amounts included in addition to unpaid balances on two invoices for pre-termination costs, plus interest on those balances loss of volume discounts, continuing lease costs, cost of undelivered equipment, and cost of additional equipment mark-up. Also included are labor costs for termination negotiations.

15. The cognizant contracting officer did not issue a final decision on ISN's CDA claim. Accordingly, on May 21, 1993, ISN filed a notice of appeal with the ASBCA based on the contracting officer's deemed denial of its CDA Claim. The case was assigned ASBCA No. 46119 ("the Case").

16. After the conduct of the trial and completion of post-trial briefing before the ASBCA in the Case, the parties executed a bilateral modification which authorized payment by the defendant of $538,040 to ISN. The payment made by the defendant on January 31, 1997 was stated to be a "full and final settlement" and "an accord and

satisfaction" of the parties obligations under the Delivery Order, but the modification language provided that the acceptance of the amount did not represent an acknowledgement by ISN that the Defendant's computational breakdown of costs was correct or accurate.

**The ASBCA Decision**

17. On July 10, 2002, the ASBCA issued its Opinion and Decision ("the Opinion"), a copy of which is attached as Exhibit A. The Opinion first determined the contract price i.e., was the Air Force position that the Delivery Order was for four sites only correct. The ASBCA concluded that the Delivery Order was not "fixed-price" for four sites, but was a Delivery Order for 13 sites to which additional funds would be added.

18. In addition, the Opinion concluded that ISN was entitled to recover damages for the following types of losses: (i) For the volume discounts ISN lost as a result of the partial termination of the Delivery Order; (ii) For the continuing costs for the Sprint communication circuit leases; (iii) For the undelivered equipment which ISN was storing; (iv) For the additional major equipment markup. The Opinion also found that ISN was not entitled to Prompt Payment Act interest on two of its invoices.

19. The Opinion remanded to the parties the resolution of quantum on the four issues decided in ISN's favor as alleged in paragraph 18 herein.

**Another Partial Payment**

20. On August 2, 2002, ISN filed a CDA claim regarding the quantum portion of ISN's original certified CDA claim dated October 23, 1991 (which only addressed entitlement), ("the 2002 CDA Claim"). Pursuant to the 2002 CDA Claim, ISN requested that the cognizant contracting officer issue a decision as to the amount or quantum the defendant believed was due and owing ISN consistent with the Opinion. The 2002 CDA Claim covered both the four claims decided in ISN's favor in the Opinion as well as a new breach of contract claim.

21. After the submission of the 2002 CDA claim, ISN then invoiced the defendant in the amount of $1,664,879.07 consisting of the original amount of the claim of $1,383,111 (which included the costs on the four specific claims) plus calculated CDA interest.

22. The ISN invoice covered the costs claimed by ISN on the four specific claims which the Opinion remanded to the parties for the purpose of negotiating quantum. The invoice also included CDA interest due ISN.

23. Thereafter, the defendant paid ISN the full amount of the invoice. The payment was made pursuant to a bilateral modification which stated "Agreement for settlement of Information Systems and Networks Corporation to provide funds of $1,664,879 for ASBCA Case No. 90119." The settlement only related to the four claims set forth in the Opinion and did not address or include the 2002 CDA Claim.

24. The 2002 CDA claim was the first claim asserted by ISN on the breach of contract claim. The operative facts on the breach of contract claim are totally different from those on the original entitlement CDA claim. As a result, a separate and distinct claim from the original CDA claim exists.

25. The Case addressed only the defendant's liability for specific costs incurred under the Delivery Order. The Case did not address whether the termination of the Delivery Order was a breach of contract. Thus, the Case could not resolve the breach of contract issue and thus was not a final decision.

**COUNT I**

**(Loss of Profit on the Terminated Portion of the Delivery Order)**

26. ISN repeats and realleges paragraphs 1 through 25 of this Complaint as if fully set forth herein.

27. The Opinion decided that the Delivery Order was for 13 sites. As a result of the termination of the Delivery Order, ISN lost profit on the terminated portion of the Delivery Order. The defendant, in terminating the Delivery Order, breached its contract with ISN thereby preventing it from completing all 13 sites.

28. ISN incurred loss of profit on the terminated portion of the Delivery Order totaling at least $1,300,000.

29. ISN is entitled to judgment against the defendant in the sum of at least $1,300,000, excluding applicable CDA interest.

**COUNT II**

**(For Unabsorbed Overhead on the Terminated Portion of the Delivery Order)**

30. ISN repeats and realleges paragraphs 1 through 27 of this Complaint as if fully set forth herein.

31. As a result of the defendant's breach of the Delivery Order which prevented ISN from fully performing on the Delivery Order, ISN was required to reallocate overhead

which would have been absorbed from the revenue on the terminated portion of the Delivery Order to other contracts making those contracts less profitable to ISN.

32. The terminated portion of the Delivery Order would have absorbed at least $1,200,000 of ISN overhead

33. ISN is entitled to judgment against the defendant in the sum of at least $1,200,000, excluding applicable CDA interest.

**COUNT III**

**(For CDA Interest)**

34. ISN repeats and realleges paragraphs 1 through 31 of this Complaint as if fully set forth herein.

35. ISN is entitled to CDA interest on the amounts found to be due and owing under Count I of this Complaint from August 1, 2003, to when paid at the allowable CDA interest rate.

36. ISN seeks judgment against the defendant in the amount of CDA interest found to be due and owing until payment.

WHEREFORE, the premises considered, plaintiff, Information Systems and Networks Corporation, respectfully demands judgment against the defendant, United States, as follows:

A. On Count I, for judgment in the sum of at least $2,500,000.00;

B. On Count II, for judgment in the sum of at least $1,200,000;

C. For CDA interest on the amount found to be due and owing on Counts I and II until paid;

D. For such other and further relief as this Court may deem proper.

Dated: March 30, 2004

SINGER & ASSOCIATES, PC

NORMAN H. SINGER, ESQUIRE
10411 Motor City Drive
Suite 725
Bethesda, Maryland 20817
T. (301) 469-0400
F. (301) 469-0403

Counsel for the Plaintiff

VERIFICATION

I, Roma Malkani, under the penalty of perjury, hereby state the following:

1. I am the President and Chief Executive Officer of Plaintiff, Information Systems & Networks Corporation ("ISN"). I have served in that position since 1980.
2. I am familiar with ISN's books and records of accounts as well as its various contracts.
3. ISN's accounting department has calculated the amount of profit due ISN, as well as the unabsorbed overhead from the terminated portion of the Delivery Order.
4. The claims set forth in this Complaint are based upon ISN's supporting books and records and are accurate and complete to the best of my knowledge and belief. The amounts demanded in the Complaint accurately reflect a minimum estimate of the contract amounts due and owing ISN and to which the Government is liable.

Under the penalty of perjury
March 30, 2004

Roma Malkani
ROMA MALKANI

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Information Systems & Networks Corporation | ) | ASBCA No. 46119 |
| | ) | |
| Under Contract No. F49642-88-D-0054 | ) | |

APPEARANCE FOR THE APPELLANT: Norman H. Singer, Esq.
Singer & Associates, P.C.
Bethesda, MD

APPEARANCES FOR THE GOVERNMENT: COL Alexander W. Purdue, USAF
Chief Trial Attorney
Mark E. Landers, Esq.
Maria S. Kavouras, Esq.
Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE HARTMAN

The Department of the Air Force terminated for convenience "part" of a delivery order issued under appellant's indefinite quantity contract. The Air Force contends the delivery order terminated was for work at four sites at a "fixed price" of $3,400,378.95 (as modified) and that appellant is precluded from recovering costs exceeding that sum, less $158,315.00 for equipment the Air Force asserts was not delivered and $170,000.00 the Air Force asserts was added to the delivery order to preserve "end-of-year" funds and for which no work was to be performed. Appellant, in contrast, contends that the delivery order was for work at 13 sites, and was being funded incrementally. Appellant asserts that, due to the Air Force's reduction of work from 13 to 4 sites, it is entitled to recover its lost vendor volume discounts, expenses incurred for one-year leases of communication circuits, and other costs relating to the termination. Appellant additionally contends that, under the Prompt Payment Act (PPA), 31 U.S.C. §§ 3901-07, it is entitled to interest on two unpaid invoices for the terminated delivery order. While appellant asserts that the two invoices were not "disputed," the Air Force contends otherwise.

Appellant's appeal is from the Air Force Contracting Officer's deemed denial of its $1,383,110.93 certified claim and pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 605(c)(5). Only the issue of entitlement currently is before the Board.

FINDINGS OF FACT

The Contract

Effective 22 September 1988, the Air Force District of Washington (AFDW) entered into an indefinite-quantity contract, No. F49642-88-D-0054, with the Small Business Administration (SBA) for provision of "all labor, tools, supervision and other services necessary to design, install, certify and manage the integration of 7CG computers, computer system and networks including local and wide area networks at the 7CG Air Force Communications, Pentagon, Wash. DC., and other Air Force Departments in the Washington DC metropolitan area, **in accordance with . . . Statement of Work, dated 01 Sep 88.**" Simultaneously, pursuant to section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), the SBA entered into a contract, No. 3-88-1-2885, with appellant, Information Systems & Networks Corporation (ISN), for the performance of that work. We refer to these contracts collectively as the "contract." (R4, tab 1) (emphasis added)

The 1 September 1988 statement of work (SOW) appended to the parties' contract set forth "general requirements" to "install, test[,] and align a Communication Facility (CF) for the HQ U.S. Air Force," portions of which were "already installed and available as Government Furnished Equipment." The SOW divided the uninstalled cable plant into "segments," which were to be treated as separate deliverables and "considered optional at the Government's discretion." While the first paragraph of the SOW noted that "[t]he CF shall be used to provide voice communications, video and audio (voice) conferencing and data communications service to the HQ USAF," the SOW repeatedly provided that the contractor shall "complete the work according to the original specifications" for the CF. In sum, the SOW required ISN "to complete the inside CF cable plant" using "cable and components [which] shall be of the same type and brand used on the original HQ USAF CF Installation already in progress." (*Id.*)

The contract period was from date of award through 30 September 1989, unless the contract was terminated or extended by the Government's exercise of an option (R4, tab 1 at F-1, ¶ 1). Total contract duration was not to exceed 60 months (R4, tab 1 at I-9, ¶ 3).

The contract contained or incorporated various standard clauses, including Federal Acquisition Regulation (FAR) 52.232-1 PAYMENTS (APR 1984); 52.243-1 CHANGES - FIXED-PRICE (AUG 1987); 52.233-1 DISPUTES – ALT I (APR 1984); 52.249-2 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE CONTRACTS) (APR 1984); 52.232-25 PROMPT PAYMENT (FEB 1988); 52.216-18 ORDERING (APR 1984); and 52.216-22 INDEFINITE QUANTITY (APR 1984) (R4, tab 1 at H-9, I-2, I-3, I-5, I-14, I-15). The contract's Indefinite Quantity clause, FAR 52.216-22, provided that the contractor was to furnish to the Air Force, when ordered, "supplies or services specified

in the Schedule," up to a maximum of $800,000 per year, and that the Air Force was to order at least a minimum of $80,000 per year (R4, tab 1 at 1, and I-15, ¶ 17.(b)). The clause further provided that delivery and/or performance was to "be made only as authorized by orders issued in accordance with the Ordering clause," FAR 52.216-18, and any order which was issued during the effective period of the contract and not completed within that period shall be completed by the contractor within the time specified in the order. The Ordering clause, FAR 52.216-18, stated that the supplies or services to be furnished under the contract were to be ordered through delivery orders (DOs) issued by the individuals or activities "designated in the Schedule" and that DOs were subject to the terms of the contract, which would control in the event of a conflict with any DO (R4, tab 1 at I-14, ¶ 15.(a), (b)). The parties' contract provided that the Air Force would make payment to the contractor upon the receipt of a "proper invoice," as required by FAR 52.232-1, "for all services completed and accepted during the month" (R4, tab 1 at G-1, ¶ 3), and that invoices were to be submitted to a 7CG (Air Force) office at the Pentagon and paid by a different 7CG (Air Force) office within the Pentagon (R4, tab 1 at G-1, ¶ 3).

The contract listed unburdened direct labor rates for 15 labor categories and provided that, subject to a post-award audit by the Defense Contract Audit Agency (DCAA), the following cost elements would be applied to direct labor costs: fringe benefits (33.50%); on-site overhead (48.09%); general and administrative expenses (G&A) (11.10%); and profit (10%) (R4, tab 1 at B-1a). The listed rates were effective from date of contract award through 30 September 1989, with new rates to be negotiated for any extended contract period (*id.*).

On 15 September 1989, contracting officer (CO) Joanne Mohn executed unilateral Modification (Mod.) No. P00002 to the contract, effective 1 October 1989, exercising the Government's option to extend the contract's term through 30 September 1990 (R4, tab 1b). In September of 1990, she executed unilateral Mod. No. P00003, effective 1 October 1990, extending the term through 30 September 1991 (R4, tab 1c). Both Mod. Nos. P00002 and P00003 contained the standard AVAILABILITY OF FUNDS clause, FAR 52.232-18 (APR 1984), with respect to the option periods (R4, tabs 1b, 1c).

The IWAC Project -- Background

In September 1988, The Joint Chiefs of Staff (JCS or Joint Staff) entered into a "Memorandum of Agreement" with the Assistant Secretary of Defense (Comptroller) regarding funding for an Internetted Warfighting Analysis Capability (IWAC) project, which would link via a network the "commanders of the unified and specified commands to participate, real time," in wargaming and analysis, "build[ing] upon existing Modern Aids to Planning Program (MAPP) analysis capabilities" at each command (AR4, tab 3; tr. 2/93-94). The agreement contemplated that the IWAC project would be accomplished during Fiscal Year (FY) 1989, and require $6 million in operation and maintenance

(O&M) funds and $1.3 million in procurement funds. JCS was to provide part of the funding from MAPP procurement funds. The Comptroller was to provide most of the funding from O&M funds.

Gerard Krebs, a computer specialist and systems analyst who worked in the JCS Force Structure, Resource, and Assessment Directorate (J-8), was directed to find a contract vehicle whose scope could cover the IWAC project. Because Mr. Krebs lived near Andrews Air Force Base and had seen a sign at the base with an arrow pointing to a "contracting office," he visited AFDW's Contracting Office and met with one of its COs, Ms. Mohn. This was the first time Mr. Krebs had dealt with AFDW's Contracting Office and he did not believe that office had been involved in other JCS procurement projects. (AR4, tab 3 at 2; tr. 1/24-29, 76-78, 196-97)

After meeting several times to discuss the IWAC "concept" (tr. 1/27-28), on 9 March 1989, Mr. Krebs forwarded to CO Mohn a five-page IWAC SOW, which stated that the Joint Chiefs of Staff had an "urgent requirement" for a network "to facilitate the expeditious exchange of worldwide nuclear and conventional force structure, and warfighting capability information between the Commander in Chiefs (CINCs) and the Joint [Chiefs of] Staff" (SR4, tab 3, SOW at ¶ 6.a.). The SOW called for "providing VAX to VAX connectivity using 56kbs service and linking all sites for teleconferencing using commercial T1 service" from "AT&T and/or U.S. Sprint long haul communication lines" with "encryption devices to allow passage of classified data to the Top Secret level" (*id.* at ¶¶ 5.b., 8.b.). J-8 analytical computers were to serve as the "center hub" processor for "11 external nodes" (*id.* at ¶¶ 8.b., 9.a.). Design details for the network were to be a "contractor deliverable" (*id.* at ¶ 9.b.). Network acceptance was "subject to formal Joint Staff/J-8/TSD acceptance testing" (*id.* at ¶ 10). Half of the sites were to be installed and tested by September 1989, and be operational in October 1989. The remainder were to be installed and tested by February of 1990, and be operational in March of 1990. (*Id.* at ¶ 4) Three of the sites (plus the hub) were to be installed as "prototype" sites and be "accomplished as soon as possible" (*id.* at ¶¶ 8.b., 11.a.).[1]

AFDW's Contracting Office had ISN and INET, an ISN competitor that was also performing work in support of Air Force communication/networking needs under an 8(a) contract, give oral presentations to JCS concerning how each company would implement the IWAC SOW. JCS selected ISN. (*See* AR4, tab 29; tr. 6/104, 111, 203, 7/117-18)

On 3 April 1989, Michael Rogers, ISN's director of contracts (tr. 3/42), submitted to AFDW contract specialist Kenneth Carter (tr. 5/129) a 42-page technical and budgetary proposal based on the 9 March IWAC SOW and a 13-site network (R4, tab 3, 3a, 3b; tr. 5/139-40). ISN's "budgetary estimate" for the project was $6,454,053.78. Adding costs for 12 months of recurring communication circuit services, identified as "Option," the

estimate totaled $10,789,447.37. (R4, tab 3b at 2) ISN stated in the proposal that it "will design a network that will provide T1 connectivity between the eleven IWAC subscribers and J-8" (R4, tab 3a at 1, ¶ 1.1), and that "[n]etwork installation at the three designated prototype sites will be accomplished as soon as possible after an agreed upon network design" (*id.* at 8, ¶ 1.2.4).

Effective 6 April 1989, Mr. Rogers and CO Germaine Dillon, who worked under CO Mohn and was Mr. Carter's immediate supervisor (tr. 6/46, 120), executed bilateral Mod. No. P00001 to ISN's contract adding "The Joint Staff, Pentagon . . . ," to the Air Force locations set forth in the Schedule for performance of work (R4, tab 1a). AFDW's Contracting Office thereafter issued seven DOs under ISN's contract (DO Nos. 6001-6004, 6006-6008) for performance of IWAC work -- site surveys, training and other matters (*see* AR4, tab 95, attach. 1).

In a 14 April 1989 executive summary for J-8, Mr. Krebs noted that the IWAC project had a funding shortfall for FY89 and FY90 due, in part, to the fact "IWAC will achieve full 12 node operational capability in two fiscal years rather than three as was the original plan" (AR4, tab 6, ¶ 6.a.). An attachment to this executive summary stated that the ISN "[f]unding requirements are based on costs necessary to develop and implement a technical plan to accomplish phased internetting of 13 IWAC nodes with the Joint Staff analytical computers" (AR4, tab 6 at 4th typewritten page).

The Air Force contends in this appeal that negotiations occurred on 25 April 1989 between ISN and AFDW finalizing the price of an eighth IWAC DO, DO No. 6009. We do not, however, find the Air Force's evidence regarding the existence of such negotiations to be credible. The Air Force offers an undated Price Negotiation Memorandum (PNM), which was prepared and signed by Mr. Carter, and signed by CO Dillon (SR4, tab 5b; tr. 6/28). The PNM lists ISN's IWAC proposal as having been submitted on 28 March 1989 and a revised ISN proposal for $3,029,000.00 being submitted on 1 April 1989 ($1,046,357.13 labor + $1,982,642.87 material/equipment) (SR4 tab 5b at ¶¶ 1.a., 1.b.) There are no ISN proposals in the appeal record dated 28 March 1989 or 1 April 1989. As found above, ISN submitted its IWAC proposal on 3 April 1989. The PNM further lists the contractor's proposed amount, Government's objective, and amount negotiated for "Material/Equipment" all as "$1,982,642.87." The amount listed is identical to the amount ISN advised AFDW on 2 April 1990, almost a year later, was its "equipment" expenditures as of that date and, as found below, ISN's equipment markup (which was part of this amount) was not finalized by the parties until September 1989, more than four months after the alleged 25 April 1989 negotiation. Finally, while the PNM lists Steve Simons, Carl Neubecker, Mr. Krebs and Mr. Carter as participating in the 25 April 1989 negotiation, none of the individuals listed, with the exception of Mr. Carter, testified that the 25 April price negotiation actually occurred. Mr. Krebs, who was the CO's technical representative (COTR) for the IWAC project and

was responsible for validating ISN's invoices (tr. 1/26, 241), in addition to being IWAC project manager for the Joint Staff/J-8, could not recall the alleged negotiation or any discussion of a $3,029,000 price (tr. 1/156-58). Mr. Neubecker, a former ISN employee, testified that he had only an indefinite recollection of price negotiations with the Government prior to issuance of DO No. 6009. He stated that no ISN contract personnel were listed in the PNM as having attended the 25 April 1989 meeting, rendering it unlikely that a pricing agreement could have been concluded at that time. While Mr. Neubecker could not remember a specific time frame, he recalled generally that the Government deemed ISN's proposed costs to be too high and that ISN had worked to lower them, including adjusting its design and negotiating with vendors. Mr. Neubecker, who had been ISN's Video-Teleconferencing Division director, IWAC project manager, and official designated to "interface" with Mr. Krebs (tr. 4/8, 44), stated under oath that he did not engage in any direct negotiations with AFDW over terms and prices in ISN's 3 April proposal or negotiate a $3,029,000.00 DO price. (Tr. 4/38-42, 66-67, 124-26) Mr. Simons, an ISN telecommunications vice president who did not have final contracting authority (tr. 3/46-47, 233-34, 4/90), was deceased at the time of trial. While Mr. Carter initially testified that he negotiated DO No. 6009 on 25 April 1989 and the equipment markup was agreed to during those negotiations, he subsequently testified that the markup had been reduced later, with the negotiated DO amount simply remaining the same (tr. 5/159-160, 6/71-72).[2] It is clear from the foregoing, and from our findings of fact below, that DO No. 6009's terms and price were not finalized on 25 April 1989. We therefore find the undated PNM and Mr. Carter's testimony pertaining thereto to be not credible.

In an internal ISN memorandum dated 27 April 1989, Mr. Rogers reported that the "[DO] for JCS has not been issued" due to the SBA's and the CO's determination that "ISN's participation" must equal at least "50% of the total dollar value of the [DO]" or else AFDW had to get SBA's approval before issuing the DO (SR4, tab 13A at 1). He attached an SBA "Special Conditions" provision to that effect, noting the SBA planned to incorporate the provision into the parties' contract by modification and the Air Force CO intended to enforce that provision, regardless (*id.*). Mr. Rogers added that:

> Recently, the [CO] has expressed a willingness to issue the JCS [DO] promptly by reducing the amount of equipment to be ordered to achieve a 50/50 split between labor and equipment. That equipment removed from the [DO] will be provided as GFE.

(*Id.*) Mr. Rogers concluded that the basic contract was clearly a services contract as defined in FAR 37.101 ("'Service contract' means a contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task

rather than to furnish an end item of supply") and that ISN was satisfying the Limitations on Subcontracting FAR clause (under services contract, "[a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern") (R4, tab 1 at H-9, ¶ 24.(a)). He opined that "[i]f you consider only this FAR clause, the JCS [DO] can be issued without alteration of the required equipment" (SR4, tab 13A at 1). He suggested ISN challenge SBA's special provision or request a waiver; and prove to the CO that it was more beneficial to the Government "to proceed as we have proposed," *i.e.*, with ISN supplying all equipment (*id.* at 2).

In a 1 June 1989 executive summary for the Joint Staff, which attached J-8's 9 March 1989 SOW (tr. 1/159), Mr. Krebs stated that SBA and AFDW had approved "[t]he concept of allowing the IWAC effort to 'piggyback' off of the . . . [ISN] contract" (AR4, tab 7 at ¶ 4). He said that: ISN would "provide ADP [automated data processing] technical services in the performance of all task orders issued through AFDW by J-8 against the basic contract" (*id.* at ¶ 5); J-8 had to authorize equipment procurement on a case by case basis and, even though it had completed a preliminary network analysis and a composite equipment requirements list, the precise types or amounts of services to be ordered would be determined as the effort matured (*id.* at ¶¶ 5, 6); services were to be ordered by "negotiated [DOs] with specifically defined scopes of work, schedules for completion, technical requirements, criteria for deliverable products, and total price" (*id.* at ¶ 7); and the negotiated DO process would be followed "[f]or each J-8 requirement or segment of work" (*id.* at ¶ 8.a.; *see also* ¶ 8.b.). Mr. Krebs recommended J-8 "MIPR" (*i.e.*, issue a Military Interdepartmental Purchase Request for) $500,000 in O&M funds and $500,000 in procurement funds to AFDW "to begin FY89 network installation" and stated that additional MIPRs totaling about $2.25 million could be expected (*id.* at ¶ 9.a).

On 5 June 1989, the Department of Defense (DOD) Washington Headquarters Services Installation Accounting Branch prepared MIPR No. DJAM90061 to AFDW in the amount of $500,000, "for the services and purchase of equipment to accomplish an IWAC video conferencing network as stated in the attached SOW." The MIPR named Mr. Krebs as the point of contact. (R4, tab 19d at fourth page) The record copy of the MIPR does not include an SOW, but we infer it was J-8's 9 March 1989 SOW, which had been attached to Mr. Krebs' 1 June 1989 report. Also, on 5 June 1989, the same office prepared MIPR No. DJAM90062 to AFDW in the amount of $500,000, "for the services and purchases associated with an IWAC video conferencing network" (R4, tab 19d at fifth page). The same month, by memorandum dated 23 June 1989, J-8's Deputy Director, Brig. Gen. John Robinson, approved an attached, undated, IWAC Mission Need Statement which estimated O&M and procurement costs for 12 nodes at $3,716,000 for FY 89, $2,866,000 for FY 1990, and $3,817,000 for FY 91, for a total of $10,399,000 (AR4, tab 32 at 14, 18).

By letter dated 1 August 1989 to Mr. Carter, Mr. Rogers submitted invoice No. 1218-04-001, in the total amount of $9,328.49, covering expenses for two IWAC site surveys, SPACECOM (Colorado) and EUCOM (Germany), said to have been done at Mr. Krebs' request (R4, tab 61b). On 4 August 1989, Mr. Krebs provided an IWAC "update" to J-8, noting that: eight site surveys had been completed; "[c]ompetitive bids for hardware procurement and T-1 circuits [had] been accomplished;" U.S. Sprint had been selected as the domestic circuit carrier; and "[w]e begin hardware installation and site connectivity in September 89" (AR4, tab 12 at ¶ 2). Attached to this "update" was a schedule of telephonic connectivity dates for 13 sites, with J-8, CENTCOM, SAC and TRANSCOM to be completed by 4 December 1989, and the remainder to be completed by November 1990 (*id.* at attach. 2).

By letter dated 9 August 1989, Mr. Rogers sent Mr. Carter a 16-page "Bill of Materials" (including two summary sheets) containing equipment price quotes for a 13-site network, which included a 21.1% markup for ISN (11.1% G&A; 10% fee) and no U.S. Sprint charges (R4, tabs 19b, 19b-1). Mr. Rogers stated in his cover letter that, by having ISN purchase this equipment, the Government "will have a single point of procurement which will avoid potential conflicts between Vendor and Contractor with regards to performance responsibility, especially during a network outage," but ISN will "work with any vendor that the Government has qualified to supply equipment." (R4, tab 19b)

At least two of ISN's equipment quotes were based on volume discounts. For example, ISN priced the Rembrandt Video Codec System (codec), which was sold by Compression Labs Incorporated (CLI), and said by ISN to be the "[s]ingle most important piece of equipment to the video teleconferencing suites," at $47,450.00 per unit, plus ISN's markup (R4, tab 19b-1 at 3). ISN stated that 26 codecs were required at a total cost of $1,507,704.70 and noted that, if five codecs were purchased with a commitment for 26 in 12 months, the $47,450.00 unit price would remain the same for all (*id.*) since CLI had offered pricing based on volume discounts (AR4, tab 10). Similarly, ISN's $53,520 unit price quote for Spartan Video Modules sold by Videoconferencing Systems, Inc. (VSI) (R4, tab 19b-1 at 7) varied based on volume discounts (AR4, tab 11).

On 23 August 1989, Mr. Krebs sent to Mr. Neubecker an "IWAC Connectivity Dates" schedule covering 13 sites, which indicated that it also had been distributed to U.S. Sprint and AFDW. The schedule set forth connectivity dates for J-8, CENTCOM, SAC and TRANSCOM in October, November and December of 1989. Five sites had connectivity dates during 1990 and four sites had connectivity dates to be "determined" at a future date. (AR4, tab 15)

Also, on 23 August 1989, DataBeam Corporation (DataBeam), a vendor that had not been included in Mr. Rogers' 9 August 1989 Bill of Materials, sent Mr. Neubecker a

quotation for 12 full color high resolution graphics systems and a 19.2 Kbps data bridge (19.2 bridge) necessary for multipoint conferences. DataBeam offered to discount its unit price for the graphics system from $51,950.00 to $39,740.00 if ISN purchased 12 systems because ISN was deemed to be a distributor or integrator. (AR4, tab 115; SR4, tab 15A; tr. 1/115-17)

In a 25 August 1989 memorandum to the AFDW Contracting Office, which was to the attention of Mr. Carter and executed by Mr. Krebs as "Joint Staff/J-8/CSD IWAC Program Manager," Mr. Krebs stated:

> 1. In order to provide the turn-key network integration for the IWAC program, I request that . . . [ISN] procure the hardware components necessary to implement the IWAC network.
>
> 2. As you are aware, the IWAC network installation is incremented by site. Equipment costs for the first full increment should be based on total purchase quantity. Attachment 1 is the equipment order list. Prices for the hardware components are achieved by combining the cost of the item as indicated in attachment 2, plus the negotiated markup agreed to at the 24 August meeting between you and Michael Rogers of ISN. [3]

(AR4, tab 17) Two documents were appended to Mr. Krebs' memorandum. The first was a one-page list entitled IWAC Hardware Component Requirements, which set forth an "Initial Quantity" based on 4 sites and a "Total Quantity" based on 13 sites for 12 items of hardware, including DataBeam's graphics system and data bridge (*id.*). The second was an ISN 10-page Bill of Materials, plus a VSI pricing sheet. This Bill of Materials differed from the one submitted 9 August 1989 by, among other things, including the DataBeam equipment and Motorola, Inc. encryption devices. (*Id.*) The revised materials bill continued to include CLI's and VSI's equipment and discounted prices (AR4, tab 17 at attach. 2). The prices set forth for Motorola's security devices also included volume discounts (AR4, tab 8 at 3).

On 6 September 1989, DOD's Washington Headquarters Services Installation Accounting Branch issued MIPR No. DJAM90078 to AFDW's Contracting Office, in the separately appropriated amounts of $719,053.05 and $1,388,946.95, for a total amount of $2,108,000.00 (R4, tab 19d at 6). The MIPR stated:

> Funds are for services and purchase of equipment to accomplish an IWAC video conferencing network that will

> provide the technical baseline to enhance CINC participation in the detailed supporting analysis of the joint strategic planning process as stated in the attached SOW.

(*Id.*) The attached SOW was a one-page document labeled "DJAM0078 SOW," which provided:

> Internetted Warfighting Capability (IWAC) connectivity solution.
>
> 1. Provide the services and the network and video teleconferencing hardware components to accomplish an IWAC video conferencing network that will provide the technical baseline to enhance CINC participation in the detailed supporting analysis of the joint strategic planning process.
>
> 2. The technical plan calls for linking all sites for teleconferencing using commercial T1 service. The IWAC network architecture will consist of a fundamentally designed hub/spoke network concept using U.S. Sprint long haul communication lines. The result of this capability would provide a secured, sophisticated video conferencing network dedicated exclusively to IWAC. J-8 analytical computers will serve as the center hub processor. External node connectivity planned for FY89 initial testing of the networking and analytical prototypes are J-8, CENTCOM, TRANSCOM, and SAC.
>
> 3. The following describes specific required capabilities of the proposed IWAC network:
>
> a. High-speed digital data and text transmission.
>
> b. Electronic mail and TELEFAX capability
>
> c. Voice communications and multipoint video teleconferencing using a rollabout system containing two 35 inch video monitors that can be used in a conference room environment. One monitor can simultaneously display all subscribers on the network. The second monitor can focus on a single individual, map, etc.

(R4, tab 19d at 7)

Also on 6 September 1989, ISN's Manager of Contract Administration, Karen Hendricks, and another ISN employee, Tony Palazzo, met with Mr. Carter and discussed hardware pricing. In a 6 September 1989 memorandum of record to Mr. Rogers reporting on this meeting and another meeting later that day with CO Mohn, Ms. Hendricks stated:

> 1. JCS-IWAC hardware pricing: We proposed equip. at cost + 11.1% G&A and 10% fee. Ulanta (EDS/TRW) have a bid almost identical to ours at raw cost and a much lower markup. Their ADP contract is mandatory for USAF. USAF cannot justify giving us the award at the markup of 21.1%. Ken agreed to 11.1% G&A (if we send him letter justifying application of G&A to materials by COB tomorrow . . . ) and 4.9% fee (total markup 16%) but he had to run it by Joanne Mohn. After I left, Tony & Ken met with Joanne. Her absolute bottom line offer is 12% markup (11.1% G&A, .9% fee). . . . The letter on G&A is still needed. Please sign it.
>
> . . . .
>
> 3. Ken needs to know balance of funding left on the NTE orders for JCS, plus the value of the 3 FFP orders for JCS. This total, subtracted from his MIPR'd funds, will let him know how much $ he has and how much more he needs. He's looking at 5.5M in awards to ISN for JCS for FY 90. . . .

(AR4, tab 104) (emphasis in original) The following day, on 7 September 1989, Mr. Rogers advised Mr. Carter by letter that ISN's 11.1% G&A markup upon its IWAC equipment prices was the same as that it applied to similar bids and proposals, and in accord with its DCAA and DCASMA approved accounting system. (R4, tab 19c)

While CO Mohn was aware that, as an ADP industry integrator, ISN was more likely than the Government to be able to secure discounted pricing when purchasing equipment, she found ISN's proposed 21.1% equipment markup to be high compared to that of other ADP integrators, which she recalled was about 5%. Because ISN was an 8(a) contractor, however, she was willing to agree to a markup of 12%, but no more. (Tr. 6/115-18, 133, 135-36, 7/66-68)

In a letter dated 13 September 1989, Mr. Rogers notified Mr. Carter that he was "confirm[ing] [ISN's] acceptance of the twelve percent (12%) handling charge as

previously expressed by our president, Roma Malkani, last week at your location" and submitting "revised pricing which reflects this agreement." He attached to the letter a revised, 12-page "Bill of Materials," which reflected the reduced markup for 10 items of equipment and contained 2 summary sheets with total and "initial quantity" price quotes. The total quantity price quote was $4,796,709.12. The "initial quantity" price quote was $1,505,326.42. (AR4, tab 103)

The next day, on 14 September 1989, Mr. Krebs issued to ISN, with a copy to AFDW, an "[IWAC] Letter of Intent," which he signed as "IWAC Program Manager Joint Staff/J-8/TSD." The letter of intent was almost identical to the memorandum he sent to AFDW on 25 August 1989, except it specifically referenced 13 sites and contained modified "costing" instructions, as follows:

> 1. In order to provide turn-key network integration for the IWAC program, I request that [ISN] procure the hardware components necessary to implement **a 13 site** IWAC video teleconferencing/telecommunications network.
>
> 2. As you are aware, the IWAC network installation is incremented by site. **Communication hardware and video conferencing equipment costs for each increment should be based on total purchase quantity for 13 sites.**
>
> 3. Attachment 1 is the equipment order list. **Prices for the hardware components should not vary from the costs provided by you to J-8 and the [AFDW] Contracting Office.**

(*Compare* AR4, tab 17 *with* R4, tab 9) (emphasis added) Attachment 1 to the letter of intent was a 14 September 1989 IWAC Hardware Components Requirement list, which showed "initial" quantities for 4 sites and "total" quantities for 13 sites of 13 items of hardware (*see* R4, tabs 9, 19, 19e; tr. 4/29). Mr. Krebs issued this letter of intent, after coordinating with his supervisor and Mr. Carter, because: (1) Mr. Neubecker had asked him to furnish a written statement that the Government was procuring equipment for 13 sites, which Mr. Neubecker could show to vendors to ensure ISN retained the quantity discount pricing it previously had obtained; and (2) he thought such a letter might expedite delivery of IWAC project equipment (tr. 1/229-31, 236-37, 4/26-29).

Issuance of DO No. 6009

The same day that Mr. Krebs sent his letter of intent, 14 September 1989, AFDW unilaterally issued to ISN DO No. 6009 prepared by Mr. Carter and signed by CO Dillon.

The parties agree on the appearance of the first page of the DO, which sets forth an amount of $3,029,000, does not identify the DO as "fixed price" or otherwise characterize the nature of the DO, states that invoices should be sent to AFDW's Accounting and Finance Office (which will make payment upon the invoices), provides "See Attached Schedule(s) Items: 1" with respect to "Schedule of Supplies/Services," and specifies delivery is to be made by 30 September 1990. (AR4, tab 63 at 1; SR4, tab 5A at 1; tr. 6/28) The parties, however, disagree as to the composition of the remainder of the DO.

The Government has advanced two versions of DO No. 6009 during the course of this appeal, each including the same second page, but with different attachments. The version it placed in the Rule 4 file (R4, tab 10) attaches a copy of J-8's 9 March 1989 five-page IWAC SOW. The Government, principally through Mr. Carter (tr. 6/32-36), now claims the version of the DO in its supplemental Rule 4 file (SR4, tab 5A), which contains two attachments, is the correct DO (tr. 6/32; Gov't br. at 16, proposed findings 24, 25). The first attachment to this DO is the one-page IWAC hardware component requirements list, plus cover sheet, that was attachment 1 to Mr. Krebs' 25 August 1989 memorandum to AFDW (*compare* SR4, tab 5A at 3 *with* AR4, tab 17). Mr. Krebs testified that the "Attachment 1" designation on the cover sheet is in his handwriting and that it was part of his AFDW memorandum, but in his opinion was not a part of the DO, although he does not specifically recall the DO's appearance (tr. 2/177-78). Mr. Carter also testified at trial that the cover sheet was not a part of the DO (tr. 6/32-33). The second attachment to this DO is the one-page SOW appended to MIPR No. DJAM90078 issued 6 September 1989 (*compare* SR4, tab 5A at 2, 5 *with* R4, tab 19d at 7). Mr. Carter testified that he prepared the DO. His only explanation, however, for the DO's first page referencing only one attachment was that he automatically sends a second copy of the DO statement of work to the contractor even though the contractor already possesses a copy of that statement from preparing its proposal and that he must have made a typographical error during the end of the fiscal year rush in noting only one attachment. (Tr. 6/31-37) There is no evidence in the record that ISN saw attachment two (the one-page September 1989 MIPR SOW) before submitting its April 1989 IWAC proposal or, in fact, ever saw that SOW before issuance of DO No. 6009 on 15 September 1989.

The second pages of the Government's two versions of DO No. 6009 both list the DO's amount as $3,029,000.00 and state:

> CONTRACTOR TO PROVIDE SERVICES, LABOR, TOOLS, MATERIALS, PERSONNEL AND EQUIPMENT TO SUCCESSFULLY IMPLEMENT THE NETWORK AND VIDEO TELECONFERENCING HARDWARE COMPONENTS TO ACCOMPOLISH [sic] AND [sic] IWAC VIDEO CONFERENCING NETWORK THAT WILL PRVOIDE [sic] THE TECHNICAL BASELINE TO

> ENHANCE CINC PARTICIPATION IN THE DETAILED SUPPORTING ANALYSIS OF THE JOINT STRATEGIC PLANNING PROCESS **FOR THE FOLLOWING SITES JCS/J8, CENTCOM, TRANSCOM AND SAC.** SEE ATTACHMENT (1) FOR EQUIPMENT.

(R4, tab 10 at 2; SR4, tab 5A at 2) (emphasis added) The second pages additionally list Mr. Krebs as "POINT OF CONTACT" and contain accounting and appropriation data, which is typed in the computer-generated format known as BCAS (tr. 6/63) and matches typing on the remainder of the second page and on page one of the DO (R4, tab 10; SR4, tab 5A at 2).

ISN, through Ms. Hendricks, contends that the version of DO No. 6009 contained in appellant's Rule 4 file supplement (AR4, tab 63), is the DO ISN received (tr. 3/69-70; app. br. at 19, proposed finding 45). The second page of ISN's DO lists the DO amount as $3,029,000 and the "point of contact" as Mr. Krebs, but does not mention the four sites which are set forth on the second pages of the Government's DOs. Instead, ISN's second page provides, in BCAS format, as follows:

> CONTRACTOR TO PROVIDE EQUIPMENT, LABOR, TOOLS, MATERIALS, SUPPLIES, SERVICES AND PERSONNEL TO SUCCESSFULLY IMPLEMENT THE NETWORK AND VIDEO TELECONFERENCING HARDWARE COMPONENTS TO ACCOMPOLISH [sic] AN IWAC VIDEO CONFERENCING NETWORK THAT WILL PROVIDE THE TECHNICAL BASELINE TO ENHANCE CINC PARTICIPATION IN THE DETAILED SUPPORTING ANALYSIS OF THE JOINT STRATEGIC PLANNING PROCESS. SEE ATTACHMENT (1) FOR EQUIPMENT LIST.

ISN's second page also contains the same accounting and appropriation data listed on the Government's second pages, but that data is set forth in typeface, rather than in the BCAS format. (AR4, tab 63 at 2)

ISN's DO No. 6009 has only one attachment, a nine-page document labeled with the contract number, the DO number, and the designation "Attachment (1)." It is entitled "Equipment List" and each page bears the heading "[IWAC] Bill of Materials." (AR4, tab 63) Apart from the labeling, title, numbering of the pages, and the fact that there are no summary sheets, the document is the same as the Bill of Materials submitted by Mr. Rogers on 13 September 1989, minus its last page. We attribute the omission of the last page to a copying error because, when Ms. Hendricks sent AFDW a copy of ISN's

DO No. 6009 on 25 April 1990, the "Attachment (1)" Equipment List was the same as that contained in appellant's Rule 4, tab 63, except it included the missing last page, *i.e.*, was 10 pages in length (*see* R4, tab 19d). We find that the 10-page Equipment List was, in fact, "Attachment (1)" to ISN's DO No. 6009.

The Government points to the typewritten accounting and appropriation data on page two of ISN's DO No. 6009 as evidence that AFDW did not generate that page. ISN counters that page two of Mod. No. 03 to DO No. 6009, which contains accounting and appropriation data, also was typewritten (SR4, tab 8A). The Government suggests the existence of typewriting on this DO modification should be given no weight because the modification was a "correction" of a prior modification and did not obligate funding (tr. 6/198-99). We note, however, that Mod. No. 04 to DO No. 6009 (below), which added $220,000 to the DO, also contains accounting and appropriation data which clearly was not in the BCAS format and appears to have been typewritten (R4, tab 10d at 2). Thus, the Government's contentions concerning BCAS do not persuade us that the second page of ISN's DO was not generated by AFDW. After evaluating the testimony, in light of the chronological course of events, which we elaborate upon below, we find that ISN's DO No. 6009 is the correct one.

<u>DO No. 6009 -- Performance</u>

ISN received DO No. 6009 on or about the date it was issued. At or about the same time, it received copies of each of the June 1989 MIPRs and of the 6 September 1989 MIPRs identified above. The MIPRs totaled $3,108,000, exceeding the $3,029,000 stated amount of the DO. (*See* R4, tabs 19, 19(d); tr. 3/74)

Upon receipt of DO No. 6009, Ms. Hendricks called Mr. Carter to register her concern that the order, which was issued for $3,029,000, had an equipment list attached with a value of $4,796,709.12. While the equipment list was for 13 sites, Mr. Carter indicated that the order was only for the initial sites and that JCS would be adding more money for the additional equipment. Mr. Carter advised that the price stated on the DO was "just -- the money for the first four sites to get started with." Essentially, when Ms. Hendricks expressed concern about how ISN was to know what work it was to perform, Mr. Carter said:

> [C]ontinue to do this work the way that you've done the other work for JCS. You can bill at the rates that are in the contract and, you know, you'll be paid for your work, . . . they've got lots of money, they'll put more money on it.

Ms. Hendricks did not understand how she was to set up DO No. 6009 for purposes of ISN's contracting and accounting records. She had no ISN proposal to perform work

which corresponded with the $3,029,000 amount set forth on the DO and the $3,029,000 amount set forth did not correspond with the 13-site equipment list appended to the DO. Ms. Hendricks, therefore, brought the DO to the attention of ISN's president. (R4, tab 19 at 2; tr. 3/44-45, 69-72, 77, 100, 108, 110-13, 228-31)

Because there were discussions that ISN should send a letter to AFDW concerning DO No. 6009, Mr. Neubecker sent Ms. Hendricks a memorandum on 20 September 1989 stating, among other things, that:

> After discussions with our staff and the COTR, I want to make sure that we send to Ken Carter a letter that he can concur with.
>
> "It is understood that task 6009 of contract No. F4964288D0054 effective September 14, 1989 is for the initial installations at J-8, CENTCOM, TRANSCOM and SAC, along with the network HUB at the Pentagon.
>
> The services will include U.S. SPRINT circuits for these initial installations, labor, travel, per diem and other direct costs associated with the installation of the initial sites and labor, travel, per diem and other direct costs for site visits or site surveys to SAC, TRANSCOM, RACCOM, HQ ROK, and SOCOM.
>
> The equipment will include VTC and network equipment, test equipment and installation equipment required to support the initial IWAC network installation. The VTC and network equipment is as requested by the letter dated 14 September 1989 from Mr. Krebs".

(SR4, tab 13B) On 21 September 1989, Ms. Hendricks responded to Mr. Neubecker's 20 September memorandum as follows:

> I am waiting for a call back from Joanne Mohn. I need to advise her (1) of the probable overextension of currently MIPR'd funding on 6009, and (2) of the understanding that 6009 is for "initial installations at J-8, etc." as per your memo of 9/20.
>
> As soon as I have clarified these points with her I will set up 6009, provided that you give me a breakdown of the

total estimated cost (labor, materials, comm. circuits, travel, and misc. ODC's [other direct costs]) for performing these initial installations. . . . This information is essential for setting the project up in Jamis and for establishing the labor and ODC budgets (so that you can begin ordering the equipment).

I advised both you and Steve Simons on 9/18, and again on 9/20, that I needed this information. . . . [T]he format must include:

1. Total estimated labor, broken down by category, hours, and fully burdened contractual rates.
2. Total equipment (items subject to the 12% handling charge) broken down by item, quantity, and burdened unit price.
3. Communications Services (dedicated SPRINT circuits) burdened at 11.1% G&A and 10% fee.
4. Travel (TDY & local) burdened at 11.1% G&A and 10% fee.
5. Miscellaneous ODC's – tools, supplies, rental of test equipment, materials (other than equipment items cited in (2) above) burdened at 11.1% G&A & 10% fee.

. . . .

You are reminded that in any event, the total estimated cost of all sites should not exceed $3,001,050.46, which (according to my calculations) is the actual remaining available MIPR'd funding for D.O. 6009.

If you cannot provide me with the detailed breakdown required for ISN budgetary management purposes in a timely fashion, I recommend that you "ballpark" the figures for each of the cost categories above and obtain [ISN's president's] written authorization to use the rough figures to set up the job . . . . [I]f I am consulted on the advisability of risk approval, I will recommend against it. The budget figures must be determined at project onset, and this particular project has a history of being overtaken by events.

(SR4, tab 13C) (emphasis in original)

On 21 September 1989, Mr. Neubecker advised CLI by letter that "ISN intends to purchase 26 of the Rembrandt T-1 codecs from your company over the next year, based on the enclosed letter from The Joint Chiefs" and "[p]lease make sure the price per unit remains the same during the next year as stated in your proposal" (R4, tab 11). The enclosed letter referenced was Mr. Krebs' 14 September 1989 letter of intent (*see* tr. 4/125-28). Mr. Neubecker sent similar letters to DataBeam, VSI, and U.S. Sprint that day or the next day (SR4, tabs 15B, 17B, 19A). DataBeam responded on 25 September 1989 with the quote it had supplied in August 1989, stating that quantity discounts had been provided based upon a purchase of 13 units during a year's period and, if the actual quantity was less, a pricing adjustment would be required. (SR4, tab 15C; tr. 1/117-22)

On 25 September 1989, Ms. Hendricks informed Mr. Carter that, based on the MIPRs and work performed by ISN to date for JCS, there was not $3,029,000.00 in funding remaining for DO No. 6009. Mr. Carter replied that he knew he did not have that much funding remaining and that AFDW would add more funding. He added that JCS has "lots of money," "they're going to put more money on it as [ISN] need[s] it," and she should not "worry about it." (Tr. 3/72-75; AR4, tab 102)

The same day, 25 September 1989, Mr. Carter sent Ms. Hendricks by facsimile a revised "14 September 1989" IWAC Hardware Component Requirements List. This list differed from that attached to Mr. Krebs' letter of intent by omitting 1 item of hardware and setting forth varying "initial" and "total" quantities for several of the 12 remaining hardware items. (*Compare* R4, tab 19f *with* R4, tabs 9, 19, 19e)

On 27 September 1989, Ms. Hendricks prepared a contracts information sheet (CIS), with the notation that its "Special Provisions" were approved by ISN's president that date (SR4, tab 20C; tr. 3/171-73). On the CIS, Ms. Hendricks identified DO No. 6009 as covering four sites and funded in the amount of $3,029,000.00 (SR4, tab 13D at 26-27). She noted that "[m]ajor equipment" was to be billed at cost plus 12% handling charge (treated internally as 11.1% G&A and 0.9% fee) and that "[c]ommunication lines, supplies, and miscellaneous ODCS" were to be "invoiced at cost plus 11.1% G&A, and 10% fee <u>on top</u> of G&A" (*id.* at 27) (emphasis in original). Under "Special Provisions," Ms. Hendricks wrote:

> 1. This is a fully-funded firm-fixed-price [DO] which according to discussion with AFDW Contracts is considered partial funding for the overall JCS/IWAC VTC project. The current funding of $3,029,000 is verbally understood to cover VTC installation at four (4) sites, which ISN has priced internally at $2,970,498. The

> burdened budget figures and PM contract ODC budgets shown in the Billing Instructions above are for the four initial sites . . . . The delta between the total burdened budget and the D.O. value is to be allocated to cost addressed in Note 2, following.
>
> 2. According to AFDW Contracts, funding on this order also applies to labor and travel costs incurred in support of JCS prior to 9/14/89, where such costs exceed the amounts funded on previously issued JCS orders. . . .
>
> . . . .
>
> 3. To minimize the substantial risk involved with ambiguous/changing requirements and "verbal understandings" under a FFP order, <u>ISN must put AFDW contracts on formal notice as to exactly what we intend to provide for the fixed price of $3,029,000</u>. This is to be done by letter to Ken Carter from ISN contracts . . . .
>
> This letter must include an itemized list of the major equipment subject to a 12% handling charge. . . .
>
> In the event that the baseline price for the four initial sites, adjusted for the value of transfers from other JCS tasks, comes to <u>less</u> than the $3,029,000 funded for D.O. 6009, we will recommended [sic] that the balance be applied to changes and additions to the baseline as defined in our letter. If the adjusted total price exceeds the $3,029,000 funded, we must advise AFDW of the shortfall.

(*Id.* at 28-29) (emphasis in original)

Ms. Hendricks never sent to AFDW a letter describing what work ISN would perform for $3,029,000.00. Ms. Hendricks testified during trial that generation of the letter was overtaken by events, *i.e.*, "work was going pretty smoothly," "everybody was happy," "nobody seemed to be upset," and she had become "uncomfortable with the risk" of sending a letter that might upset the Government (tr. 3/239-40). Ms. Hendricks added during trial that, having "a beautiful piece of work like this in ISN's statement of credentials" was of importance to ISN, a company graduating from the 8(a) program, because it would provide the company "an entree to commercial work" (tr. 3/221). She explained that this was "the Joint Chiefs, we jump when the Joint Chiefs say jump," and

"AFDW even more so than ISN is going to jump when the Joint Chiefs say jump" (tr. 3/266).

On 28 September 1989, DOD's Washington Headquarters Services Installation Accounting Branch issued MIPR No. DJAM90084 to AFDW's Contracting Office in the amount of $170,000.00. The MIPR stated that "[f]unds are provided for the services and purchase of equipment to accomplish an IWAC video conferencing network as stated in the attached SOW." (SR4, tab 6C) The record copy of the MIPR does not include any SOW.

The record does contain an undated "Pricing Memorandum," signed by Mr. Carter and CO Dillon, stating that the purpose of an AFDW "negotiation" on an unspecified date with unspecified individuals was to add additional funds for IWAC services and, based on the negotiations and a Technical Evaluation by JCS/J-8, "[a]dditional funds in the amount of $170,000.00 is determined to be fair and reasonable" (SR4, tab 6B at 3-4). The pricing memorandum references an ISN "proposal" for "$170,000.00 Additional Funds," which was "submitted by ISN on 28 March 1989," "forwarded to the using activity for Technical Evaluation on *23 March 1990,*" and "found technically acceptable" on 17 April 1989 (*id.*) (emphasis added). However, there is no such proposal or evaluation in the record. We find that the pricing memorandum does not report an actual negotiated transaction (*see* tr. 7/184-88).

On 30 September 1989, AFDW issued unilaterally Mod. No. 01 to DO No. 6009 signed by CO Dillon. The modification did not alter or change the supplies and services ISN was to furnish under the DO, but stated simply:

> TOTAL PRICE OF DELIVERY ORDER INCREASED BY $170,000.00. CHANGE TOTAL PRICE OF DELIVERY ORDER TO READ $3,186,397.55.

(SR4, tab 6A)

Mod. No. 01 listed five funding cites, four as before and a new cite -- DJAM90084. Unlike DO No. 6009, the funding cites listed included dollar designations. These dollar designations, however, did not correspond to the MIPRs given ISN. The modification stated that the amount of funding allocable to MIPR Nos. DJAM90061 and DJAM90062 was not $500,000 each, as reflected in the MIPRs provided ISN, but was $485,588.00 and $422,809.55, respectively. The total funding set forth, including MIPR No. DJAM90084 for $170,000.00, was now $3,186,397.55, as reflected on Mod. No. 1. (*Id.*)

On 19 October 1989, AFDW unilaterally issued Mod. No. 02 to DO No. 6009. The modification, signed by CO Charles Thompson, did not alter the DO's price, but simply added a DOD security classification form. (R4, tab 10b)

In a memorandum to Mr. Neubecker dated 27 November 1989, Mr. Krebs confirmed the scheduling of a meeting for 4 December 1989, wherein ISN was to "provide specific accountability for the actual IWAC expenses, to date," which were deemed "necessary for additional site installation planning" (AR4, tab 24, ¶ 2) (emphasis in original). Mr. Krebs stated in this memorandum that the parties needed to: resolve connectivity issues concerning Hawaii, Germany, Korea and Panama; schedule site visits to Hawaii, Korea and Panama; and, "[f]or the purpose of this meeting, . . . finalize an IWAC site installation schedule" (*id.* at ¶¶ 3, 6, 7).[4]

An internal ISN contract summary prepared for the month of November 1989 indicated that the current funding level for DO No. 6009 was $3,029,000 and that ISN had expended $2,058,918 to date (AR4, tab 111 at 1). The "project description" for the summary stated that: "JCS/IWAC is a FFP contract that is incrementally funded by the customer as needed;" "[w]e are presently funded to design and install a VTC Hub at the Pentagon and three remote sites;" "present funding is $3,029,000 minus $58,552 which was set aside to cover any cost overruns in previous tasks;" "[t]here are approximately nine more remote sites to be designed and installed along with expansion at the Hub to accept the additional sites;" the extra sites are "scheduled for completion in FY90;"and "the cost projection for the additional sites is approximately $11,000,000" (*id.* at 2). Among the attachments to the summary was a listing of accomplishments, which stated that ISN had provided "VTC capability between PENTAGON J-8 and CENTCOM, FL, in order to provide a demonstration of the system to the JCS," and a document prepared by Mr. Neubecker entitled "JCS/IWAC Schedule 12-4-89," which contained site survey and installation dates for 11 sites, other than the Pentagon hub and CENTCOM (*id.* at 3-4; *see* tr. 4/67-69).

On or about 20 December 1989, ISN submitted invoice No. 1218-6009-001 (invoice 001) dated 20 December 1989 to AFDW in the amount of $2,054,738.28, for "JCS/IWAC VTC Installations (4 Sites)," for the period "Initial to 11/30/89" (AR4, tab 57). ISN's invoice 001 contained (*id.* at 3, 4, 6) its internal charge numbers for "equipment+handling cost only" (01218-6009-002) (002 equipment) and "miscellaneous ODCs only" (01218-6009-003) (Misc. ODCs). A "Requisition List" included with ISN's invoice lists 16 requisitions of 002 equipment totaling $1,593,648.20, plus a 12% markup, for a grand total of $1,784,885.98 (*id.* at 6-7). The list included 43 requisitions of Misc. ODCs totaling $198,105.27, plus 21.1% markup (11.1% G&A and 10% fee), for a grand total of $242,104.45 (*id.*). ISN, however, only billed $1,743,932.00 under the 002 equipment portion of the invoice and $68,836.85 under the Misc. ODC portion (*id.* at 3,

4). On dates not specified in the record, Mr. Krebs validated invoice 001, DCAA approved it for provisional payment (subject to later audit), and AFDW paid ISN (*id.* at 1; *see* AR4, tab 78 at 1).

On 19 January 1990, Mr. Krebs validated ISN's previous invoice No. 1218-04-001 dated 1 August 1989, for IWAC site survey expenses of $9,328.49 incurred prior to the issuance of DO No. 6009 (R4, tab 61c). On 8 February 1990, AFDW's Accounting and Finance Office returned the invoice to ISN because no DO number had been referenced and it could not identify the appropriate payment account (R4, tabs 61, 61b at last page). On 12 February 1990, Mr. Carter advised Ms. Hendricks to identify the invoice as one for DO No. 6009 (R4, tab 61e). On 13 February 1990, she returned the invoice, so marked (R4, tab 61d), and directed ISN personnel to transfer the costs internally to DO No. 6009 (R4, tab 61e). The invoice was paid, with "interest," in the amount of $9,414.53 on 2 April 1990 (R4, tab 61 at 2, tab 61f).

Beginning at least in early February 1990, the Comptroller, J-6 (the Joint Staff's Command Control and Communications Directorate (tr. 1/253)), J-8 and the Defense Communications Agency (DCA) (which, by the time of trial had become the Defense Information Services Agency (tr. 6/153)) were reviewing IWAC implementation and funding issues. One option being considered was having DCA be responsible for the communication circuits. (AR4, tab 50 at 1; tr. 2/54-56, 6/153)

On 23 February 1990, Mr. Neubecker advised both Mr. Krebs and Mr. Carter by letter that, "[i]f labor hours and equipment procurement necessary to support installation of [the IWAC] network" are reduced: the "network will consist of J-8, CENTCOM, SAC and TRANSCOM"; there will be "insufficient documentation, and reduced . . . support for a network that will operate marginally, if at all"; "delays affecting . . . installation and the implementation of the network [will] occur"; "Joint Staff will be liable to pay existing monthly recurring circuit costs"; "[m]onthly recurring circuit charges will be raised by the carrier to accomodate [sic] a 9 node reduction in services"; ISN vendors (Motorola, CLI, VSI, Network Equipment Technologies, Inc., and DataBeam) "are costing their equipment for a minimum 13 node network"; "[c]harges for existing and future hardware procurement shall increase to accomodate [sic] a hardware acquisition of less than a block of 13 sites"; ISN IWAC "personnel will be reassigned and could be lost to the IWAC program permanently"; and ISN "will graduate from the 8(a) program and may not be able to perform under the contract vehicle being used," meaning AFDW could "have to compete [a contract] causing up to a year delay" in IWAC work (R4, tabs 13, 13a). According to ISN's calculations, if the IWAC "contract" was "stopped," the Government's remaining obligation could exceed $1.7 million (R4, tab 13a at 4).

On 6 March 1990, Mr. Krebs advised Mr. Carter and the AFDW Contracting Office that an "[e]valuation of design and implementation alternative connectivity

schemes for the IWAC network [wa]s being accomplished within the Joint Staff" and "[s]ome of the options being considered provide for less than a full 13 node IWAC implementation." Mr. Krebs requested that AFDW provide to J-8 by 9 March 1990 the following data – the "[c]ontractual arrangements between ISN and their subcontractors," a "[d]etailed accounting of estimated costs," and "[c]ertification of the circuit shut-down costs after 1 year." (AR4, tab 96)

In a 13 March 1990 memorandum for J-8 that evaluated the information Mr. Neubecker supplied on 23 February 1990, CO Mohn stated:

> a. I agree if the work is descoped (a reduction in labor hours and equipment), increased costs will occur for existing capabilities. This is due to volume discounts not being applied to smaller quantities of equipment and costs being amortizied [sic] over a shorter period of time.
>
> b. Agree that termination or suspension of work with US Sprint will result in increased costs to support a scaled down network.
>
> c. The costs identified . . . totaling $1.7M obviously represent a worst case scenario of a termination or suspension. If what we are talking about is simply a suspension of work for a definitive period of time (such as two months) the incurred costs during the suspension again should be much lower than the $1.7M. . . .

(AR4, tab 25)

By letter to Mr. Carter dated 15 March 1990, a copy of which was sent to Mr. Krebs, Mr. Neubecker stated:

> It has come to our attention that the Government may not transfer funds to continue the IWAC Network project in a timely manner. If the funds are not available as of March 30, ISN will be forced to take steps to phase down the program.
>
> . . . .
>
> We have begun to temporarily reassign personnel from the IWAC program in an attempt to ensure current funds will cover resources to complete the TRANSCOM installation.

> This will allow ISN to concentrate resources on the physical installation of TRANSCOM. Further reassignments will be necessary to ensure ISN does not work at risk. Hopefully, no unforeseen problems will occur during the TRANSCOM installation that will require additional materials or labor hours.
>
> . . . .
>
> Unless ISN is notified by March 16 that funding will be provided by March 30th, ISN will have to plan for a phase down of the program and the following planned tasks will not be completed:
>
> - As built documentation for SAC, CENTCOM, TRANSCOM and the J8/Hub
> - Hub design drawing package . . .
> - Complete requirements package for Hub build-out for RFQ
> - Blue . . . room audio/video drawings and costs
> - Preliminary Installation Package for PACOM
> - Preparation of purchase orders for PACOM

(R4, tab 17 at 1) Mr. Neubecker appended to his letter two letters from VSI and CLI requesting that orders be issued promptly with respect to the full network installation expected (R4, tabs 17a, 17b).

On 21 March 1990, AFDW unilaterally issued Mod. No. 03 to DO No. 6009. Mod No. 3, which was effective 20 February 1990 and signed by CO Dillon, provided:

> A. THIS MODIFICATION ISSUED TO CORRECT THE DELIVERY ORDER AS FOLLOWS:
>
> | | |
> |---|---|
> | (1) MIPR DJAM 90061 | $457,027.85 |
> | (2) MIPR DJAM 90062 | $445,351.10 |
> | (3) MIPR DJAM 90078 | $2,108.000.00 |
> | TOTAL | $3,010,378.95 |
>
> THIS IS THE CORRECT ORIGINAL FUNDING OF THIS ORDER.

B. THE CORRECT CUMULATIVE TOTAL SHOULD READ $3,180,378.95, INCLUDING MODIFICATION P00001.

(R4, tab 10c)

In a memorandum dated 22 March 1990 to Mr. Simons and Mr. Neubecker, Ms. Hendricks reported on a meeting she had attended on 21 March 1990 with CO Mohn and Mr. Carter. She stated:

> Joanne confirmed that JCS is "pausing to regroup" on the JCS/IWACS VTC program. The direction came from Joint Chiefs level; JCS Comptroller is involved. Some of the things they plan to consider are whether the J-8 IWACS VTC system is in consonance with overall JCS plans and whether it is cost-effective. They want to test the sites installed . . . to see if they are operational and generally acceptable, and will then make a decision as to whether to continue. Joanne said there is no cause for alarm at this point; she feels they will probably opt to continue, but of course could not guarantee that.
>
> What AFDW Contracts needs from ISN is a complete accounting of the money they have funded for all JCS tasks. This includes awarded value by [DO], what has been expended, and what has been delivered -- particularly with regard to hardware. They need an itemized list of the equipment that has been procured (ordered) versus what has been received and delivered. They also need to see what has been billed and paid against each order. For the completed T&M orders they want to see the amount of any residual funds available for reallocation.
>
> For 6009, they need to see itemized costs incurred, cost to complete the initial sites (including outstanding commitments) versus the currently funded amount. . . . Incidentally, I did get AFDW to issue a mod to 6009 to correct the total funded amount to $3,180,378.95.

(SR4, tab 13F)

By letters to Mr. Neubecker dated 21 and 27 March 1990, DataBeam's director of sales, Peter Gammon, supplemented the information he had provided Mr. Neubecker and Mr. Krebs during a March 1990 meeting at DataBeam's Kentucky Headquarters. Mr. Gammon advised that DataBeam would have a high speed 224 Kbps data bridge (224 bridge) available in September 1990, to replace the 19.2 bridge (above), which worked but was deemed "just too slow" by IWAC users. (AR4, tab 28; SR4, tab 15J; *see also* tr. 2/179-82) Mr. Gammon stated that, on an interim basis, DataBeam would ship one 19.2 bridge for use with the IWAC network and, when the high speed 224 bridge is delivered, take the low speed 19.2 "bridge back and provide a full (100%) credit toward the new unit." (SR4, tab 15J) Mr. Gammon further advised that, on receipt of a purchase order, DataBeam would manufacture the color printer shelf for use above the existing cabinet, which Mr. Krebs had approved during their March meeting. He stated that the lead time to manufacture "at least the first (4) units" will be four weeks so time is of the essence. (AR4, tab 28)

On 2 April 1990, Ms. Hendricks submitted an accounting to CO Mohn of the funding and expenditures for the JCS program (AR4, tab 95). She stated, in part:

> The current unexpended funding for D.O. 6009 is $118,015.95, less the $9,328.49 invoiced for EUCOM Site Survey which was approved for payment out of D.O. 6009. This leaves an unspent balance of $108,687.46 as of the end of March. If you will issue modifications to deobligate the residual funds from D.O. 6001, 6006, 6007 and 6008 [which she identified as $24,399.72] and reallocate them to 6009, there would be a balance of $133,087.18 on D.O. 6009. This will fund labor for an additional month (thru April 90) but will not cover additional equipment purchases.

(*id.* at 1) The first attachment to Ms. Hendricks' accounting identified DO No. 6009 as funded in the amount of $3,180,378.95, with a "price" of $3,062,363.00 (AR4, tab 95 at 3). The term "price" referred to ISN's "expenditures," as invoiced (tr. 3/215). The second attachment to the accounting showed labor, equipment, circuits, travel, and material (which included test equipment) DO No. 6009 expenses totaling $3,062,363.00. (AR4, tab 95 at 4). The fourth attachment to the accounting entitled "JCS/IWAC 4 SITE EQUIPMENT INVENTORY MATRIX" listed 34 equipment items, in various quantities, totaling $1,982,642.87 (the amount included for "equipment" on the first attachment). The fourth attachment also contained four end notes stating that certain equipment had been "received for Install at Future Sites;" and that other equipment had been "added" or "upgraded" at the Government's request. (*Id.* at 6)

Ms. Hendricks was not surprised that AFDW had requested a complete accounting of the money funded for all JCS tasks on 21 March 1990. At trial, with respect to her 2 April 1990 response which accounted for the funding, she testified:

> [W]e had treated this as a bank account and they were spending against it. We were doing the job as we went along and we were keeping track of what we were spending. We're billing labor to them at the rates in the contract and we were billing hardware to them at the negotiated rates for the major equipment and then the stated rates for the smaller ODCs. We were keeping track of this, how much money was being spent on the project and we were letting them know how much they had left. We were treating the funding as being their money for them to spend as they wished.
>
> Now, apparently there was a question, there's always a question as to where additional funds are going to come from, so if they were having trouble getting money, there are certain things that you can do. On this particular contract it seemed to me since the money, the MIPR'ed funds, were allocated across several delivery orders that – and it was work that was done for JCS and it was all done on the IWAC program, that [AFDW] could take these other delivery orders that had been issued for site surveys where there was residual money on them. . . .
>
> And I'm telling Ms. Mohn you can take the money out of that pocket and put it in the other pocket, or you know, go through all your handbags and find all the spare change you have and here is some money and this will keep us going for a little longer, we have some more money to spend.

(Tr. 3/88-90)

On 6 April 1990, DOD's Washington Headquarters Services Installation Accounting Branch issued MIPR No. DJAM 0 0051 in the amount of $168,000 and MIPR No. DJAM 0 0052, in the amount of $52,000, to AFDW, for a total of $220,000 (SR4, tab 9C). Both MIPRs provided the funds were for IWAC "PER THE ATTACHED STATEMENT OF WORK." The two MIPRs admitted into the appeal record, however, did not contain any SOWs. (*Id.*)

An undated Pricing Memorandum signed by Mr. Carter and CO Dillon states on its first page that ISN submitted a proposal on 28 March *1989* in the amount of $220,000; a technical evaluation was received from JCS/J8 on 17 April *1989* recommending AFDW accept the proposal, and there was a negotiation to add funds for IWAC services. While the second page of the memorandum states ISN's proposal was forwarded for technical evaluation on 23 March *1990,* it again refers to AFDW receiving the evaluation on 17 April *1989.* The memorandum concludes that additional funds in the amount of $220,000 are fair and reasonable to the Government. (SR4, tab 9B) The record in this appeal does not contain any such proposal or evaluation. We find that the pricing memorandum does not report an actual negotiated transaction.

On or about 16 April 1990, AFDW held an IWAC briefing for Maj. Gen. Baldwin, deputy director of J-6, to assist the Joint Staff's senior leadership with a decision on how or whether to proceed with IWAC (AR4, tab 29; *see also* AR4, tab 31; tr. 2/54, 7/139-40). CO Mohn prepared a briefing chart for the meeting, which listed IWAC "TASKINGS TO DATE" under DO Nos. 6001 through 6004 and 6006 through 6009 and stated -- "Two types of task orders issued: (1) Firm fixed price and (2) NTE level of effort" (AR4, tab 29 at 4; tr. 7/140). The chart did not specify which of the DOs were considered "Firm fixed price." All were listed as having an "NTE AMOUNT," with a separate column for "ACTUAL" expenditures. DO No. 6009 was entered twice on the chart. The first entry indicated that the DO covered EUCOM/SPACECOM site surveys, with NTE and actual amounts of "$9,328." The second entry indicated that the DO covered "JCS/IWAC VTC," with a NTE amount of "$3,180,378" (DO No. 6009's contractually obligated funding as of 16 April 1990) and an actual amount of "$3,062,363," stated to be the "[t]otal expenditures on IWAC project thru end of March 90." (AR4, tab 29 at 4)

In a 19 April 1990 memorandum to Mr. Krebs, Mr. Neubecker stated that the 224 bridge would be available by 1 September and, in the meantime, DataBeam would supply the 19.2 bridge. He added that the "Databeam Table" for "color printer" approved during their March visit to DataBeam would "be available to procure when funds for equipment are made available." (AR4, tab 30) On 23 April 1990, ISN ordered four color printer shelves, at a price of $700 each, from DataBeam (R4, tab 63b).

On or about 26 April 1990, AFDW issued unilateral Mod. No. 04 to DO No. 6009, signed by CO Dillon (R4, tab 10d at 1). Mod. No. 4 cited both DJAM 0 0052 and DJAM 0 0051, listed Mr. Krebs as the point of contact, and stated that:

> A. TOTAL PRICE OF DELIVERY ORDER INCREASED BY $220,000.00. CHANGE TOTAL PRICE OF DELIVERY ORDER TO READ $3,400,378.95.

> B. CONTRACTOR TO PRVOIDE [sic] ON SITE TECHNICAL SUPPORT FOR THE PREPARATION AND CONDUCT OF THE IWAC FUNCTIONAL EVALUATION TO BE CONDUCTED 1-31 MAY 1990. PER ATTACHED STATEMENT OF WORK.

(R4, tab 10d at 2) The SOW attached stated, in pertinent part:

> a. Provide continued support of the IWAC four-node prototype network . . . .
>
> b. Provide necessary technical on-site support for the preparation and conduct of the IWAC Functional Evaluation.
>
> c. Purchase and install the appropriate network analysis hardware/software required to collect various types of data on the IWAC system to support decisions concerning program requirements and future modifications. . . .
>
> d. If required, purchase and install the required number of KG94A encryption devices at J-8, CENTCOM, SAC, and, TRANSCOM.

(*Id.* at 4)

On or about 3 May 1990, AFDW generated a new version of DO No. 6009 (the May DO), which Mr. Carter sent to ISN with a note to Ms. Hendricks to call him (AR4, tab 64; tr. 3/78). The May DO included the original cover page signed by CO Dillon. It revised the first paragraph of the DO we found to have been issued on 14 September 1989 (AR4, tab 63) as follows:

> CONTRACTOR TO PROVIDE SERVICES, LABOR, TOOLS, MATERIALS, PERSONNEL AND EQUIPMENT TO SUCCESSFULLY IMPLEMENT THE NETWORK AND VIDEO TELECONFERENCING HARDWARE COMPONENTS TO ACCOMPOLISH [sic] THE IWAC VIDEO CONFERENCING NETWORK THAT WILL PRVOIDE [sic] THE TECHNICAL BASELINE TO ENHANCE CINC PARTICIPATION IN THE DETAILED SUPPORTING ANAYSIS OF THE JOINT STRATEGIC PLANNING PROCESS FOR THE FOLLOWING SITES

> JCS/J8, CENTCOM, TRANSCOM AND SAC. SEE ATTACHMENT (1) FOR EQUIPMENT.

(AR4, tab 64 at 3) Attachment (1) to the May DO was the above "JCS/IWAC VTC 4 SITE EQUIPMENT INVENTORY MATRIX" totaling $1,982,642.87 that Ms. Hendricks submitted to CO Mohn on 2 April 1990, except that Attachment (1) included only the first of the four end notes – the one about installation of some of the equipment at future sites (*id.* at 4).

Ms. Hendricks testified that:

> I had asked [Mr. Carter] to modify the contract to say what it was, add a modification of some sort to clarify what it was that you want . . . because you're not going to be happy if you don't define what it is.
>
> And I would have expected -- this wouldn't surprise me except that it's not a modification, it appears to be the same [DO] with a different page two . . . [a]nd different attachments.

(Tr. 3/79-80) She further testified that after she received the May DO on 16 May 1990 she called Mr. Carter to inquire about the purpose of the DO and he told her that he was "trying to straighten the record out" (tr. 3/78, 81-82, 85; AR4, tab 64). We find the testimony of Ms. Hendricks regarding the May DO to be credible.

On 4 May 1990, the day after the May DO was postmarked, Lt. Col. Michael Baxter of J-8 wrote a "memorandum for the record" with respect to an AFDW briefing "of shutdown costs associated with the IWAC portion of the ISN contract," which was presented at Maj. Gen. Baldwin's request. Besides Lt. Col. Baxter, briefing attendees included CO Mohn, Mr. Carter, a representative of the Comptroller, and several J-6 representatives. Lt. Col. Baxter had asked that Mr. Krebs and another J-8 representative be allowed to attend the briefing, but was told by J-6 that "there was not enough room for more than one J8 representative." (AR4, tab 31; *see* AR4, tabs 79 (AFDW held two meetings with J-6), 82 (Mr. Carter briefed two-star general first week of May)). In his memorandum for the record, Lt. Col. Baxter stated, among other things, that: Maj. Gen. Baldwin is recommending that the Government "[l]et the contract with ISN expire on 31 May 1990;" Mr. Carter "briefed a potential shut down cost of $80K as an upper limit" based on "potential claims for reimbursement of volume discount;" and an AFDW "investigation had determined that the COTR's (Mr. Krebs') actions had been appropriate, with respect to dealing with the contractor, throughout the contract" (AR4, tab 31). Lt. Col. Baxter concluded his memorandum of record by listing several of his

"[p]ersonal impressions," including: "Lt. Gen. Cassity will press for a halt while J8 conducts a full program review;" the IWAC test in late May "will be viewed as a waste of time;" "[a]ll hardware will have to be competed which will mean a certain delay and possibly new vendors;" and he had been "set up in that [he] was not prepared to address any issues except contract management, which was the stated purpose of the meeting" (*id.*).

On or about 16 May 1990, Vincent P. Roske, Jr., J-8's Deputy Director for Technical Operations, submitted to the Joint Chiefs of Staff an "Information Paper" he had prepared for a 17 May 1990 meeting called to address the status and future direction of IWAC (AR4, tab 32; tr. 1/197). Mr. Roske stated in the paper that an informal five-week review of IWAC by J-6 and J-8 had concluded that, "[a]lthough IWAC may satisfy a J-8 requirement, its efficient implementation may be beyond the management capability of J-8" and "DCA is better positioned than the J-8 and the Joint Staff in general to effectively manage the IWAC implementation" (AR4, tab 32 at p. 3).

As a result of a meeting between Joint Chiefs of Staff Chairman Colin Powell, Lt. Gen. Cassity, Maj. Gen. Baldwin, and Maj. Gen. Robinson on or about 17 May 1990, J-8 was "tasked to develop a requirements document and a concept of operations" for the IWAC and DCA was tasked to "manage the [IWAC] project from here on out" (AR4, tab 33). On 21 May 1990, Mr. Roske held a meeting with Lt. Col. Baxter, Mr. Krebs, CO Mohn, and others "to discuss fall-out from the Chairman's meeting" (*id.*).

During the week of 21 May 1990, the IWAC end-users conducted a functional evaluation of IWAC. The evaluation concluded that "IWAC does provide a secured, sophisticated, high-speed network which can serve as the technical baseline for fast turnaround distributed analyses and multi-sided wargaming exchanges among the Joint Staff and the commanders in chief of the unified and specified commands." (AR4, tab 84)

On 24 May 1990, Mr. Krebs notified the AFDW Contracting Office that "the following issues in support of the existing 4 node IWAC network remain outstanding:" (1) final site implementation reports for SAC, TRANSCOM, CENTCOM, J-8, and the IWAC hub; (2) final pre-installation plans for PACOM, LANTCOM and SPACECOM; (3) a technical adjustment configuration for a printer; (4) an equipment inventory at each IWAC location; (5) an accounting of GFE in ISN's possession; (6) the replacement of the 19.2 bridge with the 224 bridge; (7) an interface for a SAC VSI/Datapoint link; (8) any outstanding hardware component documentation; and (9) any necessary legal certification for transfer of licensing agreements from vendors (SR4, tab 12B).

The same date, 24 May 1990, Mr. Krebs advised AFDW's Contracting Office by separate memorandum that to carry out his COTR duties and certify that ISN's invoiced

amounts are correct, he "will need more detailed documentation of all expenses" with respect to invoices "1218-6009-002, 003, 004, 005, and 005A." Mr. Krebs stated that "[d]etailed documentation is to be presented in the same manner as for the previous invoices" and include other direct costs (ODCs), supplies, materials and subcontractors, travel expenses, and manpower. Mr. Krebs indicated that he had delivered the invoices to Mr. Carter earlier that day. (SR4, tab 12A; *see* SR4, tab 12c) The record in this appeal does not contain copies of those invoices.

<u>Partial Termination for Convenience</u>

On 31 May 1990, CO Jack Bynane, who was the deputy director of AFDW's Contracting Office and the only person at AFDW possessing contract termination authority (tr. 6/144), notified ISN by telephone and a letter transmitted by facsimile that, pursuant to the contract's Termination for Convenience clause, all deliverables not specifically called for and funded by DO No. 6009, as modified by modifications one through four, including dedicated T-1 lines, were being terminated that date and "[t]his action will be finalized with a modification to the delivery order containing termination settlement instructions" (R4, tab 21). On 12 June 1990, CO Bynane issued to ISN Mod. No. 05, effective 31 May 1990, entitled "Notice of Partial Termination" terminating DO No. 6009 "in part" for convenience. Mod. No. 05 stated that ISN was to "[s]top all work performed under delivery order 6009," except for nine deliverables, which were the issues identified by Mr. Krebs on 24 May 1990 as "outstanding." Among the nine deliverables set forth to be completed were the final pre-installation plans for PACOM, LANTCOM, and SPACECOM, and replacement of the 19.2 bridge with the 224 bridge. Mod No. 5 additionally stated that: ISN was to settle with its subcontractors and suppliers; notify the CO of completed items still on hand and arrange for their delivery or other disposal; and invoice for completed items in the usual way, without including them in its termination settlement proposal. (SR4, tab 10)

After DO No. 6009 was terminated, Motorola, CLI, and VSI billed ISN to recoup their discounts. CLI and VSI, respectively, threatened or filed lawsuits (SR4, tab 18A; AR4, tabs 35, 36, 41, 116). Sprint billed to recover early termination penalties (R4, tab 45b; AR4, tab 37). DataBeam billed ISN to recoup quantity discounts on delivered systems and for the four color printer shelves which were being shipped. Mr. Gammon of Databeam advised ISN on 26 June 1990:

> The only open issue at this time is the high speed data bridge that was discussed and agreed upon during our last meeting at DataBeam in which Mr. Krebs and yourself met with us in Lexington. This bridge, at a cost of $35,000, will be available for delivery in September of this year. Due to the commitment that this bridge was needed, DataBeam moved

> forward with the development of this product and have [sic] incurred expenses with the expectation of delivering the unit for use in the IWAC network. Please let me know the current status of the need for this bridge and how we should handle the project which is now partially complete.

(R4, tab 63b at ex. 2d)

<u>Invoices and Termination for Convenience Proposal</u>

On 12 July 1990, ISN submitted to AFDW a "revised" invoice No. 1218-6009-002 (invoice 2) in the amount of $904,949.99, which transferred some items billed previously on invoice 1 as "major equipment" at 12% markup, to "ODCs," at 21.1% markup, and included Sprint circuit charges as ODCs with 21.1% markup (R4, tab 24). CO Mohn advised ISN on or about 2 August 1990 that AFDW disputed ISN's 21% markup on ODCs and the Sprint circuit charges. She indicated, however, that AFDW planned to pay the undisputed portions of invoice 2 pending resolution of the "loading rates." By letter dated 6 August 1990, Ms. Hendricks advised Ms. Mohn:

> With regard to the Sprint communication lines, there is nothing in the contract or in our records to support Mr. Krebs' statement that a "straight pass-through" was subsequently negotiated between him, Mr. Carter and Mr. Neubecker. I first became aware of this issue on May 9, 1990, when Ken Carter called to ask me if I had any knowledge of an agreement for a straight pass-through that might have been made with Mr. Krebs by Mike Rogers (ISN's former Director of Contracts), Mr. Neubecker, and Mr. Simons in the October 89 timeframe. At that time (May 9), Ken had no record of such an agreement but said that Mr. Krebs recalled it. I checked ISN's records and spoke with each of the ISN people, including Mr. Rogers, and found no evidence that such an agreement had ever been made. When you and I discussed this matter on May 21 during Mr. Carter's absence, you told me that this was not an issue and that you had "no problem" with ISN's markup on Sprint services.
>
> ISN's position is that the Sprint communications lines were not included in the network hardware items for which a reduced markup was requested and negotiated, and are therefore to be treated like all "other" ODCs. We ask that you review your records in this matter as soon as possible and

> provide us with any documentation you have of a formal agreement to the contrary. In the absence of such records please approve for payment the "disputed" portions of the subject invoice.

(SR4, tab 12D; AR4, tab 78) On 14 August 1990, CO Mohn authorized payment of $712,694.01 of invoice 2 not in dispute, and the Government paid that amount on 11 September 1990 (AR4, tab 59; compl. ¶ 7; answer ¶ 7).

On 12 September 1990, Ms. Hendricks submitted to CO Mohn a termination proposal for $439,801.61, the "amount by which ISN's costs exceed" the $3,400,378.95 "value" of DO No. 6009. Ms. Hendricks advised that: ISN's proposal reflects "a diligent and successful effort" to "minimize the total additional cost to the Government;" the bulk of the additional cost stems from two items – loss of volume discounts and cancellation of the Sprint leases; and the Government is liable for the lost equipment discounts arising from its decision not to proceed with a 13-node network and for the Sprint costs, which are "the portions of the [circuit] leases . . . unexpired at the time of termination" and for which ISN "is still liable." ISN's proposal included costs for DataBeam's 224 bridge and its prospective installation, and for DataBeam's printer shelves. (AR4, tab 46)

On or about 14 September 1990, ISN submitted a new invoice No. 1218-6009-003 (invoice 3) for $440,690.68. The only document appended to invoice 3 was a "Material Inspection and Receiving Report" listing equipment which was "shipped" to the Joint Staff on 31 May 1990. (R4, tab 29A at 2) By letter dated 18 October 1990, CO Mohn returned invoice 3 to ISN "for backup documentation and a complete breakdown of labor and materials." (*Id.* at 1)

On 21 September 1990, after a "preliminary review of the ISN IWAC termination proposal," Mr. Krebs informed CO Mohn that ISN had not been instructed to order the printer shelves, and the 224 bridge "is not required due to the current status of the IWAC system." Mr. Krebs added that the "bridge was planned as an ISN proposed technical solution," but "its development was not specifically for IWAC." (SR4, tab 12E)

After "discussions" with "Government contracts people," on 1 October 1990, ISN requested that DataBeam refrain from delivering the 224 bridge and withdraw its $35,000 product development cost claim for the 224 bridge (R4, tab 63a at ex. 1c). By letter dated 9 October 1990, DataBeam stated it would charge a "development and restocking fee" of $25,000 if delivery of the bridge was canceled (R4, tab 63a at ex. 1d). DataBeam said it had planned to develop the bridge in 1991 but "accelerated this project" at "the request of Mr. Krebs" (*id.*).

On 22 October 1990, the Government issued Mod. No. 06 to DO No. 6009, which "further increase[d] the partial termination [of DO No. 6009] effected by" Mod. No. 05 by "deleting" the item in Mod. No. 05 calling for replacement of the 19.2 bridge with the 224 bridge (SR4, tab 11). On 31 October 1990, Ms. Hendricks confirmed receipt of Mod. No. 06, and requested a meeting with COs Mohn and Bynane pursuant to FAR 49.105(c) to (1) discuss the method and format for a revised termination proposal and (2) obtain a justification for the the Government's withholding of what Ms. Hendricks described as "disputed amounts" under ISN's invoices (R4, tab 30).

During December, ISN submitted directly to Mr. Krebs (rather than to AFDW's Accounting and Finance Office as specified by DO No. 6009) a revised invoice 3 dated 11 December 1990 for $641,491.88 with documentation appended similar to that supplied for invoice 1. This invoice sought $248,870.58 for labor, $9,894.07 for major equipment, $165,982.67 for ODCs, $10,145.43 for travel, $9,946.15 in interest on invoice 3, and the amount not paid under invoice 2, plus interest on that sum. While the revised invoice indicated that the labor, travel and ODCs sought were for the period "4/01/90 to 5/31/90," the documentation appended indicated that the labor and travel costs were for the period "ending 9/30/90." It, therefore, was not clear whether ISN's revised invoice 3 included only "pre-termination" costs or included both pre- and post-termination costs. Further, the documentation appended to the invoice indicated that the ODCs included U.S. Sprint circuit charges for January, February and March of 1990, with an ISN markup of 21.1% as was disputed with respect to invoice 2. The same month, during December 1990, ISN also submitted to Mr. Krebs invoice No. 1218-6009-777-001 (invoice 777-001), dated 14 December 1990, which covered post-termination costs of $484,516.35 and a $160,221.77 increase to major equipment charges previously billed on invoice 2 for the period ending 31 May 1990. ISN thus again appeared to be seeking both pre- and post-termination costs in one invoice. (R4, tabs 32, 33; SR4, tab 12J)

On 12 December 1990, ISN personnel met with COs Mohn and Bynane to discuss the format for the termination proposal, unpaid invoice amounts, special terms negotiated or allegedly negotiated, and circumstances surrounding issuance of DO No. 6009 (*see* R4, tabs 30, 31, 34; SR4, tab 13J; tr. 3/134-40). Eight days later, on 20 December 1990, ISN submitted a revised termination proposal, in the amount of $1,286,230.00, using the total cost method and the contract's labor and burden rates "in accordance with the instructions given . . . on 12 December." The revised proposal included all costs previously invoiced for unterminated work and all costs related to the termination. The proposal stated that it "is therefore contingent on payment in full for ISN's invoice [3] and [the] payment of the amounts which were improperly withheld from invoice [2]." The proposal was based on a net amount of $4,053,662.00, and therefore exceeded DO No. 6009's funded value by $653,283.00. (R4, tabs 34, 34a)

ISN stated that $385,236.00 of the claimed cost was due to the loss of volume discounts on major system components and cancellation of the Sprint circuits. It further stated that $160,222.00 of the claimed cost constituted an increase in ISN's fee on major equipment items from 0.9% to 10.0% (the same fee percentage awarded for equipment on previous DOs under ISN's contract) because the special handling rate of 11.1% G&A plus 0.9% fee had been agreed to "in anticipation of installing the entire JCS/IWAC VTC network." (R4, tab 34)

On 3 January 1991, Mr. Krebs requested CO Mohn obtain from ISN a complete accounting of equipment in ISN's possession that still needs to be delivered to J-8 and arrange for ISN to turn over the appropriate equipment no later than 10 January 1991 (SR4, tab 12H; tr. 2/114-15). The next day, on 4 January 1991, CO Mohn sent ISN a memorandum requesting it deliver nine equipment items listed in the memorandum (R4, tab 35). By letter dated 15 January 1991, Ms. Hendricks advised Ms. Mohn that ISN previously had delivered three of the nine items listed, had "boxed up" the remaining listed items, and was awaiting further instructions regarding where and to whom she would like the items delivered (R4, tab 36). In another letter dated 24 January 1991, Ms. Hendricks advised Ms. Mohn that ISN had located one of the items she had reported had been installed previously, and the item would be boxed and returned with the others as soon as ISN received delivery instructions (R4, tab 37). On 28 January 1991, Ms. Mohn notified ISN by letter that it was to deliver the items to Mr. Krebs (R4, tab 38).

During February of 1991, Ms. Hendricks instructed Donald Miller to deliver the equipment to Mr. Krebs. On 1 March 1991, Mr. Miller loaded the equipment into ISN's van, prepared a receipt (which listed the 29 equipment items he was delivering, contained a line for signature by the Government agent receiving that equipment, and was sent by facsimile to Mr. Krebs), and called Mr. Krebs by telephone to coordinate access to the Pentagon South Parking Lot. Mr. Krebs indicated that "something else had come up," he could not meet Mr. Miller, the delivery would need to be made another time, and he would get back to Mr. Miller when his schedule would permit. When Mr. Krebs canceled the delivery, Mr. Miller unpacked the van and returned the equipment to his ISN office. On 12 March 1991, Mr. Krebs sent the unexecuted "equipment receipt" he had received from Mr. Miller to CO Mohn stating that he "will not accept" five items of equipment set forth on that list "because they are not applicable to the IWAC technical solution." Mr. Krebs never contacted Mr. Miller about rescheduling the delivery. Mr. Miller testified he believes AFDW subsequently advised him at a meeting that Mr. Krebs lacked storage space for the equipment and needed to resolve that issue. Between 1 March 1989 and 1 May 1992, Mr. Miller stored the equipment in his ISN office and instructed others not to use that equipment. However, because Mr. Miller was working off-site subsequent to June 1991, some inadvertent use of the equipment occurred. In all cases, the equipment removed from his office was returned and repackaged for delivery to the Government when it was explained the equipment belonged to the Government. On

1 May 1992, Mr. Miller moved the equipment from his office to a secure storage area with access by only one individual, Ron Austin. (AR4, tab 52; tr. 3/276-88; SR4, tab 12L) At trial, when asked "[d]id you ever cancel a delivery request by ISN," Mr. Krebs testified:

> No. I don't think of any instance. The only thing I refused delivery on, and it was clearly documented, that there was some equipment ordered by mistake by ISN which I didn't want the Government to have to pay for. I did not want equipment that was not proper for use in the IWAC delivery order to be delivered to the Government. So that would be the only equipment I would even consider rejecting.

(Tr. 2/89, 119) We find that ISN attempted to deliver the equipment to Mr. Krebs, as directed by CO Mohn, and Mr. Krebs canceled the delivery after ISN had loaded the equipment into a van for delivery to the Pentagon.

DCAA audited ISN's termination proposal on 22 January 1991 and issued its report (not in the record) on 1 March 1991, questioning many of the claimed costs (R4, tab 67 at 2; compl. ¶ 17; answer ¶ 17). By letter to CO Bynane dated 22 March 1991, ISN challenged DCAA's findings, stating that most of the questioned costs related to whether certain labor hours "belong to the FFP delivery order or the termination costs" (R4, tab 39). Ms. Hendricks explained that:

> The JCS/IWAC Network was extensively reconfigured/ redesigned during the month of May 1990 prior to the termination notice. The network was changed to conform to the new transmission speed mandated by the Government. . . . Documentation previously prepared based on the design prior to May 1990 utilizing full T1 network transmission speed and equipment configuration, now had to be redone. Because of the termination, the price of the delivery order was never adjusted to reflect the cost impact of these Government directed changes.
>
> The additional documentation costs which were incurred after the date of partial termination were necessary in order to complete the documentation to the reconfigured/redesigned JCS/IWAC network. We were required to continue this documentation as stated in the notice of partial termination and such costs are reasonable and should be allowable . . . .

(*Id.*)

On 3 April 1991, CO Mohn notified ISN that another CO, Capt. Dean Hufford, would be negotiating the termination settlement (R4, tab 40). By letter to CO Mohn dated 9 April 1991, ISN demanded AFDW immediately pay invoice 3, which it said sought payment for "pre-termination" costs. ISN stated that invoice 3 was submitted in December of 1990 and never returned to ISN as a defective invoice. (R4, tab 41) CO Hufford replied that ISN had conditioned its termination for convenience proposal on payment of the pre-termination amounts, invoice 3 clearly was "part of the termination proposal," and ISN had been advised to include in the termination proposal only "costs associated with the actual termination action" (R4, tab 42).

In September and October 1991, at the Government's request, ISN provided back-up for its labor charges under invoice 3 and all other labor charges it invoiced under DO No. 6009 (R4, tabs 47, 49).. More than a year after ISN submitted its initial termination proposal, by letter dated 23 October 1991, ISN submitted a certified CDA claim to CO Mohn for $1,383,110.93, which requested "payment of the claimed amounts, plus CDA interest," or a final CO's decision (R4, tab 48). The claimed amounts included: unpaid balances on invoices 2 and 3 for pre-termination costs, plus interest on those balances; post-termination costs shown on invoice 777-001 for labor, ODCs, travel, lost discounts, restocking charges, and increased fee due to a reduced purchase volume of equipment; additional interest on unpaid billed costs; and labor costs for termination negotiations (R4, tab 48 at 2; *see* R4, tab 50). CO Mohn received the CDA claim on 31 October 1991 (R4, tab 48; compl. ¶ 25; answer ¶ 25).

On 29 November 1991, CO Hufford sent ISN 30 "factfinding questions" which he desired be answered by 5 December 1991 (R4, tab 51). Four days later, on 3 December 1991, CO Mohn returned to ISN its CDA claim, asserting that the claim was premature because termination negotiations had not occurred (R4, tab 52). On 24 January 1992, CO Hufford notified ISN that: COTR Krebs had "questioned all the hours" of labor which ISN had incurred after DO termination for additional documentation preparation and which were discussed in Ms. Hendrick's 22 March 1991 letter; no response had been received from ISN to his "factfinding questions;" he desired a response to the questions by 31 January 1992; and he was scheduling negotiations for the second week of February. (R4, tab 54) On 17 March 1992, CO Mohn notified ISN that: AFDW had not received responses to its "factfinding questions;" the CO will unilaterally determine the allowability of ISN's costs if no responses are received; and negotiations are being rescheduled for April 1992 (R4, tab 56). By letter dated 20 March 1992, ISN responded to each of the 30 "factfinding questions," by stating where ISN believed the questions had been addressed previously and setting forth additional information with respect to seven of the questions (R4, tab 57).

On 23 March 1992, ISN resubmitted its October 1991 CDA claim, asserting that AFDW's CO had had no right to refuse to accept a properly certified claim (R4, tab 57 at 4, tab 58). In April 1992, CO Mohn became the deputy director of AFDW's Contracting Office and the termination contracting officer (TCO) (tr. 6/144-45).

On 4 June 1992, ISN submitted another invoice 3 in the amount of $632,163.39 (R4, tabs 61, 61a; SR4, tab 13I). ISN explained that: the period had been corrected to end on "9/30/90 instead of 5/31/90" since "[t]he hours invoiced included work on the non-terminated portion of the order;" and the invoice total had been reduced by $9,328.49 to reflect the 2 April 1990 payment for site surveys at Stuttgart and Colorado Springs, which had been mistakenly recorded where ISN's accountants had tracked the costs, rather than against DO No. 6009 where AFDW had instructed the costs be invoiced (R4, tab 61).

On 8 June 1992, Mr. Krebs notified CO Hufford that, after review of ISN's June 1992 invoice 3, he was able to validate $243,324.50 in labor expenses and AFDW was authorized to release the funds. He said that fringe benefits and overhead charges under invoices 2 and 3 "still need to be resolved." (AR4, tab 62) In a memorandum dated 9 June 1992 to the Joint Staff, which referenced DO Nos. 6001 through 6004 and Nos. 6007 through 6009, Mr. Krebs reported that, subject to fringe benefit and overhead exceptions, all invoices supporting IWAC's implementation had been validated and CO Hufford had been advised to make payment (AR4, tab 61). Although, at the time, he and Mr. Krebs were responsible for payments to ISN, CO Hufford did not pay the validated amounts. He considered ISN's invoices to be part of its termination proposal, and to be settled in conjunction with the termination proposal (tr. 4/203-07).

On 27 August 1992, ISN officials met with CO Hufford. About two weeks later, on 14 September 1992, ISN's president sent position papers and other documentation to CO Hufford concerning eight termination issues to assist him in reaching a position on those issues. (R4, tabs 63, 63a-63g)

On 18 September 1992, DOD's Washington Headquarters Services Installation Accounting Branch issued a $330,000.00 MIPR to AFDW to cover "probable liability" for IWAC termination costs (AR4, tab 54 at 3). On 29 September 1992, CO Hufford unilaterally issued Mod. No. 07 to DO No. 6009 increasing its funding by $330,000.00. (AR4, tab 54 at 2; R4, tab 10g) Mod. No. 7 stated it was for internal Government purposes only and an administrative modification obligating funds to cover probable liabilities. (AR4, tab 54 at 2) The funds added to the DO by the Mod. were "expiring end-of-fiscal-year funds" which were being "preserved" for settlement considerations (tr. 6/129-31).

By letter to CO Mohn dated 8 January 1993, ISN demanded payment of PPA interest in the amount of $123,367.35 on the unpaid amount of $1,383,110.93 and that its CDA claim be processed (R4, tab 65). On 15 February 1993, CO Hufford completed a draft CO's decision that accepted the vendors' claims for lost volume discounts (without ISN's claimed profit) and Sprint's termination penalty charges (without ISN's markup), and denied other portions of the claim (ex. A-119; tr. 4/186, 5/5-10, 56-60, 65). He found ISN's decisions to secure volume discount pricing and to enter into one-year leases with Sprint, which yielded considerable cost savings over a monthly arrangement, to have been "prudent" (tr. 4/177, 186, 211, 5/56-57, 59; *see* R4, tab 53). CO Hufford forwarded his draft decision "through" TCO Mohn to "legal" (tr. 5/5-8, 60, 63). CO Hufford had fact-finding responsibility, and could only make recommendations to the TCO. TCO Mohn testified at trial that she never saw CO Hufford's draft decision. (Tr. 6/145-46)

On 21 May 1993, ISN filed a notice of appeal with this Board based on the CO's deemed denial of its CDA claim (R4, tab 67). The Board subsequently denied summary judgment motions filed by the Air Force and ISN based upon the existence of disputed questions of material fact. *Information Sys. and Networks Corp.*, ASBCA No. 46119, 96-1 BCA ¶ 28,059, *aff'd on recon.*, 96-1 BCA ¶ 28,094; *Information Sys. and Networks Corp.*, ASBCA No. 46119, 96-2 BCA ¶ 28,094.

During the conduct of an eight day trial in this appeal, Mr. Carter testified that he did not "ever negotiate with ISN any 'charges' or fees to be applied to Sprint['s] charges to ISN," but did not address the markups set forth in ISN's 1988 contract for direct costs (11.10% G&A and 10% profit) (tr. 6/54; R4, tab 1). CO Mohn testified at trial that, while she did not "personally sit in on" any negotiations concerning Sprint charges, she recalled Mr. Carter, Mr. Krebs, and Mr. Neubecker "indicating that the Sprint lease would be a straight pass-through cost to the government" (tr. 6/134). According to CO Mohn, "Ken [Carter] was very, very good about keeping me informed on all of his work activities and, in particular, on the JCS project," and "whenever Mr. Krebs would visit Andrews from the Pentagon[,] he and Ken, after the negotiation session, would come in [my office] and discuss with me what had occurred" (tr. 6/213). The Air Force, however, did not introduce into evidence any document *dated prior to its convenience termination* which discussed negotiation with ISN of a pass-through of Sprint charges without markup. Based upon ISN's documents, which were generated contemporaneously with start of work on DO No. 6009 (during the fall of 1989) showing ISN would invoice Sprint communication lines at "cost plus 11.1% G&A and 10% fee on top of G&A" (SR4, tab 13D at p. 27; *see* SR4, tabs 13C, 20C), and ISN's and AFDW's contemporaneous 1989 documents which memorialized the special markup or handling fee (12%) that ISN agreed to charge for major equipment (*e.g.*, AR4, tabs 103, 104; SR4, tab 13D at p. 27), we find that there was no agreement between ISN and AFDW that ISN would pass the Sprint circuit charges through to the Government "straight," *i.e.*, without any ISN markup (G&A and fee).

After the conduct of trial and completion of post-trial briefing in this appeal, the parties executed bilateral Mod. No. 08 to DO No. 6009, which authorized payment of $538,039.73 to ISN. The amount paid was said to represent DO No. 6009's $3,400,379 funded amount (rounded) minus $2,767,432.00 already paid, $170,000.00 set forth as the amount of Mod. No. 01, and $163,511.00 in "estimated costs of unreturned equipment," plus $9,328.49 for travel incurred but not paid under another DO, $89,963.00 in estimated termination labor costs, and $139,312.24 in CDA interest from 31 October 1991 through 31 January 1997. While the $538,039.73 is stated to be a "full and final settlement" and an "accord and satisfaction" of the parties' obligations under DO No. 6009, Mod. No. 8 expressly provides that the acceptance of that amount under the DO does not represent an acknowledgment by ISN that the Government's computational breakdown of costs is in any way correct or accurate, and "does not waive or preclude the parties from exercising their rights" in this appeal.

## DECISION

The threshold issue for resolution is whether there is a limit on the amount ISN may recover due to the DO convenience termination. The Air Force contends that "the maximum amount ISN may recover in this appeal is $304,632[,] which is the dollar amount remaining on Delivery Order [No.] 6009 whereby work was [being] performed" (Gov't br. at 78-79). ISN, however, contends that its termination "claim for lost volume discounts, restocking charges, and early termination of the U.S. Sprint lease, all represent constructive changes to Delivery Order [No.] 6009" and "are therefore not subject to the general rule that recovery is limited to the contract price" (app. reply at 3).

The contract's Termination for Convenience clause (FAR 52.249-2) provides that the amount to be paid because of the termination, exclusive of costs of settlement of the terminated work, "may not exceed the total contract price as reduced by (1) the amount of payments previously made and (2) the contract price of work not terminated." Both parties therefore correctly recognize that the general rule is that recovery is limited to the contract price. The Air Force, however, fails to recognize a condition precedent for application of the rule. As noted by ISN, it is not appropriate to apply the contract price limit to a termination settlement without giving consideration to unpriced changes and to other modifications. *E.g.*, *Okaw Industries, Inc.*, ASBCA Nos. 17863, 17864, 77-2 BCA ¶ 12,793 at 62,226-27 (Government failure to fulfill contract obligations in timely manner causing lost time and extra work for packaging are to be considered in determining contract price for purpose of establishing convenience termination payment limit); FAR 49.114; R.C. Nash, Jr. & J. Cibinic, FEDERAL PROCUREMENT LAW 1161 (1980) (consideration must be given to unpriced changes). While ISN does not describe or set forth specifically the constructive changes to DO No. 6009 which must be considered before applying the general rule in this appeal, we agree with ISN that there is a

constructive change to the parties' contract which must be addressed before determining the contract price.

The most straightforward method of determining the contract price, of course, is for parties to negotiate an appropriate price increase or decrease for a change and amend their contract accordingly. Where this does not occur and a contractor is entitled to a price increase, however, boards will determine the amount of the adjustment or ignore the limitation on recovery. *See, e.g., id., citing Pilcher, Livingston & Wallace*, ASBCA No. 13391, 70-1 BCA ¶ 8331; *Scope Electronics, Inc.*, ASBCA No. 20359, 77-1 BCA ¶ 12,404; and *Douglas Corp.*, ASBCA No. 8566, 69-1 BCA ¶ 7578. Accordingly, we proceed to determine the contract price for purposes of the convenience termination limit.

Contract Price

The contract's Changes clause (FAR 52.243-1) provides that: the CO may make specified changes in contract terms; whenever one of those changes causes an increase or decrease in the cost of, or time required for, performance of contract work, the CO shall make an equitable adjustment in the contract price; and a failure to agree to an adjustment shall be a dispute under the Disputes clause. The Disputes clause in the contract (FAR 52.233-1) provides all disputes arising under or relating to the contract shall be resolved under that clause and the contractor shall proceed with the performance of contract work pending a final resolution of any dispute arising under the contract.

Under the Changes clause, the contract price must be equitably adjusted when a change in the contract work causes an increase or decrease in the cost of performance of the work. *E.g., Mills Trucking, Inc.*, ASBCA Nos. 50163, 50164, 97-1 BCA ¶ 28,907 at 144,115. In sum, equitable adjustments are corrective measures used to keep a contractor whole when the Government modifies a contract. *Bruce Constr. Corp. v. United States*, 324 F.2d 516, 518 (Ct. Cl. 1963).

The CO here faced two "dilemmas." First, ISN wished to perform the IWAC work proposed by the Joint Chiefs of Staff and the Joint Chiefs desired that ISN perform that additional work. However, ISN's contract "to complete the inside cable plant" using "cable and components of the same type and brand used on the original HQ USAF CF Installation already in progress" did not require or contemplate the "development" and installation of a multi-million dollar IWAC video conferencing network linking 13 sites around the world. Second, the Joint Chiefs did not possess in 1989 monies to fully fund IWAC installation at 13 sites and ISN's contract with the Air Force was not one which had incremental funding.

Apparently recognizing that parties to a contract, at any time after contract award, may modify not only prescribed contract procedures, but substantive provisions of their

contract, *see, e.g., Pinewood Realty Ltd. v. United States*, 617 F.2d 211, 215 (Ct. Cl. 1980); *General Dynamics Corp. v. United States*, 558 F.2d 985, 990 (Ct. Cl. 1977), the Air Force's CO decided to *unilaterally* "change" ISN's contract by issuing DO No. 6009, requiring ISN to develop and install an IWAC network. DO No. 6009, therefore, most closely resembles a unilateral change order issued by a CO.[5]

Development and installation of an IWAC video conferencing network linking sites around the world, however, was not one of the changes in contract terms the Air Force's CO could make under the express language of the Changes clause. *See, e.g., Edward R. Marden Corp. v. United States*, 442 F.2d 364, 370 (Ct. Cl. 1971) (CO order to reconstruct hangar constructed under a contract after hangar's collapse due to defective specifications was not "'essentially the same work as the parties [had] bargained for when the contract was awarded'" and not within scope of Changes clause). A CO may make changes only to the contract drawings, designs, specifications, method of shipment or packing, and place of delivery which are within the "general scope" of the contract. *See, e.g, CTA, Inc.*, ASBCA No. 47062, 00-2 BCA ¶ 30,947; FAR 52.243-1.

When a CO's order altering a contract is outside the scope of the Changes clause, it is denominated a "cardinal change." *E.g., Saddler v. United States*, 287 F.2d 411, 413-14 (Ct. Cl. 1961); *accord AT&T Communications, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993). A cardinal change is a contract breach and not redressable under the Changes clause. *Allied Materials & Equipment Co. v. United States*, 569 F.2d 562, 563-64 (Ct. Cl. 1978); *Air-A-Plane Corp. v. United States*, 408 F.2d 1030, 1032-33 (Ct. Cl. 1969). Accordingly, when a CO orders a contractor to perform duties materially different than those it bargained for, as here, the contractor is free to pursue a breach of contract claim and, if the breach is "material," to halt contract work. *Allied Materials & Equip. Co. v. United States*, 569 F.2d at 563-64; *Edward R. Marden Corp. v. United States*, 442 F.2d at 369-70.

A material breach does not automatically "end" a contract. Rather, it simply gives the injured party the right to "end" the contract. The injured party may choose between canceling and continuing its contract. *Cities Service Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976). If the injured party elects to continue the contract, the parties' obligations remain in force and the injured party retains only a claim for "partial breach," unless it explicitly reserves its right to claim material breach and promptly pursues that right. *Id.* at 1313-19; *Northern Helex Co. v. United States*, 455 F.2d 546, 552-55 (Ct. Cl. 1972). Here, because ISN continued to perform contract work after the CO's unilateral modification, it elected to continue, not end, the contract, and to waive any claim for "material" breach. *See Pinewood Realty Ltd. v. United States*, 617 F.2d at 215 (where contractor ignores breach and continues to perform, it waives right to terminate and retains only claim for partial breach); *Cities Service Helex, Inc. v. United*

*States*, 543 F.2d at 1313-19 (where contractor continues performing and accepts benefits of the Government's continued performance, the contract remains in effect and there is no material breach claim).

ISN agreed to continue performing under the "reconfigured" contract terms, *i.e.*, a delivery order for a 13-site IWAC video conferencing network. The parties agreed "implicitly" to amend the Changes clause of their contract to allow for the unilateral change issued by the CO. *See General Dynamics Corp. v. United States*, 558 F.2d at 991 (parties can modify a contract to authorize administrative relief under a clause otherwise not available); *see also Pinewood Realty Ltd. v. United States*, 617 F.2d at 215-16 (where Government accepted extension of closing date which was conditioned upon contractor's reservation of right to seek delay damages, while denying liability, the extension could be deemed a "modification" whereby the parties agreed to continue performance).

While the Air Force contends that the DO issued, which simply stated that ISN was "to provide equipment, labor, tools, materials, supplies, services and personnel to successfully implement the network and video teleconferencing hardware components to accomplish an IWAC video conferencing network," was not for 13 sites, but 4 sites (Gov't br. at 79-84), the evidence in the record belies that contention. As found above, in 1989, the Air Force sought a proposal from ISN based upon a JCS SOW for 13 sites and ISN submitted to the Air Force a proposal for design and installation of IWAC at 13 sites. More importantly, when DO No. 6009 issued to ISN, the only attachment to the DO was an equipment list for 13 sites and, on the same date the DO issued, Mr. Krebs (the JCS IWAC program manager and COTR) sent ISN (with knowledge of AFDW's Contracting Office) a letter stating, "[i]n order to provide a turn-key network integration for the IWAC program, I request that [ISN] procure the hardware components necessary to implement a 13 site IWAC video teleconferencing/telecommunications network" and "costs for each increment should be based on total purchase quantity for 13 sites." Further, as we found above, even after the DO issued, Government and ISN personnel continued to focus on installation of IWAC at 13 sites. For example, when Mr. Carter of AFDW's Contracting Office sent ISN a revised hardware component list on 25 September 1989, that list set forth, among other things, "total quantities" for 13 sites and, during November 1989, COTR Krebs confirmed scheduling of a meeting with ISN to resolve "connectivity issues" for Hawaii, Germany, Korea, and Panama, four sites which were not among the first four sites to be installed. We note that, even in the 31 May 1990 notice of "partial" termination of the DO for convenience, which was issued after successful testing of the first four IWAC sites, AFDW's CO stated that the pre-installation plans for PACOM, LANTCOM, and SPACECOM (three sites not among the first four to be installed) were among "deliverables" to be completed by ISN.

The Air Force suggests we must conclude DO No. 6009 was for four sites because the funding set forth on the DO was $3,029,000.00 (Gov't br. at 86). The $3,029,000.00

amount set forth on the DO, however, does not correspond to ISN's cost for development and installation of IWAC at four sites or to any ISN proposal for performance of work. It simply constitutes the amount of funds deemed available to AFDW's CO for IWAC at time of issuance of the DO. As we found above, when ISN's Ms. Hendricks asked Mr. Carter (AFDW's contract specialist who had prepared DO No. 6009) about this amount, he repeatedly assured her that the Joint Chiefs had "lots of money," more money would be added to the DO, and she should not worry about the amount set forth. Moreover, as additional funds became available to AFDW for IWAC, the funds were added to the DO as if the DO was incrementally-funded. On 30 September 1989, AFDW's CO issued a modification increasing the DO amount by $170,000.00 without any explanation or justification. Also, in April 1990, AFDW's CO issued a modification increasing the DO amount by $220,000.00. While this modification indicated it was for on-site support for conduct of the IWAC functional evaluation and for purchase of encryption devices, that work was required by the March 1989 JCS SOW and was a part of ISN's April 1989 proposal in response to the SOW. That AFDW's CO deemed DO No. 6009 to be one which could have funds added incrementally is also supported by AFDW's repeated requests that ISN supply data regarding costs incurred to date. There would have been no reason for the CO to repeatedly solicit data from ISN regarding costs incurred and for ISN to submit such data if the parties deemed the DO to be for a "fixed price" of $3,029,000.00. We therefore conclude that AFDW's CO was not treating DO No. 6009 as a $3,029,000.00 "fixed price" DO for 4 sites, but as a DO for 13 sites to which additional funds would be added.

It is not disputed that the costs to develop and install a 13-site IWAC network in accordance with the March 1989 JCS SOW would have exceeded $6 million. ISN's proposal in response to the JCS SOW was $6,454,053.78, plus more than $4 million for 12 months of recurring communication circuit services. Similarly, Brig. Gen. Robinson approved an IWAC mission statement in June 1989 estimating costs for a 13-site IWAC network at $10,399,000. Accordingly, the "amount" of DO No. 6009, which changed the contract to provide for installation of a 13-site IWAC network, was not $3,029,000.00, as the Air Force asserts, but in excess of $6 million.

ISN's 12 December 1990 termination proposal using the total cost method is based on a net amount of $4,053,662.00. When constructive changes to the parties' contract are considered, as we discuss above, the contract price for purpose of establishing a payment limit under the Termination for Convenience clause is significantly in excess of the sum ISN seeks. The payment limit, thus, does not restrict ISN's recovery in this appeal to an amount less than that sought and is not of concern here.

Lost Volume Discounts

The Air Force contends that ISN may not recover the volume discounts it lost as a result of the partial termination of the DO from 13 to 4 sites, *i.e.*, ISN is only entitled to payment for the discounted prices of equipment supplied, not the actual prices it was charged when its vendors realized equipment was being procured for only 4 sites. The Air Force asserts that ISN "voluntarily" supplied the discounts because there was no requirement for 13 sites which "the contractor [wa]s obligated to fulfill." (Gov't br. at 88-93)

As we explain above, AFDW issued DO No. 6009 to ISN for the development and installation of an IWAC network at "13 sites." Despite the Air Force's assertion to the contrary, there was a DO requirement for "13 sites," which ISN was obligated to fulfill. ISN's supply of discounted equipment based upon a volume of 13 sites thus was not a voluntary act on its part, as the Air Force contends. Our decision in *Sierracin/Sylmar*, ASBCA Nos. 27531, 30380, 85-1 BCA ¶ 17,875, therefore, simply is not applicable to this appeal.

FAR 49.104 states that, among the duties of ISN after its receipt of notice of termination, was to "[p]erform the continued portion of the contract and [to] submit promptly any request for an equitable adjustment of price for the continued portion, supported by evidence of any increase in the cost, if the termination is partial." Here, ISN continued to perform unterminated contract work during the summer of 1990 and promptly submitted to AFDW a termination claim in September 1990 showing that its costs had increased for unterminated contract work as a result of the termination due to lost volume discounts and restocking charges from its vendors. The Termination for Convenience clause in the parties' contract expressly provides that, when the termination is partial, as here, the contractor may submit a proposal for an "equitable adjustment of the price(s) of the continued portion of the contract." FAR 52.249-2(k); *accord* FAR 49.208. ISN, therefore, is entitled to recover from the Air Force its increased cost of performing nonterminated work which arose from the convenience termination, *i.e.*, lost volume discounts and vendor restocking charges.[6]

Sprint Circuit Leases

The Air Force also contends that ISN may not recover its continuing costs after the termination for U.S. Sprint communication circuit leases. The Air Force asserts ISN was "taking a business risk when it negotiated the one-year contracts with US Sprint." (Gov't br. at 97-99)

As CO Hufford found in his draft decision, ISN's entry into one-year leases with U.S. Sprint for communication circuits was prudent because those leases yielded considerable cost savings to the Government over a monthly arrangement. Also, it is undisputed that the communication circuits ISN leased were necessary for the IWAC network. We, therefore, do not deem ISN's entry into the U.S. Sprint leases to constitute a "business risk" on its part, as the Air Force asserts.

Rental costs under unexpired leases, less the residual value of such leases, are generally allowable as termination costs when shown to have been reasonably necessary for the performance of the terminated contract and the contractor makes all reasonable efforts to terminate, assign, settle, or otherwise reduce the cost of such leases. FAR 31.205-42(e). Moreover, costs which cannot be discontinued immediately after the effective date of a termination are generally allowable. Only such costs continuing after the effective date of a termination due to the negligent or willful failure of the contractor to discontinue those costs are deemed unallowable. FAR 31.205-42(c); *see, generally, Qualex Int'l*, ASBCA 41962, 93-1 BCA ¶ 25,517 at 127,089; *American Elec., Inc.*, ASBCA No. 16635, 76-2 BCA ¶ 12,151 at 58,483-85, *modified on other grounds*, 77-2 BCA ¶ 12,792; *Baifield Indus. Div. of A-T-O, Inc.*, 76-2 BCA ¶ 12,096 at 58,091-93, *recon. denied*, 76-2 BCA ¶ 12,203; *see, also, Sundstrand Turbo v. United States*, 389 F.2d 406, 415 (Ct. Cl. 1968) (the lease period reimbursable may even extend beyond the contract's completion date if reasonable). ISN, therefore, is entitled to recover from the Air Force as termination costs its continuing expenses for Sprint leases, as provided by the FAR.

<u>Undelivered Equipment</u>

The Air Force contends that it need not pay ISN for the equipment which ISN is storing and has not delivered. The Air Force asserts ISN would be "unjustly enriched" if paid for the equipment because ISN "cannot prove" it "delivered any equipment to justify its entitlement to payment," and that ISN "should be sanctioned for attempting to secure payemnt [sic] for equipment not delivered." (Gov't br. at 104-06)

As we found above, ISN attempted to deliver the remaining IWAC equipment to Mr. Krebs, as CO Mohn directed. Mr. Krebs, however, canceled the delivery after he received from ISN a list of the equipment to be delivered, which set forth equipment he did not wish to receive. ISN, therefore, unpacked the equipment which had already been loaded into a van and returned it to storage, pending further instruction from Mr. Krebs with respect to a time that he would be available to receive the equipment and coordinate access to the Pentagon.

The Termination for Convenience clause set forth in the parties' contract states that, after notice of termination, a contractor is to "[t]ake any action that may be

necessary, or that the [CO] may direct, for the protection and preservation of the property related to this contract that is in the possession of the Contractor and in which the Government has or may acquire an interest." FAR 52.249-2(b)(8). The FAR further provides that, among the duties of a contractor after receipt of notice of termination, is "[t]ake necessary or directed action to protect and preserve property in the contractor's possession in which the Government has or may acquire an interest and, as directed by the TCO, deliver the property to the Government." FAR 49.104. We conclude ISN took necessary action to protect and preserve the equipment, and attempted to deliver the property to Mr. Krebs (as TCO Mohn directed), but was stopped from doing so by Mr. Krebs' cancellation of the delivery to the Pentagon.

The FAR states that, among the duties of the TCO after notice of termination, is "hold[ing] a conference with the contractor" to discuss "[a]rrangements for transfer of title and delivery to the Government of any material required by the Government." As found above, after he canceled ISN's equipment delivery, Mr. Krebs informed TCO Mohn in writing that he had received a list of equipment to be delivered by ISN and would not accept delivery of some of that equipment. There is no evidence in the record before us that, after being advised of Mr. Krebs' refusal to accept delivery of equipment, TCO Mohn took any action to arrange delivery by ISN of the equipment to another site or to resolve Mr. Krebs' concerns regarding delivery of specific items of equipment. Rather, the record suggests ISN simply was advised that Mr. Krebs needed to locate storage for the equipment TCO Mohn had said was to be delivered to the Pentagon. ISN accordingly lacked specific direction from TCO Mohn regarding delivery of the equipment at issue.

The Termination for Convenience clause set forth in the parties' contract states that the CO "shall exclude from the amounts payable to the Contractor . . . [because of the termination], the fair value, as determined by the [CO], of property that is destroyed, lost, stolen, or damaged so as to become undeliverable to the Government or to a buyer." FAR 52.249-2(g). There is no evidence in the appeal record that the equipment ISN attempted to deliver to Mr. Krebs has been destroyed, lost, stolen or damaged. Rather, the record reflects that the equipment is being stored in a secure location for future delivery, pending further direction. ISN, therefore, is entitled to recover from the Air Force as part of its termination cost proposal the value of the equipment it is securely storing, pending further delivery instruction.

Major Equipment Markup

The Air Force contends that ISN is not entitled to a markup on major equipment exceeding 12%. The Air Force asserts that, while ISN claims that the 12% "profit rate" applies only to a "13-site" network, "ISN never told the Government that if it only ordered four sites, [ISN's] rate would be greater." (Gov't br. at 93-95)

While the Air Force characterizes ISN's claim for a different "handling fee" as one seeking "anticipatory profit" (Gov't br. at 94), which is not allowed under the contract's convenience termination clause, *e.g., Molony & Rubien Constr. Co.*, ASBCA No. 22280, 78-1 BCA ¶ 13,000 at 63,400; FAR 49.202, the Air Force's characterization of ISN's claim is misleading. We initially consider ISN's claim as seeking that part of actual overhead incurred during DO performance of unterminated work which, but for AFDW's reduction in number of IWAC sites, would have been recovered under the DO. *See, e.g., H.L. Yoh Co. v. United States*, 288 F.2d 493, 494-95 (Ct. Cl. 1961); *Wheeler Bros., Inc.*, ASBCA No. 20465, 79-1 BCA ¶ 13,642 at 66,919.

The 12% "handling fee" for major equipment agreed to by ISN constituted both "G&A" and "fee." As found above, ISN submitted to AFDW a bill of materials which reflected a revised 12% markup for 10 equipment categories with "total" price quotes for 13 IWAC sites. The contracting parties thus contemplated that the dollar volume of work to be performed under the DO for 13 sites would allow ISN to recover the direct costs of the equipment furnished, plus its overhead and a reasonable amount of profit. Due to AFDW's partial termination of DO No. 6009, the dollar volume of the work performed, including major equipment supplied, was significantly less than the parties contemplated. This reduction in work under DO No. 6009 affected the "dollar volume" ISN would have realized had the Air Force fully performed the DO. ISN, therefore, was no longer able to spread its fixed overhead over major equipment for 13 sites.

The Termination for Convenience clause set forth in the parties' contract allows ISN to recover its costs as it would have had it known the dollar volume of work to be performed would be less. *Fairchild Stratos Corp.*, ASBCA No. 9169, 67-1 BCA ¶ 6225 at 28,798-99. Where a contractor, such as ISN, quotes a percentage markup for overhead based upon a specified quantity of work and part of that quantity later is terminated for convenience, this Board must ascertain what overhead rate the contractor would have quoted upon the "quantity as terminated" for comparison with the overhead rate quoted upon the "original quantity." To the extent that the overhead rate quoted changes due to the partial termination of work, the contractor is entitled to an equitable adjustment which applies the increase to the work quantity performed. *Id.*; *accord H.L. Yoh Co. v. United States*, 288 F.2d at 494-95; *Wheeler Bros., Inc.*, 79-1 BCA ¶ 13,642 at 66,919.

Moreover, we note that, to the extent ISN is seeking to increase its "handling charge" markup on major equipment based upon the fee component of that markup, the convenience termination clause set forth in the parties' contract expressly provides that, if the parties agree upon the whole amount to be paid because of the termination of work, the contractor is to be given "a reasonable allowance for profit on work done." FAR 52.249-2(e). The parties' agreed settlement is supposed to "compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract, including a reasonable allowance for profit." FAR 49.201(a); *accord* FAR

49.202 ("TCO shall allow profit on preparations made and work done by the contractor for the terminated portion of the contract but not on the settlement expenses"); *see, e.g., Metered Laundry Servs.*, ASBCA No. 21573, 78-1 BCA ¶ 13,206 at 64,606, *modified on other grounds*, 78-2 BCA ¶ 13,451. ISN, therefore, is not precluded from seeking an increase in its "handling charge" markup on major equipment as part of its termination cost proposal, as the Air Force asserts.

Prompt Payment Act Interest[7]

The Air Force contends that ISN is not entitled to a PPA interest penalty on invoices 2 and 3. The Air Force asserts that AFDW advised ISN that it disputed the amount of both invoices 2 and 3, and thus ISN is not entitled to payment of any PPA interest. (Gov't br. at 99-101)

"Interest on amounts owed by the Government is payable only to the extent authorized by statute or contract provision." *James Lowe, Inc.*, ASBCA No. 42026, 92-2 BCA ¶ 24,835 at 123,903, *citing United States v. Thayer-West Point Hotel Co.*, 329 U.S. 585 (1947). Pursuant to the Prompt Payment clause of the contract (FAR 52.232-25), as authorized by the PPA, 31 U.S.C. §§ 3901-3906, payment is due 30 days after the receipt of a proper invoice, and an interest penalty is assessed from that date if payment is not made within a 15-day grace period after the due date.[8] Interest penalties, however, are not required when payment is delayed due to a dispute over the amount of payment or other issues involving contract compliance, but might be due the contractor under the CDA, 41 U.S.C. § 611. *E.g., Ross & McDonald Contracting, GmbH*, ASBCA Nos. 38154 *et al.*, 94-1 BCA ¶ 26,316 at 130,893; *James Lowe, Inc., supra* at 123,903. The fact that a contractor may ultimately prevail on the merits of an underlying dispute does not defeat an otherwise proper good faith dispute at the time of the withholding. *Ross & McDonald Contracting, GmbH, supra*, at 130,894.

As found above, AFDW advised ISN there was a dispute regarding the amount of invoice 2. ISN's invoice 3 included amounts under invoice 2 not paid and specifically disputed by AFDW. Moreover, ISN's invoice included U.S. Sprint circuit charges with a 21.1% markup among the ODCs, and labor and travel costs for the period after DO No. 6009's partial termination, even though the invoice indicated it was for pre-termination costs. After the partial termination, the Air Force consistently disputed any ISN markup on U.S. Sprint circuit charges. It also disputed that the costs set forth on invoice 3 were all pre-termination costs because the Air Force was attempting to comply with the FAR, which provides that the amount to be paid "because of termination" is to be the subject of a negotiated termination settlement proposal or determined by the CO in accordance with the FAR (FAR 52.249-2(d), (e), (f), (i); *see* FAR 49.103, 49.104(h), 49.105(a), (b)). The Air Force, therefore, correctly asserts that there was an objectively discernible dispute

with respect to the amounts of both invoices 2 and 3. *See, e.g., Information Systems and Networks Corporation*, ASBCA No. 46119, 96-1 BCA ¶ 28,059 at 140,121.

While ISN asserts that AFDW should have paid it monies sought in the invoices which were not specifically disputed (app. reply br. at 86-89), which AFDW did at least in part with respect to invoice 2, as explained above, there was an objectively discernible dispute with respect to the unpaid amounts until after ISN submitted its CDA claim. PPA interest does not continue to accrue after the submission of a CDA claim for an interest penalty. 31 U.S.C. § 3906(b)(1). In sum, under the provisions of the parties' contract, the existence of an objectively discernible dispute with respect to the amounts invoiced was sufficient for AFDW to not make payment and excuse payment of PPA interest on the invoices. *See, e.g., James Lowe, Inc., supra* at 123,902-03; FAR 52.232-25(a)(6)(iv); 31 U.S.C. § 3907(c). ISN, therefore, is not entitled to recover "PPA interest" upon the unpaid amounts of the two invoices.

CONCLUSION

The appeal is sustained to the extent stated, and remanded to the parties to resolve quantum.

Dated: 10 July 2002

TERRENCE S. HARTMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur in result
(See separate opinion)

CHERYL SCOTT ROME
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

EUNICE W. THOMAS
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

NOTES

1 A "node" was a designated site that could accept the contemplated installation (tr. 1/81). Depending upon the manner in which the nodes were counted (one node covered two organizations), the projected network would cover 12 or 13 sites (tr. 1/88-89, 95). Hereafter, we generally refer to 13 sites.

2 The Air Force did not call CO Dillon to testify at trial. The record, therefore, does not contain any sworn testimony from her concerning DO No. 6009, modifications to the DO, or PNMs, which she executed.

3 The record in this appeal does not contain information regarding any 24 August 1989 negotiated markup, except that Mr. Krebs later reported that ISN had agreed at a 24 August 1989 meeting to a straight pass through of Sprint costs, with no markup for ISN (see below).

4 Mr. Krebs suggested at trial that, in this memorandum, he was referring only to an "installation schedule" for the first "four sites." He admitted, however, that the Hawaii, Germany, Korea and Panama sites he referred to as needing resolution of connectivity issues were not among the first four IWAC sites ISN was to install (tr. 1/237-39).

5 In discussing the "dilemmas" faced by the CO and the actions taken to modify ISN's contract, this Board does not approve of or, in any manner, condone the

course of conduct selected. The CO's actions in this appeal may violate various procurement regulations. *See, e.g.*, FAR 6.101(b) (CO shall provide for full and open competition), 6.303-1 (CO shall not commence negotiation of sole source contract or award any other contract without full and open competition based on unusual and compelling urgency unless CO justifies use of such action in writing, as required by FAR 6.302(c), and obtains approval from competition advocate or head of procuring activity under FAR 6.304). Neither party here, however, has raised a question of legality. We, thus need not and do not address the legality of the CO's actions in modifying the contract.

6 FAR 49.001 defines a "partial termination" as "the termination of a part, but not all, of the work that has not been completed and accepted under a contract." While this definition envisions that some work will continue after the issuance of the notice of termination, "in practice, the term also has been applied to cases where a part of the work has already been completed and accepted and the balance terminated." John Cibinic, Jr., and Ralph C. Nash, Jr., ADMINISTRATION OF GOVERNMENT CONTRACTS 1131 (3d ed. 1995).

7 ISN's CDA claim for recovery of interest upon unpaid invoices is not a "model of clarity." However, we have held that, for us to exercise jurisdiction over a PPA claim, it need not be. *Toombs & Co., Inc.*, ASBCA Nos. 35085, 35806, 89-1 BCA ¶ 21,402 at 107,885-86. Rather, the claim need only present sufficient detail to notify the CO of the basic factual allegations upon which the claim is premised. *Id.* ISN's CDA claim sufficiently apprised the CO that it was seeking payment of invoices 2 and 3, and interest accruing on the amounts of the invoices. Reference to payment of "interest" on the invoices accruing after submission of the invoices to AFDW could only connote that ISN believed that the PPA interest penalty was applicable. As found above, AFDW already had paid ISN interest pursuant to the PPA on an invoice not promptly paid. We, thus, may entertain ISN's claim for interest, which the Air Force has construed as seeking the PPA interest penalty, and address the parties' contention with respect to PPA interest. *See id.*; FAR 52.232-25; 31 U.S.C. §§ 3901-3906.

8 The parties' contract at issue was entered into, and DO No. 6009 was issued by AFDW under the contract's "initial" term, prior to the effective date of the 1988 amendments to the PPA. PPA Amendments of 1988 § 14(a), Pub. L. No. 100-496, 102 Stat. 2455 (1988); Revised OMB Circular A-125, 54 Fed. Reg. 52700 (1989), § 15c. We, thus, address the PPA as it existed prior to those amendments.

CONCURRING OPINION BY ADMINISTRATIVE JUDGE ROME

I concur in the result, principally because appellant did not file a claim for contract breach; did not assert breach before the Board; and I do not agree that there was a breach. The general "Performance Work Statement/Statement of Work/Specification" included in the parties' basic contract covered design, installation and management of the integration of computer systems and networks, including local and wide area networks, at the Air Force's 7th Communications Group at the Pentagon, and at other Air Force Departments in the Washington, DC area (R4, tab at C-1). The Air Force Headquarters Communications Facility Statement of Work referenced in that general work statement covered general requirements for the installation, construction, testing and alignment of a communications facility to provide "communications, video and audio (voice) conferencing and data communications services" (R4, tab 1 at attach. (1)). IWAC, too, required such services.

Appellant vigorously pursued the IWAC work, competed with another 8(a) contractor to get it, and was delighted when it succeeded. Prior to the Government's issuance of DO No. 6009 and earlier delivery orders covering the IWAC work, appellant joined the Government in executing bilateral Modification No. P00001 to the parties' basic contract, which added the Joint Chiefs of Staff as an entity for which appellant was to perform work (R4, tab 1(b)). The basic contract's Indefinite Quantity clause authorized the Government to "issue orders requiring delivery to multiple destinations or performance at multiple locations" (R4, tab 1 at I-15, ¶ 17.(c)). There is nothing remarkable in the fact that the Government issued DO No. 6009 unilaterally. The basic contract's Ordering clause called for the issuance of unilateral delivery orders (R4, tab 1 at I-14).

In my view, DO No. 6009 was incrementally funded and covered 13 sites. When the Government partially terminated the delivery order for convenience, eliminating most work that would have followed completion of the four-site "proof of concept," appellant was entitled under the basic contract's Termination for Convenience clause to an equitable adjustment in the price of the continued portion of the contract, as the majority finds. That clause provides the needed remedy.

CHERYL SCOTT ROME
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 46119, Appeal of Information Systems & Networks Corporation, rendered in conformance with the Board's Charter.

Dated: 11 JUL 2002

EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals