IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION, | ) | |
| Plaintiff, | ) | No. 04-632C (Judge Bush) |
| v. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**APPENDIX TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT CONCERNING AMENDED COMPLAINT**

NORMAN H. SINGER, Esquire
10411 Motor City Drive
Suite 725
Bethesda, Maryland 20817
Tel. (301) 469-0400
Fax (301) 469-0403

Counsel for Plaintiff

June 22, 2005

# INDEX TO THE APPENDIX

Page

_Appeal of Information Systems & Networks Corporation_, ASBCA No. 46119 (2002) .......... 1

Settlement Agreement (April 14, 2003) .......... 56

Table B-1 of Subcontract .......... 58

Tripartite Agreement Signature Page .......... 59

Provision 23 .......... 60

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Information Systems & Networks Corporation | ) | ASBCA No. 46119 |
| | ) | |
| Under Contract No. F49642-88-D-0054 | ) | |

APPEARANCE FOR THE APPELLANT: Norman H. Singer, Esq.
Singer & Associates, P.C.
Bethesda, MD

APPEARANCES FOR THE GOVERNMENT: COL Alexander W. Purdue, USAF
Chief Trial Attorney
Mark E. Landers, Esq.
Maria S. Kavouras, Esq.
Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE HARTMAN

The Department of the Air Force terminated for convenience "part" of a delivery order issued under appellant's indefinite quantity contract. The Air Force contends the delivery order terminated was for work at four sites at a "fixed price" of $3,400,378.95 (as modified) and that appellant is precluded from recovering costs exceeding that sum, less $158,315.00 for equipment the Air Force asserts was not delivered and $170,000.00 the Air Force asserts was added to the delivery order to preserve "end-of-year" funds and for which no work was to be performed. Appellant, in contrast, contends that the delivery order was for work at 13 sites, and was being funded incrementally. Appellant asserts that, due to the Air Force's reduction of work from 13 to 4 sites, it is entitled to recover its lost vendor volume discounts, expenses incurred for one-year leases of communication circuits, and other costs relating to the termination. Appellant additionally contends that, under the Prompt Payment Act (PPA), 31 U.S.C. §§ 3901-07, it is entitled to interest on two unpaid invoices for the terminated delivery order. While appellant asserts that the two invoices were not "disputed," the Air Force contends otherwise.

Appellant's appeal is from the Air Force Contracting Officer's deemed denial of its $1,383,110.93 certified claim and pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 605(c)(5). Only the issue of entitlement currently is before the Board.

## FINDINGS OF FACT

### The Contract

Effective 22 September 1988, the Air Force District of Washington (AFDW) entered into an indefinite-quantity contract, No. F49642-88-D-0054, with the Small Business Administration (SBA) for provision of "all labor, tools, supervision and other services necessary to design, install, certify and manage the integration of 7CG computers, computer system and networks including local and wide area networks at the 7CG Air Force Communications, Pentagon, Wash. DC., and other Air Force Departments in the Washington DC metropolitan area, **in accordance with . . . Statement of Work, dated 01 Sep 88.**" Simultaneously, pursuant to section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), the SBA entered into a contract, No. 3-88-1-2885, with appellant, Information Systems & Networks Corporation (ISN), for the performance of that work. We refer to these contracts collectively as the "contract." (R4, tab 1) (emphasis added)

The 1 September 1988 statement of work (SOW) appended to the parties' contract set forth "general requirements" to "install, test[,] and align a Communication Facility (CF) for the HQ U.S. Air Force," portions of which were "already installed and available as Government Furnished Equipment." The SOW divided the uninstalled cable plant into "segments," which were to be treated as separate deliverables and "considered optional at the Government's discretion." While the first paragraph of the SOW noted that "[t]he CF shall be used to provide voice communications, video and audio (voice) conferencing and data communications service to the HQ USAF," the SOW repeatedly provided that the contractor shall "complete the work according to the original specifications" for the CF. In sum, the SOW required ISN "to complete the inside CF cable plant" using "cable and components [which] shall be of the same type and brand used on the original HQ USAF CF Installation already in progress." (*Id.*)

The contract period was from date of award through 30 September 1989, unless the contract was terminated or extended by the Government's exercise of an option (R4, tab 1 at F-1, ¶ 1). Total contract duration was not to exceed 60 months (R4, tab 1 at I-9, ¶ 3).

The contract contained or incorporated various standard clauses, including Federal Acquisition Regulation (FAR) 52.232-1 PAYMENTS (APR 1984); 52.243-1 CHANGES - FIXED-PRICE (AUG 1987); 52.233-1 DISPUTES – ALT I (APR 1984); 52.249-2 TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE CONTRACTS) (APR 1984); 52.232-25 PROMPT PAYMENT (FEB 1988); 52.216-18 ORDERING (APR 1984); and 52.216-22 INDEFINITE QUANTITY (APR 1984) (R4, tab 1 at H-9, I-2, I-3, I-5, I-14, I-15). The contract's Indefinite Quantity clause, FAR 52.216-22, provided that the contractor was to furnish to the Air Force, when ordered, "supplies or services specified

in the Schedule," up to a maximum of $800,000 per year, and that the Air Force was to order at least a minimum of $80,000 per year (R4, tab 1 at 1, and I-15, ¶ 17.(b)). The clause further provided that delivery and/or performance was to "be made only as authorized by orders issued in accordance with the Ordering clause," FAR 52.216-18, and any order which was issued during the effective period of the contract and not completed within that period shall be completed by the contractor within the time specified in the order. The Ordering clause, FAR 52.216-18, stated that the supplies or services to be furnished under the contract were to be ordered through delivery orders (DOs) issued by the individuals or activities "designated in the Schedule" and that DOs were subject to the terms of the contract, which would control in the event of a conflict with any DO (R4, tab 1 at I-14, ¶ 15.(a), (b)). The parties' contract provided that the Air Force would make payment to the contractor upon the receipt of a "proper invoice," as required by FAR 52.232-1, "for all services completed and accepted during the month" (R4, tab 1 at G-1, ¶ 3), and that invoices were to be submitted to a 7CG (Air Force) office at the Pentagon and paid by a different 7CG (Air Force) office within the Pentagon (R4, tab 1 at G-1, ¶ 3).

The contract listed unburdened direct labor rates for 15 labor categories and provided that, subject to a post-award audit by the Defense Contract Audit Agency (DCAA), the following cost elements would be applied to direct labor costs: fringe benefits (33.50%); on-site overhead (48.09%); general and administrative expenses (G&A) (11.10%); and profit (10%) (R4, tab 1 at B-1a). The listed rates were effective from date of contract award through 30 September 1989, with new rates to be negotiated for any extended contract period (*id.*).

On 15 September 1989, contracting officer (CO) Joanne Mohn executed unilateral Modification (Mod.) No. P00002 to the contract, effective 1 October 1989, exercising the Government's option to extend the contract's term through 30 September 1990 (R4, tab 1b). In September of 1990, she executed unilateral Mod. No. P00003, effective 1 October 1990, extending the term through 30 September 1991 (R4, tab 1c). Both Mod. Nos. P00002 and P00003 contained the standard AVAILABILITY OF FUNDS clause, FAR 52.232-18 (APR 1984), with respect to the option periods (R4, tabs 1b, 1c).

<u>The IWAC Project -- Background</u>

In September 1988, The Joint Chiefs of Staff (JCS or Joint Staff) entered into a "Memorandum of Agreement" with the Assistant Secretary of Defense (Comptroller) regarding funding for an Internetted Warfighting Analysis Capability (IWAC) project, which would link via a network the "commanders of the unified and specified commands to participate, real time," in wargaming and analysis, "build[ing] upon existing Modern Aids to Planning Program (MAPP) analysis capabilities" at each command (AR4, tab 3; tr. 2/93-94). The agreement contemplated that the IWAC project would be accomplished during Fiscal Year (FY) 1989, and require $6 million in operation and maintenance

(O&M) funds and $1.3 million in procurement funds. JCS was to provide part of the funding from MAPP procurement funds. The Comptroller was to provide most of the funding from O&M funds.

Gerard Krebs, a computer specialist and systems analyst who worked in the JCS Force Structure, Resource, and Assessment Directorate (J-8), was directed to find a contract vehicle whose scope could cover the IWAC project. Because Mr. Krebs lived near Andrews Air Force Base and had seen a sign at the base with an arrow pointing to a "contracting office," he visited AFDW's Contracting Office and met with one of its COs, Ms. Mohn. This was the first time Mr. Krebs had dealt with AFDW's Contracting Office and he did not believe that office had been involved in other JCS procurement projects. (AR4, tab 3 at 2; tr. 1/24-29, 76-78, 196-97)

After meeting several times to discuss the IWAC "concept" (tr. 1/27-28), on 9 March 1989, Mr. Krebs forwarded to CO Mohn a five-page IWAC SOW, which stated that the Joint Chiefs of Staff had an "urgent requirement" for a network "to facilitate the expeditious exchange of worldwide nuclear and conventional force structure, and warfighting capability information between the Commander in Chiefs (CINCs) and the Joint [Chiefs of] Staff" (SR4, tab 3, SOW at ¶ 6.a.). The SOW called for "providing VAX to VAX connectivity using 56kbs service and linking all sites for teleconferencing using commercial T1 service" from "AT&T and/or U.S. Sprint long haul communication lines" with "encryption devices to allow passage of classified data to the Top Secret level" (*id.* at ¶¶ 5.b., 8.b.). J-8 analytical computers were to serve as the "center hub" processor for "11 external nodes" (*id.* at ¶¶ 8.b., 9.a.). Design details for the network were to be a "contractor deliverable" (*id.* at ¶ 9.b.). Network acceptance was "subject to formal Joint Staff/J-8/TSD acceptance testing" (*id.* at ¶ 10). Half of the sites were to be installed and tested by September 1989, and be operational in October 1989. The remainder were to be installed and tested by February of 1990, and be operational in March of 1990. (*Id.* at ¶ 4) Three of the sites (plus the hub) were to be installed as "prototype" sites and be "accomplished as soon as possible" (*id.* at ¶¶ 8.b., 11.a.).[1]

AFDW's Contracting Office had ISN and INET, an ISN competitor that was also performing work in support of Air Force communication/networking needs under an 8(a) contract, give oral presentations to JCS concerning how each company would implement the IWAC SOW. JCS selected ISN. (*See* AR4, tab 29; tr. 6/104, 111, 203, 7/117-18)

On 3 April 1989, Michael Rogers, ISN's director of contracts (tr. 3/42), submitted to AFDW contract specialist Kenneth Carter (tr. 5/129) a 42-page technical and budgetary proposal based on the 9 March IWAC SOW and a 13-site network (R4, tab 3, 3a, 3b; tr. 5/139-40). ISN's "budgetary estimate" for the project was $6,454,053.78. Adding costs for 12 months of recurring communication circuit services, identified as "Option," the

estimate totaled $10,789,447.37. (R4, tab 3b at 2) ISN stated in the proposal that it "will design a network that will provide T1 connectivity between the eleven IWAC subscribers and J-8" (R4, tab 3a at 1, ¶ 1.1), and that "[n]etwork installation at the three designated prototype sites will be accomplished as soon as possible after an agreed upon network design" (*id.* at 8, ¶ 1.2.4).

Effective 6 April 1989, Mr. Rogers and CO Germaine Dillon, who worked under CO Mohn and was Mr. Carter's immediate supervisor (tr. 6/46, 120), executed bilateral Mod. No. P00001 to ISN's contract adding "The Joint Staff, Pentagon . . . ," to the Air Force locations set forth in the Schedule for performance of work (R4, tab 1a). AFDW's Contracting Office thereafter issued seven DOs under ISN's contract (DO Nos. 6001-6004, 6006-6008) for performance of IWAC work -- site surveys, training and other matters (*see* AR4, tab 95, attach. 1).

In a 14 April 1989 executive summary for J-8, Mr. Krebs noted that the IWAC project had a funding shortfall for FY89 and FY90 due, in part, to the fact "IWAC will achieve full 12 node operational capability in two fiscal years rather than three as was the original plan" (AR4, tab 6, ¶ 6.a.). An attachment to this executive summary stated that the ISN "[f]unding requirements are based on costs necessary to develop and implement a technical plan to accomplish phased internetting of 13 IWAC nodes with the Joint Staff analytical computers" (AR4, tab 6 at 4th typewritten page).

The Air Force contends in this appeal that negotiations occurred on 25 April 1989 between ISN and AFDW finalizing the price of an eighth IWAC DO, DO No. 6009. We do not, however, find the Air Force's evidence regarding the existence of such negotiations to be credible. The Air Force offers an undated Price Negotiation Memorandum (PNM), which was prepared and signed by Mr. Carter, and signed by CO Dillon (SR4, tab 5b; tr. 6/28). The PNM lists ISN's IWAC proposal as having been submitted on 28 March 1989 and a revised ISN proposal for $3,029,000.00 being submitted on 1 April 1989 ($1,046,357.13 labor + $1,982,642.87 material/equipment) (SR4 tab 5b at ¶¶ 1.a., 1.b.) There are no ISN proposals in the appeal record dated 28 March 1989 or 1 April 1989. As found above, ISN submitted its IWAC proposal on 3 April 1989. The PNM further lists the contractor's proposed amount, Government's objective, and amount negotiated for "Material/Equipment" all as "$1,982,642.87." The amount listed is identical to the amount ISN advised AFDW on 2 April 1990, almost a year later, was its "equipment" expenditures as of that date and, as found below, ISN's equipment markup (which was part of this amount) was not finalized by the parties until September 1989, more than four months after the alleged 25 April 1989 negotiation. Finally, while the PNM lists Steve Simons, Carl Neubecker, Mr. Krebs and Mr. Carter as participating in the 25 April 1989 negotiation, none of the individuals listed, with the exception of Mr. Carter, testified that the 25 April price negotiation actually occurred. Mr. Krebs, who was the CO's technical representative (COTR) for the IWAC project and

was responsible for validating ISN's invoices (tr. 1/26, 241), in addition to being IWAC project manager for the Joint Staff/J-8, could not recall the alleged negotiation or any discussion of a $3,029,000 price (tr. 1/156-58). Mr. Neubecker, a former ISN employee, testified that he had only an indefinite recollection of price negotiations with the Government prior to issuance of DO No. 6009. He stated that no ISN contract personnel were listed in the PNM as having attended the 25 April 1989 meeting, rendering it unlikely that a pricing agreement could have been concluded at that time. While Mr. Neubecker could not remember a specific time frame, he recalled generally that the Government deemed ISN's proposed costs to be too high and that ISN had worked to lower them, including adjusting its design and negotiating with vendors. Mr. Neubecker, who had been ISN's Video-Teleconferencing Division director, IWAC project manager, and official designated to "interface" with Mr. Krebs (tr. 4/8, 44), stated under oath that he did not engage in any direct negotiations with AFDW over terms and prices in ISN's 3 April proposal or negotiate a $3,029,000.00 DO price. (Tr. 4/38-42, 66-67, 124-26) Mr. Simons, an ISN telecommunications vice president who did not have final contracting authority (tr. 3/46-47, 233-34, 4/90), was deceased at the time of trial. While Mr. Carter initially testified that he negotiated DO No. 6009 on 25 April 1989 and the equipment markup was agreed to during those negotiations, he subsequently testified that the markup had been reduced later, with the negotiated DO amount simply remaining the same (tr. 5/159-160, 6/71-72).[2] It is clear from the foregoing, and from our findings of fact below, that DO No. 6009's terms and price were not finalized on 25 April 1989. We therefore find the undated PNM and Mr. Carter's testimony pertaining thereto to be not credible.

In an internal ISN memorandum dated 27 April 1989, Mr. Rogers reported that the "[DO] for JCS has not been issued" due to the SBA's and the CO's determination that "ISN's participation" must equal at least "50% of the total dollar value of the [DO]" or else AFDW had to get SBA's approval before issuing the DO (SR4, tab 13A at 1). He attached an SBA "Special Conditions" provision to that effect, noting the SBA planned to incorporate the provision into the parties' contract by modification and the Air Force CO intended to enforce that provision, regardless (*id.*). Mr. Rogers added that:

> Recently, the [CO] has expressed a willingness to issue the JCS [DO] promptly by reducing the amount of equipment to be ordered to achieve a 50/50 split between labor and equipment. That equipment removed from the [DO] will be provided as GFE.

(*Id.*) Mr. Rogers concluded that the basic contract was clearly a services contract as defined in FAR 37.101 ("'Service contract' means a contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task

rather than to furnish an end item of supply") and that ISN was satisfying the Limitations on Subcontracting FAR clause (under services contract, "[a]t least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern") (R4, tab 1 at H-9, ¶ 24.(a)). He opined that "[i]f you consider only this FAR clause, the JCS [DO] can be issued without alteration of the required equipment" (SR4, tab 13A at 1). He suggested ISN challenge SBA's special provision or request a waiver; and prove to the CO that it was more beneficial to the Government "to proceed as we have proposed," *i.e.*, with ISN supplying all equipment (*id.* at 2).

In a 1 June 1989 executive summary for the Joint Staff, which attached J-8's 9 March 1989 SOW (tr. 1/159), Mr. Krebs stated that SBA and AFDW had approved "[t]he concept of allowing the IWAC effort to 'piggyback' off of the . . . [ISN] contract" (AR4, tab 7 at ¶ 4). He said that: ISN would "provide ADP [automated data processing] technical services in the performance of all task orders issued through AFDW by J-8 against the basic contract" (*id.* at ¶ 5); J-8 had to authorize equipment procurement on a case by case basis and, even though it had completed a preliminary network analysis and a composite equipment requirements list, the precise types or amounts of services to be ordered would be determined as the effort matured (*id.* at ¶¶ 5, 6); services were to be ordered by "negotiated [DOs] with specifically defined scopes of work, schedules for completion, technical requirements, criteria for deliverable products, and total price" (*id.* at ¶ 7); and the negotiated DO process would be followed "[f]or each J-8 requirement or segment of work" (*id.* at ¶ 8.a.; *see also* ¶ 8.b.). Mr. Krebs recommended J-8 "MIPR" (*i.e.*, issue a Military Interdepartmental Purchase Request for) $500,000 in O&M funds and $500,000 in procurement funds to AFDW "to begin FY89 network installation" and stated that additional MIPRs totaling about $2.25 million could be expected (*id.* at ¶ 9.a).

On 5 June 1989, the Department of Defense (DOD) Washington Headquarters Services Installation Accounting Branch prepared MIPR No. DJAM90061 to AFDW in the amount of $500,000, "for the services and purchase of equipment to accomplish an IWAC video conferencing network as stated in the attached SOW." The MIPR named Mr. Krebs as the point of contact. (R4, tab 19d at fourth page) The record copy of the MIPR does not include an SOW, but we infer it was J-8's 9 March 1989 SOW, which had been attached to Mr. Krebs' 1 June 1989 report. Also, on 5 June 1989, the same office prepared MIPR No. DJAM90062 to AFDW in the amount of $500,000, "for the services and purchases associated with an IWAC video conferencing network" (R4, tab 19d at fifth page). The same month, by memorandum dated 23 June 1989, J-8's Deputy Director, Brig. Gen. John Robinson, approved an attached, undated, IWAC Mission Need Statement which estimated O&M and procurement costs for 12 nodes at $3,716,000 for FY 89, $2,866,000 for FY 1990, and $3,817,000 for FY 91, for a total of $10,399,000 (AR4, tab 32 at 14, 18).

By letter dated 1 August 1989 to Mr. Carter, Mr. Rogers submitted invoice No. 1218-04-001, in the total amount of $9,328.49, covering expenses for two IWAC site surveys, SPACECOM (Colorado) and EUCOM (Germany), said to have been done at Mr. Krebs' request (R4, tab 61b). On 4 August 1989, Mr. Krebs provided an IWAC "update" to J-8, noting that: eight site surveys had been completed; "[c]ompetitive bids for hardware procurement and T-1 circuits [had] been accomplished;" U.S. Sprint had been selected as the domestic circuit carrier; and "[w]e begin hardware installation and site connectivity in September 89" (AR4, tab 12 at ¶ 2). Attached to this "update" was a schedule of telephonic connectivity dates for 13 sites, with J-8, CENTCOM, SAC and TRANSCOM to be completed by 4 December 1989, and the remainder to be completed by November 1990 (*id.* at attach. 2).

By letter dated 9 August 1989, Mr. Rogers sent Mr. Carter a 16-page "Bill of Materials" (including two summary sheets) containing equipment price quotes for a 13-site network, which included a 21.1% markup for ISN (11.1% G&A; 10% fee) and no U.S. Sprint charges (R4, tabs 19b, 19b-1). Mr. Rogers stated in his cover letter that, by having ISN purchase this equipment, the Government "will have a single point of procurement which will avoid potential conflicts between Vendor and Contractor with regards to performance responsibility, especially during a network outage," but ISN will "work with any vendor that the Government has qualified to supply equipment." (R4, tab 19b)

At least two of ISN's equipment quotes were based on volume discounts. For example, ISN priced the Rembrandt Video Codec System (codec), which was sold by Compression Labs Incorporated (CLI), and said by ISN to be the "[s]ingle most important piece of equipment to the video teleconferencing suites," at $47,450.00 per unit, plus ISN's markup (R4, tab 19b-1 at 3). ISN stated that 26 codecs were required at a total cost of $1,507,704.70 and noted that, if five codecs were purchased with a commitment for 26 in 12 months, the $47,450.00 unit price would remain the same for all (*id.*) since CLI had offered pricing based on volume discounts (AR4, tab 10). Similarly, ISN's $53,520 unit price quote for Spartan Video Modules sold by Videoconferencing Systems, Inc. (VSI) (R4, tab 19b-1 at 7) varied based on volume discounts (AR4, tab 11).

On 23 August 1989, Mr. Krebs sent to Mr. Neubecker an "IWAC Connectivity Dates" schedule covering 13 sites, which indicated that it also had been distributed to U.S. Sprint and AFDW. The schedule set forth connectivity dates for J-8, CENTCOM, SAC and TRANSCOM in October, November and December of 1989. Five sites had connectivity dates during 1990 and four sites had connectivity dates to be "determined" at a future date. (AR4, tab 15)

Also, on 23 August 1989, DataBeam Corporation (DataBeam), a vendor that had not been included in Mr. Rogers' 9 August 1989 Bill of Materials, sent Mr. Neubecker a

quotation for 12 full color high resolution graphics systems and a 19.2 Kbps data bridge (19.2 bridge) necessary for multipoint conferences. DataBeam offered to discount its unit price for the graphics system from $51,950.00 to $39,740.00 if ISN purchased 12 systems because ISN was deemed to be a distributor or integrator. (AR4, tab 115; SR4, tab 15A; tr. 1/115-17)

In a 25 August 1989 memorandum to the AFDW Contracting Office, which was to the attention of Mr. Carter and executed by Mr. Krebs as "Joint Staff/J-8/CSD IWAC Program Manager," Mr. Krebs stated:

> 1. In order to provide the turn-key network integration for the IWAC program, I request that . . . [ISN] procure the hardware components necessary to implement the IWAC network.
>
> 2. As you are aware, the IWAC network installation is incremented by site. Equipment costs for the first full increment should be based on total purchase quantity. Attachment 1 is the equipment order list. Prices for the hardware components are achieved by combining the cost of the item as indicated in attachment 2, plus the negotiated markup agreed to at the 24 August meeting between you and Michael Rogers of ISN. [3]

(AR4, tab 17) Two documents were appended to Mr. Krebs' memorandum. The first was a one-page list entitled IWAC Hardware Component Requirements, which set forth an "Initial Quantity" based on 4 sites and a "Total Quantity" based on 13 sites for 12 items of hardware, including DataBeam's graphics system and data bridge (*id.*). The second was an ISN 10-page Bill of Materials, plus a VSI pricing sheet. This Bill of Materials differed from the one submitted 9 August 1989 by, among other things, including the DataBeam equipment and Motorola, Inc. encryption devices. (*Id.*) The revised materials bill continued to include CLI's and VSI's equipment and discounted prices (AR4, tab 17 at attach. 2). The prices set forth for Motorola's security devices also included volume discounts (AR4, tab 8 at 3).

On 6 September 1989, DOD's Washington Headquarters Services Installation Accounting Branch issued MIPR No. DJAM90078 to AFDW's Contracting Office, in the separately appropriated amounts of $719,053.05 and $1,388,946.95, for a total amount of $2,108,000.00 (R4, tab 19d at 6). The MIPR stated:

> Funds are for services and purchase of equipment to accomplish an IWAC video conferencing network that will

000009

> provide the technical baseline to enhance CINC participation in the detailed supporting analysis of the joint strategic planning process as stated in the attached SOW.

(*Id.*) The attached SOW was a one-page document labeled "DJAM0078 SOW," which provided:

> Internetted Warfighting Capability (IWAC) connectivity solution.
>
> 1. Provide the services and the network and video teleconferencing hardware components to accomplish an IWAC video conferencing network that will provide the technical baseline to enhance CINC participation in the detailed supporting analysis of the joint strategic planning process.
>
> 2. The technical plan calls for linking all sites for teleconferencing using commercial T1 service. The IWAC network architecture will consist of a fundamentally designed hub/spoke network concept using U.S. Sprint long haul communication lines. The result of this capability would provide a secured, sophisticated video conferencing network dedicated exclusively to IWAC. J-8 analytical computers will serve as the center hub processor. External node connectivity planned for FY89 initial testing of the networking and analytical prototypes are J-8, CENTCOM, TRANSCOM, and SAC.
>
> 3. The following describes specific required capabilities of the proposed IWAC network:
>
> a. High-speed digital data and text transmission.
>
> b. Electronic mail and TELEFAX capability
>
> c. Voice communications and multipoint video teleconferencing using a rollabout system containing two 35 inch video monitors that can be used in a conference room environment. One monitor can simultaneously display all subscribers on the network. The second monitor can focus on a single individual, map, etc.

(R4, tab 19d at 7)

Also on 6 September 1989, ISN's Manager of Contract Administration, Karen Hendricks, and another ISN employee, Tony Palazzo, met with Mr. Carter and discussed hardware pricing. In a 6 September 1989 memorandum of record to Mr. Rogers reporting on this meeting and another meeting later that day with CO Mohn, Ms. Hendricks stated:

> 1. JCS-IWAC hardware pricing: We proposed equip. at cost + 11.1% G&A and 10% fee. Ulanta (EDS/TRW) have a bid almost identical to ours at raw cost and a much lower markup. Their ADP contract is mandatory for USAF. USAF cannot justify giving us the award at the markup of 21.1%. Ken agreed to 11.1% G&A (if we send him letter justifying application of G&A to materials by COB tomorrow . . . ) and 4.9% fee (total markup 16%) but he had to run it by Joanne Mohn. After I left, Tony & Ken met with Joanne. Her absolute bottom line offer is 12% markup (11.1% G&A, .9% fee). . . . The letter on G&A is still needed. Please sign it.
>
> . . . .
>
> 3. Ken needs to know balance of funding left on the NTE orders for JCS, plus the value of the 3 FFP orders for JCS. This total, subtracted from his MIPR'd funds, will let him know how much $ he has and how much more he needs. He's looking at 5.5M in awards to ISN for JCS for FY 90. . . .

(AR4, tab 104) (emphasis in original) The following day, on 7 September 1989, Mr. Rogers advised Mr. Carter by letter that ISN's 11.1% G&A markup upon its IWAC equipment prices was the same as that it applied to similar bids and proposals, and in accord with its DCAA and DCASMA approved accounting system. (R4, tab 19c)

While CO Mohn was aware that, as an ADP industry integrator, ISN was more likely than the Government to be able to secure discounted pricing when purchasing equipment, she found ISN's proposed 21.1% equipment markup to be high compared to that of other ADP integrators, which she recalled was about 5%. Because ISN was an 8(a) contractor, however, she was willing to agree to a markup of 12%, but no more. (Tr. 6/115-18, 133, 135-36, 7/66-68)

In a letter dated 13 September 1989, Mr. Rogers notified Mr. Carter that he was "confirm[ing] [ISN's] acceptance of the twelve percent (12%) handling charge as

previously expressed by our president, Roma Malkani, last week at your location" and submitting "revised pricing which reflects this agreement." He attached to the letter a revised, 12-page "Bill of Materials," which reflected the reduced markup for 10 items of equipment and contained 2 summary sheets with total and "initial quantity" price quotes. The total quantity price quote was $4,796,709.12. The "initial quantity" price quote was $1,505,326.42. (AR4, tab 103)

The next day, on 14 September 1989, Mr. Krebs issued to ISN, with a copy to AFDW, an "[IWAC] Letter of Intent," which he signed as "IWAC Program Manager Joint Staff/J-8/TSD." The letter of intent was almost identical to the memorandum he sent to AFDW on 25 August 1989, except it specifically referenced 13 sites and contained modified "costing" instructions, as follows:

> 1. In order to provide turn-key network integration for the IWAC program, I request that [ISN] procure the hardware components necessary to implement **a 13 site** IWAC video teleconferencing/telecommunications network.
>
> 2. As you are aware, the IWAC network installation is incremented by site. **Communication hardware and video conferencing equipment costs for each increment should be based on total purchase quantity for 13 sites.**
>
> 3. Attachment 1 is the equipment order list. **Prices for the hardware components should not vary from the costs provided by you to J-8 and the [AFDW] Contracting Office.**

(*Compare* AR4, tab 17 *with* R4, tab 9) (emphasis added) Attachment 1 to the letter of intent was a 14 September 1989 IWAC Hardware Components Requirement list, which showed "initial" quantities for 4 sites and "total" quantities for 13 sites of 13 items of hardware (*see* R4, tabs 9, 19, 19e; tr. 4/29). Mr. Krebs issued this letter of intent, after coordinating with his supervisor and Mr. Carter, because: (1) Mr. Neubecker had asked him to furnish a written statement that the Government was procuring equipment for 13 sites, which Mr. Neubecker could show to vendors to ensure ISN retained the quantity discount pricing it previously had obtained; and (2) he thought such a letter might expedite delivery of IWAC project equipment (tr. 1/229-31, 236-37, 4/26-29).

<u>Issuance of DO No. 6009</u>

The same day that Mr. Krebs sent his letter of intent, 14 September 1989, AFDW unilaterally issued to ISN DO No. 6009 prepared by Mr. Carter and signed by CO Dillon.

The parties agree on the appearance of the first page of the DO, which sets forth an amount of $3,029,000, does not identify the DO as "fixed price" or otherwise characterize the nature of the DO, states that invoices should be sent to AFDW's Accounting and Finance Office (which will make payment upon the invoices), provides "See Attached Schedule(s) Items: 1" with respect to "Schedule of Supplies/Services," and specifies delivery is to be made by 30 September 1990. (AR4, tab 63 at 1; SR4, tab 5A at 1; tr. 6/28) The parties, however, disagree as to the composition of the remainder of the DO.

The Government has advanced two versions of DO No. 6009 during the course of this appeal, each including the same second page, but with different attachments. The version it placed in the Rule 4 file (R4, tab 10) attaches a copy of J-8's 9 March 1989 five-page IWAC SOW. The Government, principally through Mr. Carter (tr. 6/32-36), now claims the version of the DO in its supplemental Rule 4 file (SR4, tab 5A), which contains two attachments, is the correct DO (tr. 6/32; Gov't br. at 16, proposed findings 24, 25). The first attachment to this DO is the one-page IWAC hardware component requirements list, plus cover sheet, that was attachment 1 to Mr. Krebs' 25 August 1989 memorandum to AFDW (*compare* SR4, tab 5A at 3 *with* AR4, tab 17). Mr. Krebs testified that the "Attachment 1" designation on the cover sheet is in his handwriting and that it was part of his AFDW memorandum, but in his opinion was not a part of the DO, although he does not specifically recall the DO's appearance (tr. 2/177-78). Mr. Carter also testified at trial that the cover sheet was not a part of the DO (tr. 6/32-33). The second attachment to this DO is the one-page SOW appended to MIPR No. DJAM90078 issued 6 September 1989 (*compare* SR4, tab 5A at 2, 5 *with* R4, tab 19d at 7). Mr. Carter testified that he prepared the DO. His only explanation, however, for the DO's first page referencing only one attachment was that he automatically sends a second copy of the DO statement of work to the contractor even though the contractor already possesses a copy of that statement from preparing its proposal and that he must have made a typographical error during the end of the fiscal year rush in noting only one attachment. (Tr. 6/31-37) There is no evidence in the record that ISN saw attachment two (the one-page September 1989 MIPR SOW) before submitting its April 1989 IWAC proposal or, in fact, ever saw that SOW before issuance of DO No. 6009 on 15 September 1989.

The second pages of the Government's two versions of DO No. 6009 both list the DO's amount as $3,029,000.00 and state:

> CONTRACTOR TO PROVIDE SERVICES, LABOR, TOOLS, MATERIALS, PERSONNEL AND EQUIPMENT TO SUCCESSFULLY IMPLEMENT THE NETWORK AND VIDEO TELECONFERENCING HARDWARE COMPONENTS TO ACCOMPOLISH [sic] AND [sic] IWAC VIDEO CONFERENCING NETWORK THAT WILL PRVOIDE [sic] THE TECHNICAL BASELINE TO



000013