By letter to CO Mohn dated 8 January 1993, ISN demanded payment of PPA interest in the amount of $123,367.35 on the unpaid amount of $1,383,110.93 and that its CDA claim be processed (R4, tab 65). On 15 February 1993, CO Hufford completed a draft CO's decision that accepted the vendors' claims for lost volume discounts (without ISN's claimed profit) and Sprint's termination penalty charges (without ISN's markup), and denied other portions of the claim (ex. A-119; tr. 4/186, 5/5-10, 56-60, 65). He found ISN's decisions to secure volume discount pricing and to enter into one-year leases with Sprint, which yielded considerable cost savings over a monthly arrangement, to have been "prudent" (tr. 4/177, 186, 211, 5/56-57, 59; *see* R4, tab 53). CO Hufford forwarded his draft decision "through" TCO Mohn to "legal" (tr. 5/5-8, 60, 63). CO Hufford had fact-finding responsibility, and could only make recommendations to the TCO. TCO Mohn testified at trial that she never saw CO Hufford's draft decision. (Tr. 6/145-46)

On 21 May 1993, ISN filed a notice of appeal with this Board based on the CO's deemed denial of its CDA claim (R4, tab 67). The Board subsequently denied summary judgment motions filed by the Air Force and ISN based upon the existence of disputed questions of material fact. *Information Sys. and Networks Corp.*, ASBCA No. 46119, 96-1 BCA ¶ 28,059, *aff'd on recon.*, 96-1 BCA ¶ 28,094; *Information Sys. and Networks Corp.*, ASBCA No. 46119, 96-2 BCA ¶ 28,094.

During the conduct of an eight day trial in this appeal, Mr. Carter testified that he did not "ever negotiate with ISN any 'charges' or fees to be applied to Sprint['s] charges to ISN," but did not address the markups set forth in ISN's 1988 contract for direct costs (11.10% G&A and 10% profit) (tr. 6/54; R4, tab 1). CO Mohn testified at trial that, while she did not "personally sit in on" any negotiations concerning Sprint charges, she recalled Mr. Carter, Mr. Krebs, and Mr. Neubecker "indicating that the Sprint lease would be a straight pass-through cost to the government" (tr. 6/134). According to CO Mohn, "Ken [Carter] was very, very good about keeping me informed on all of his work activities and, in particular, on the JCS project," and "whenever Mr. Krebs would visit Andrews from the Pentagon[,] he and Ken, after the negotiation session, would come in [my office] and discuss with me what had occurred" (tr. 6/213). The Air Force, however, did not introduce into evidence any document *dated prior to its convenience termination* which discussed negotiation with ISN of a pass-through of Sprint charges without markup. Based upon ISN's documents, which were generated contemporaneously with start of work on DO No. 6009 (during the fall of 1989) showing ISN would invoice Sprint communication lines at "cost plus 11.1% G&A and 10% fee on top of G&A" (SR4, tab 13D at p. 27; *see* SR4, tabs 13C, 20C), and ISN's and AFDW's contemporaneous 1989 documents which memorialized the special markup or handling fee (12%) that ISN agreed to charge for major equipment (*e.g.*, AR4, tabs 103, 104; SR4, tab 13D at p. 27), we find that there was no agreement between ISN and AFDW that ISN would pass the Sprint circuit charges through to the Government "straight," *i.e.*, without any ISN markup (G&A and fee).

After the conduct of trial and completion of post-trial briefing in this appeal, the parties executed bilateral Mod. No. 08 to DO No. 6009, which authorized payment of $538,039.73 to ISN. The amount paid was said to represent DO No. 6009's $3,400,379 funded amount (rounded) minus $2,767,432.00 already paid, $170,000.00 set forth as the amount of Mod. No. 01, and $163,511.00 in "estimated costs of unreturned equipment," plus $9,328.49 for travel incurred but not paid under another DO, $89,963.00 in estimated termination labor costs, and $139,312.24 in CDA interest from 31 October 1991 through 31 January 1997. While the $538,039.73 is stated to be a "full and final settlement" and an "accord and satisfaction" of the parties' obligations under DO No. 6009, Mod. No. 8 expressly provides that the acceptance of that amount under the DO does not represent an acknowledgment by ISN that the Government's computational breakdown of costs is in any way correct or accurate, and "does not waive or preclude the parties from exercising their rights" in this appeal.

## DECISION

The threshold issue for resolution is whether there is a limit on the amount ISN may recover due to the DO convenience termination. The Air Force contends that "the maximum amount ISN may recover in this appeal is $304,632[,] which is the dollar amount remaining on Delivery Order [No.] 6009 whereby work was [being] performed" (Gov't br. at 78-79). ISN, however, contends that its termination "claim for lost volume discounts, restocking charges, and early termination of the U.S. Sprint lease, all represent constructive changes to Delivery Order [No.] 6009" and "are therefore not subject to the general rule that recovery is limited to the contract price" (app. reply at 3).

The contract's Termination for Convenience clause (FAR 52.249-2) provides that the amount to be paid because of the termination, exclusive of costs of settlement of the terminated work, "may not exceed the total contract price as reduced by (1) the amount of payments previously made and (2) the contract price of work not terminated." Both parties therefore correctly recognize that the general rule is that recovery is limited to the contract price. The Air Force, however, fails to recognize a condition precedent for application of the rule. As noted by ISN, it is not appropriate to apply the contract price limit to a termination settlement without giving consideration to unpriced changes and to other modifications. *E.g., Okaw Industries, Inc.*, ASBCA Nos. 17863, 17864, 77-2 BCA ¶ 12,793 at 62,226-27 (Government failure to fulfill contract obligations in timely manner causing lost time and extra work for packaging are to be considered in determining contract price for purpose of establishing convenience termination payment limit); FAR 49.114; R.C. Nash, Jr. & J. Cibinic, FEDERAL PROCUREMENT LAW 1161 (1980) (consideration must be given to unpriced changes). While ISN does not describe or set forth specifically the constructive changes to DO No. 6009 which must be considered before applying the general rule in this appeal, we agree with ISN that there is a

constructive change to the parties' contract which must be addressed before determining the contract price.

The most straightforward method of determining the contract price, of course, is for parties to negotiate an appropriate price increase or decrease for a change and amend their contract accordingly. Where this does not occur and a contractor is entitled to a price increase, however, boards will determine the amount of the adjustment or ignore the limitation on recovery. *See, e.g., id., citing Pilcher, Livingston & Wallace*, ASBCA No. 13391, 70-1 BCA ¶ 8331; *Scope Electronics, Inc.*, ASBCA No. 20359, 77-1 BCA ¶ 12,404; and *Douglas Corp.*, ASBCA No. 8566, 69-1 BCA ¶ 7578. Accordingly, we proceed to determine the contract price for purposes of the convenience termination limit.

<u>Contract Price</u>

The contract's Changes clause (FAR 52.243-1) provides that: the CO may make specified changes in contract terms; whenever one of those changes causes an increase or decrease in the cost of, or time required for, performance of contract work, the CO shall make an equitable adjustment in the contract price; and a failure to agree to an adjustment shall be a dispute under the Disputes clause. The Disputes clause in the contract (FAR 52.233-1) provides all disputes arising under or relating to the contract shall be resolved under that clause and the contractor shall proceed with the performance of contract work pending a final resolution of any dispute arising under the contract.

Under the Changes clause, the contract price must be equitably adjusted when a change in the contract work causes an increase or decrease in the cost of performance of the work. *E.g., Mills Trucking, Inc.*, ASBCA Nos. 50163, 50164, 97-1 BCA ¶ 28,907 at 144,115. In sum, equitable adjustments are corrective measures used to keep a contractor whole when the Government modifies a contract. *Bruce Constr. Corp. v. United States*, 324 F.2d 516, 518 (Ct. Cl. 1963).

The CO here faced two "dilemmas." First, ISN wished to perform the IWAC work proposed by the Joint Chiefs of Staff and the Joint Chiefs desired that ISN perform that additional work. However, ISN's contract "to complete the inside cable plant" using "cable and components of the same type and brand used on the original HQ USAF CF Installation already in progress" did not require or contemplate the "development" and installation of a multi-million dollar IWAC video conferencing network linking 13 sites around the world. Second, the Joint Chiefs did not possess in 1989 monies to fully fund IWAC installation at 13 sites and ISN's contract with the Air Force was not one which had incremental funding.

Apparently recognizing that parties to a contract, at any time after contract award, may modify not only prescribed contract procedures, but substantive provisions of their

contract, *see, e.g., Pinewood Realty Ltd. v. United States*, 617 F.2d 211, 215 (Ct. Cl. 1980); *General Dynamics Corp. v. United States*, 558 F.2d 985, 990 (Ct. Cl. 1977), the Air Force's CO decided to *unilaterally* "change" ISN's contract by issuing DO No. 6009, requiring ISN to develop and install an IWAC network. DO No. 6009, therefore, most closely resembles a unilateral change order issued by a CO.[5]

Development and installation of an IWAC video conferencing network linking sites around the world, however, was not one of the changes in contract terms the Air Force's CO could make under the express language of the Changes clause. *See, e.g., Edward R. Marden Corp. v. United States*, 442 F.2d 364, 370 (Ct. Cl. 1971) (CO order to reconstruct hangar constructed under a contract after hangar's collapse due to defective specifications was not "'essentially the same work as the parties [had] bargained for when the contract was awarded'" and not within scope of Changes clause). A CO may make changes only to the contract drawings, designs, specifications, method of shipment or packing, and place of delivery which are within the "general scope" of the contract. *See, e.g, CTA, Inc.*, ASBCA No. 47062, 00-2 BCA ¶ 30,947; FAR 52.243-1.

When a CO's order altering a contract is outside the scope of the Changes clause, it is denominated a "cardinal change." *E.g., Saddler v. United States*, 287 F.2d 411, 413-14 (Ct. Cl. 1961); *accord AT&T Communications, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993). A cardinal change is a contract breach and not redressable under the Changes clause. *Allied Materials & Equipment Co. v. United States*, 569 F.2d 562, 563-64 (Ct. Cl. 1978); *Air-A-Plane Corp. v. United States*, 408 F.2d 1030, 1032-33 (Ct. Cl. 1969). Accordingly, when a CO orders a contractor to perform duties materially different than those it bargained for, as here, the contractor is free to pursue a breach of contract claim and, if the breach is "material," to halt contract work. *Allied Materials & Equip. Co. v. United States*, 569 F.2d at 563-64; *Edward R. Marden Corp. v. United States*, 442 F.2d at 369-70.

A material breach does not automatically "end" a contract. Rather, it simply gives the injured party the right to "end" the contract. The injured party may choose between canceling and continuing its contract. *Cities Service Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976). If the injured party elects to continue the contract, the parties' obligations remain in force and the injured party retains only a claim for "partial breach," unless it explicitly reserves its right to claim material breach and promptly pursues that right. *Id.* at 1313-19; *Northern Helex Co. v. United States*, 455 F.2d 546, 552-55 (Ct. Cl. 1972). Here, because ISN continued to perform contract work after the CO's unilateral modification, it elected to continue, not end, the contract, and to waive any claim for "material" breach. *See Pinewood Realty Ltd. v. United States*, 617 F.2d at 215 (where contractor ignores breach and continues to perform, it waives right to terminate and retains only claim for partial breach); *Cities Service Helex, Inc. v. United*

*States*, 543 F.2d at 1313-19 (where contractor continues performing and accepts benefits of the Government's continued performance, the contract remains in effect and there is no material breach claim).

ISN agreed to continue performing under the "reconfigured" contract terms, *i.e.*, a delivery order for a 13-site IWAC video conferencing network. The parties agreed "implicitly" to amend the Changes clause of their contract to allow for the unilateral change issued by the CO. *See General Dynamics Corp. v. United States*, 558 F.2d at 991 (parties can modify a contract to authorize administrative relief under a clause otherwise not available); *see also Pinewood Realty Ltd. v. United States*, 617 F.2d at 215-16 (where Government accepted extension of closing date which was conditioned upon contractor's reservation of right to seek delay damages, while denying liability, the extension could be deemed a "modification" whereby the parties agreed to continue performance).

While the Air Force contends that the DO issued, which simply stated that ISN was "to provide equipment, labor, tools, materials, supplies, services and personnel to successfully implement the network and video teleconferencing hardware components to accomplish an IWAC video conferencing network," was not for 13 sites, but 4 sites (Gov't br. at 79-84), the evidence in the record belies that contention. As found above, in 1989, the Air Force sought a proposal from ISN based upon a JCS SOW for 13 sites and ISN submitted to the Air Force a proposal for design and installation of IWAC at 13 sites. More importantly, when DO No. 6009 issued to ISN, the only attachment to the DO was an equipment list for 13 sites and, on the same date the DO issued, Mr. Krebs (the JCS IWAC program manager and COTR) sent ISN (with knowledge of AFDW's Contracting Office) a letter stating, "[i]n order to provide a turn-key network integration for the IWAC program, I request that [ISN] procure the hardware components necessary to implement a 13 site IWAC video teleconferencing/telecommunications network" and "costs for each increment should be based on total purchase quantity for 13 sites." Further, as we found above, even after the DO issued, Government and ISN personnel continued to focus on installation of IWAC at 13 sites. For example, when Mr. Carter of AFDW's Contracting Office sent ISN a revised hardware component list on 25 September 1989, that list set forth, among other things, "total quantities" for 13 sites and, during November 1989, COTR Krebs confirmed scheduling of a meeting with ISN to resolve "connectivity issues" for Hawaii, Germany, Korea, and Panama, four sites which were not among the first four sites to be installed. We note that, even in the 31 May 1990 notice of "partial" termination of the DO for convenience, which was issued after successful testing of the first four IWAC sites, AFDW's CO stated that the pre-installation plans for PACOM, LANTCOM, and SPACECOM (three sites not among the first four to be installed) were among "deliverables" to be completed by ISN.

The Air Force suggests we must conclude DO No. 6009 was for four sites because the funding set forth on the DO was $3,029,000.00 (Gov't br. at 86). The $3,029,000.00

amount set forth on the DO, however, does not correspond to ISN's cost for development and installation of IWAC at four sites or to any ISN proposal for performance of work. It simply constitutes the amount of funds deemed available to AFDW's CO for IWAC at time of issuance of the DO. As we found above, when ISN's Ms. Hendricks asked Mr. Carter (AFDW's contract specialist who had prepared DO No. 6009) about this amount, he repeatedly assured her that the Joint Chiefs had "lots of money," more money would be added to the DO, and she should not worry about the amount set forth. Moreover, as additional funds became available to AFDW for IWAC, the funds were added to the DO as if the DO was incrementally-funded. On 30 September 1989, AFDW's CO issued a modification increasing the DO amount by $170,000.00 without any explanation or justification. Also, in April 1990, AFDW's CO issued a modification increasing the DO amount by $220,000.00. While this modification indicated it was for on-site support for conduct of the IWAC functional evaluation and for purchase of encryption devices, that work was required by the March 1989 JCS SOW and was a part of ISN's April 1989 proposal in response to the SOW. That AFDW's CO deemed DO No. 6009 to be one which could have funds added incrementally is also supported by AFDW's repeated requests that ISN supply data regarding costs incurred to date. There would have been no reason for the CO to repeatedly solicit data from ISN regarding costs incurred and for ISN to submit such data if the parties deemed the DO to be for a "fixed price" of $3,029,000.00. We therefore conclude that AFDW's CO was not treating DO No. 6009 as a $3,029,000.00 "fixed price" DO for 4 sites, but as a DO for 13 sites to which additional funds would be added.

It is not disputed that the costs to develop and install a 13-site IWAC network in accordance with the March 1989 JCS SOW would have exceeded $6 million. ISN's proposal in response to the JCS SOW was $6,454,053.78, plus more than $4 million for 12 months of recurring communication circuit services. Similarly, Brig. Gen. Robinson approved an IWAC mission statement in June 1989 estimating costs for a 13-site IWAC network at $10,399,000. Accordingly, the "amount" of DO No. 6009, which changed the contract to provide for installation of a 13-site IWAC network, was not $3,029,000.00, as the Air Force asserts, but in excess of $6 million.

ISN's 12 December 1990 termination proposal using the total cost method is based on a net amount of $4,053,662.00. When constructive changes to the parties' contract are considered, as we discuss above, the contract price for purpose of establishing a payment limit under the Termination for Convenience clause is significantly in excess of the sum ISN seeks. The payment limit, thus, does not restrict ISN's recovery in this appeal to an amount less than that sought and is not of concern here.

000045

Lost Volume Discounts

The Air Force contends that ISN may not recover the volume discounts it lost as a result of the partial termination of the DO from 13 to 4 sites, *i.e.*, ISN is only entitled to payment for the discounted prices of equipment supplied, not the actual prices it was charged when its vendors realized equipment was being procured for only 4 sites. The Air Force asserts that ISN "voluntarily" supplied the discounts because there was no requirement for 13 sites which "the contractor [wa]s obligated to fulfill." (Gov't br. at 88-93)

As we explain above, AFDW issued DO No. 6009 to ISN for the development and installation of an IWAC network at "13 sites." Despite the Air Force's assertion to the contrary, there was a DO requirement for "13 sites," which ISN was obligated to fulfill. ISN's supply of discounted equipment based upon a volume of 13 sites thus was not a voluntary act on its part, as the Air Force contends. Our decision in *Sierracin/Sylmar*, ASBCA Nos. 27531, 30380, 85-1 BCA ¶ 17,875, therefore, simply is not applicable to this appeal.

FAR 49.104 states that, among the duties of ISN after its receipt of notice of termination, was to "[p]erform the continued portion of the contract and [to] submit promptly any request for an equitable adjustment of price for the continued portion, supported by evidence of any increase in the cost, if the termination is partial." Here, ISN continued to perform unterminated contract work during the summer of 1990 and promptly submitted to AFDW a termination claim in September 1990 showing that its costs had increased for unterminated contract work as a result of the termination due to lost volume discounts and restocking charges from its vendors. The Termination for Convenience clause in the parties' contract expressly provides that, when the termination is partial, as here, the contractor may submit a proposal for an "equitable adjustment of the price(s) of the continued portion of the contract." FAR 52.249-2(k); *accord* FAR 49.208. ISN, therefore, is entitled to recover from the Air Force its increased cost of performing nonterminated work which arose from the convenience termination, *i.e.*, lost volume discounts and vendor restocking charges.[6]

Sprint Circuit Leases

The Air Force also contends that ISN may not recover its continuing costs after the termination for U.S. Sprint communication circuit leases. The Air Force asserts ISN was "taking a business risk when it negotiated the one-year contracts with US Sprint." (Gov't br. at 97-99)

000046

As CO Hufford found in his draft decision, ISN's entry into one-year leases with U.S. Sprint for communication circuits was prudent because those leases yielded considerable cost savings to the Government over a monthly arrangement. Also, it is undisputed that the communication circuits ISN leased were necessary for the IWAC network. We, therefore, do not deem ISN's entry into the U.S. Sprint leases to constitute a "business risk" on its part, as the Air Force asserts.

Rental costs under unexpired leases, less the residual value of such leases, are generally allowable as termination costs when shown to have been reasonably necessary for the performance of the terminated contract and the contractor makes all reasonable efforts to terminate, assign, settle, or otherwise reduce the cost of such leases. FAR 31.205-42(e). Moreover, costs which cannot be discontinued immediately after the effective date of a termination are generally allowable. Only such costs continuing after the effective date of a termination due to the negligent or willful failure of the contractor to discontinue those costs are deemed unallowable. FAR 31.205-42(c); *see, generally*, *Qualex Int'l*, ASBCA 41962, 93-1 BCA ¶ 25,517 at 127,089; *American Elec., Inc.*, ASBCA No. 16635, 76-2 BCA ¶ 12,151 at 58,483-85, *modified on other grounds*, 77-2 BCA ¶ 12,792; *Baifield Indus. Div. of A-T-O, Inc.*, 76-2 BCA ¶ 12,096 at 58,091-93, *recon. denied*, 76-2 BCA ¶ 12,203; *see, also*, *Sundstrand Turbo v. United States*, 389 F.2d 406, 415 (Ct. Cl. 1968) (the lease period reimbursable may even extend beyond the contract's completion date if reasonable). ISN, therefore, is entitled to recover from the Air Force as termination costs its continuing expenses for Sprint leases, as provided by the FAR.

## Undelivered Equipment

The Air Force contends that it need not pay ISN for the equipment which ISN is storing and has not delivered. The Air Force asserts ISN would be "unjustly enriched" if paid for the equipment because ISN "cannot prove" it "delivered any equipment to justify its entitlement to payment," and that ISN "should be sanctioned for attempting to secure payemnt [sic] for equipment not delivered." (Gov't br. at 104-06)

As we found above, ISN attempted to deliver the remaining IWAC equipment to Mr. Krebs, as CO Mohn directed. Mr. Krebs, however, canceled the delivery after he received from ISN a list of the equipment to be delivered, which set forth equipment he did not wish to receive. ISN, therefore, unpacked the equipment which had already been loaded into a van and returned it to storage, pending further instruction from Mr. Krebs with respect to a time that he would be available to receive the equipment and coordinate access to the Pentagon.

The Termination for Convenience clause set forth in the parties' contract states that, after notice of termination, a contractor is to "[t]ake any action that may be

necessary, or that the [CO] may direct, for the protection and preservation of the property related to this contract that is in the possession of the Contractor and in which the Government has or may acquire an interest." FAR 52.249-2(b)(8). The FAR further provides that, among the duties of a contractor after receipt of notice of termination, is to "[t]ake necessary or directed action to protect and preserve property in the contractor's possession in which the Government has or may acquire an interest and, as directed by the TCO, deliver the property to the Government." FAR 49.104. We conclude ISN took necessary action to protect and preserve the equipment, and attempted to deliver the property to Mr. Krebs (as TCO Mohn directed), but was stopped from doing so by Mr. Krebs' cancellation of the delivery to the Pentagon.

The FAR states that, among the duties of the TCO after notice of termination, is "hold[ing] a conference with the contractor" to discuss "[a]rrangements for transfer of title and delivery to the Government of any material required by the Government." As found above, after he canceled ISN's equipment delivery, Mr. Krebs informed TCO Mohn in writing that he had received a list of equipment to be delivered by ISN and would not accept delivery of some of that equipment. There is no evidence in the record before us that, after being advised of Mr. Krebs' refusal to accept delivery of equipment, TCO Mohn took any action to arrange delivery by ISN of the equipment to another site or to resolve Mr. Krebs' concerns regarding delivery of specific items of equipment. Rather, the record suggests ISN simply was advised that Mr. Krebs needed to locate storage for the equipment TCO Mohn had said was to be delivered to the Pentagon. ISN accordingly lacked specific direction from TCO Mohn regarding delivery of the equipment at issue.

The Termination for Convenience clause set forth in the parties' contract states that the CO "shall exclude from the amounts payable to the Contractor . . . [because of the termination], the fair value, as determined by the [CO], of property that is destroyed, lost, stolen, or damaged so as to become undeliverable to the Government or to a buyer." FAR 52.249-2(g). There is no evidence in the appeal record that the equipment ISN attempted to deliver to Mr. Krebs has been destroyed, lost, stolen or damaged. Rather, the record reflects that the equipment is being stored in a secure location for future delivery, pending further direction. ISN, therefore, is entitled to recover from the Air Force as part of its termination cost proposal the value of the equipment it is securely storing, pending further delivery instruction.

Major Equipment Markup

The Air Force contends that ISN is not entitled to a markup on major equipment exceeding 12%. The Air Force asserts that, while ISN claims that the 12% "profit rate" applies only to a "13-site" network, "ISN never told the Government that if it only ordered four sites, [ISN's] rate would be greater." (Gov't br. at 93-95)

While the Air Force characterizes ISN's claim for a different "handling fee" as one seeking "anticipatory profit" (Gov't br. at 94), which is not allowed under the contract's convenience termination clause, *e.g., Molony & Rubien Constr. Co.*, ASBCA No. 22280, 78-1 BCA ¶ 13,000 at 63,400; FAR 49.202, the Air Force's characterization of ISN's claim is misleading. We initially consider ISN's claim as seeking that part of actual overhead incurred during DO performance of unterminated work which, but for AFDW's reduction in number of IWAC sites, would have been recovered under the DO. *See, e.g., H.L. Yoh Co. v. United States*, 288 F.2d 493, 494-95 (Ct. Cl. 1961); *Wheeler Bros., Inc.*, ASBCA No. 20465, 79-1 BCA ¶ 13,642 at 66,919.

The 12% "handling fee" for major equipment agreed to by ISN constituted both "G&A" and "fee." As found above, ISN submitted to AFDW a bill of materials which reflected a revised 12% markup for 10 equipment categories with "total" price quotes for 13 IWAC sites. The contracting parties thus contemplated that the dollar volume of work to be performed under the DO for 13 sites would allow ISN to recover the direct costs of the equipment furnished, plus its overhead and a reasonable amount of profit. Due to AFDW's partial termination of DO No. 6009, the dollar volume of the work performed, including major equipment supplied, was significantly less than the parties contemplated. This reduction in work under DO No. 6009 affected the "dollar volume" ISN would have realized had the Air Force fully performed the DO. ISN, therefore, was no longer able to spread its fixed overhead over major equipment for 13 sites.

The Termination for Convenience clause set forth in the parties' contract allows ISN to recover its costs as it would have had it known the dollar volume of work to be performed would be less. *Fairchild Stratos Corp.*, ASBCA No. 9169, 67-1 BCA ¶ 6225 at 28,798-99. Where a contractor, such as ISN, quotes a percentage markup for overhead based upon a specified quantity of work and part of that quantity later is terminated for convenience, this Board must ascertain what overhead rate the contractor would have quoted upon the "quantity as terminated" for comparison with the overhead rate quoted upon the "original quantity." To the extent that the overhead rate quoted changes due to the partial termination of work, the contractor is entitled to an equitable adjustment which applies the increase to the work quantity performed. *Id.*; *accord H.L. Yoh Co. v. United States*, 288 F.2d at 494-95; *Wheeler Bros., Inc.*, 79-1 BCA ¶ 13,642 at 66,919.

Moreover, we note that, to the extent ISN is seeking to increase its "handling charge" markup on major equipment based upon the fee component of that markup, the convenience termination clause set forth in the parties' contract expressly provides that, if the parties agree upon the whole amount to be paid because of the termination of work, the contractor is to be given "a reasonable allowance for profit on work done." FAR 52.249-2(e). The parties' agreed settlement is supposed to "compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract, including a reasonable allowance for profit." FAR 49.201(a); *accord* FAR

49.202 ("TCO shall allow profit on preparations made and work done by the contractor for the terminated portion of the contract but not on the settlement expenses"); *see, e.g., Metered Laundry Servs.*, ASBCA No. 21573, 78-1 BCA ¶ 13,206 at 64,606, *modified on other grounds*, 78-2 BCA ¶ 13,451. ISN, therefore, is not precluded from seeking an increase in its "handling charge" markup on major equipment as part of its termination cost proposal, as the Air Force asserts.

<u>Prompt Payment Act Interest</u>[7]

The Air Force contends that ISN is not entitled to a PPA interest penalty on invoices 2 and 3. The Air Force asserts that AFDW advised ISN that it disputed the amount of both invoices 2 and 3, and thus ISN is not entitled to payment of any PPA interest. (Gov't br. at 99-101)

"Interest on amounts owed by the Government is payable only to the extent authorized by statute or contract provision." *James Lowe, Inc.*, ASBCA No. 42026, 92-2 BCA ¶ 24,835 at 123,903, *citing United States v. Thayer-West Point Hotel Co.*, 329 U.S. 585 (1947). Pursuant to the Prompt Payment clause of the contract (FAR 52.232-25), as authorized by the PPA, 31 U.S.C. §§ 3901-3906, payment is due 30 days after the receipt of a proper invoice, and an interest penalty is assessed from that date if payment is not made within a 15-day grace period after the due date.[8] Interest penalties, however, are not required when payment is delayed due to a dispute over the amount of payment or other issues involving contract compliance, but might be due the contractor under the CDA, 41 U.S.C. § 611. *E.g., Ross & McDonald Contracting, GmbH*, ASBCA Nos. 38154 *et al.*, 94-1 BCA ¶ 26,316 at 130,893; *James Lowe, Inc.*, *supra* at 123,903. The fact that a contractor may ultimately prevail on the merits of an underlying dispute does not defeat an otherwise proper good faith dispute at the time of the withholding. *Ross & McDonald Contracting, GmbH*, *supra*, at 130,894.

As found above, AFDW advised ISN there was a dispute regarding the amount of invoice 2. ISN's invoice 3 included amounts under invoice 2 not paid and specifically disputed by AFDW. Moreover, ISN's invoice included U.S. Sprint circuit charges with a 21.1% markup among the ODCs, and labor and travel costs for the period after DO No. 6009's partial termination, even though the invoice indicated it was for pre-termination costs. After the partial termination, the Air Force consistently disputed any ISN markup on U.S. Sprint circuit charges. It also disputed that the costs set forth on invoice 3 were all pre-termination costs because the Air Force was attempting to comply with the FAR, which provides that the amount to be paid "because of termination" is to be the subject of a negotiated termination settlement proposal or determined by the CO in accordance with the FAR (FAR 52.249-2(d), (e), (f), (i); *see* FAR 49.103, 49.104(h), 49.105(a), (b)). The Air Force, therefore, correctly asserts that there was an objectively discernible dispute