> B. CONTRACTOR TO PRVOIDE [sic] ON SITE TECHNICAL SUPPORT FOR THE PREPARATION AND CONDUCT OF THE IWAC FUNCTIONAL EVALUATION TO BE CONDUCTED 1-31 MAY 1990. PER ATTACHED STATEMENT OF WORK.

(R4, tab 10d at 2) The SOW attached stated, in pertinent part:

> a. Provide continued support of the IWAC four-node prototype network . . . .
>
> b. Provide necessary technical on-site support for the preparation and conduct of the IWAC Functional Evaluation.
>
> c. Purchase and install the appropriate network analysis hardware/software required to collect various types of data on the IWAC system to support decisions concerning program requirements and future modifications. . . .
>
> d. If required, purchase and install the required number of KG94A encryption devices at J-8, CENTCOM, SAC, and, TRANSCOM.

(*Id*. at 4)

On or about 3 May 1990, AFDW generated a new version of DO No. 6009 (the May DO), which Mr. Carter sent to ISN with a note to Ms. Hendricks to call him (AR4, tab 64; tr. 3/78). The May DO included the original cover page signed by CO Dillon. It revised the first paragraph of the DO we found to have been issued on 14 September 1989 (AR4, tab 63) as follows:

> CONTRACTOR TO PROVIDE SERVICES, LABOR, TOOLS, MATERIALS, PERSONNEL AND EQUIPMENT TO SUCCESSFULLY IMPLEMENT THE NETWORK AND VIDEO TELECONFERENCING HARDWARE COMPONENTS TO ACCOMPOLISH [sic] THE IWAC VIDEO CONFERENCING NETWORK THAT WILL PRVOIDE [sic] THE TECHNICAL BASELINE TO ENHANCE CINC PARTICIPATION IN THE DETAILED SUPPORTING ANAYSIS OF THE JOINT STRATEGIC PLANNING PROCESS FOR THE FOLLOWING SITES

JCS/J8, CENTCOM, TRANSCOM AND SAC. SEE ATTACHMENT (1) FOR EQUIPMENT.

(AR4, tab 64 at 3) Attachment (1) to the May DO was the above "JCS/IWAC VTC 4 SITE EQUIPMENT INVENTORY MATRIX" totaling $1,982,642.87 that Ms. Hendricks submitted to CO Mohn on 2 April 1990, except that Attachment (1) included only the first of the four end notes – the one about installation of some of the equipment at future sites (*id.* at 4).

Ms. Hendricks testified that:

> I had asked [Mr. Carter] to modify the contract to say what it was, add a modification of some sort to clarify what it was that you want . . . because you're not going to be happy if you don't define what it is.
>
> And I would have expected -- this wouldn't surprise me except that it's not a modification, it appears to be the same [DO] with a different page two . . . [a]nd different attachments.

(Tr. 3/79-80) She further testified that after she received the May DO on 16 May 1990 she called Mr. Carter to inquire about the purpose of the DO and he told her that he was "trying to straighten the record out" (tr. 3/78, 81-82, 85; AR4, tab 64). We find the testimony of Ms. Hendricks regarding the May DO to be credible.

On 4 May 1990, the day after the May DO was postmarked, Lt. Col. Michael Baxter of J-8 wrote a "memorandum for the record" with respect to an AFDW briefing "of shutdown costs associated with the IWAC portion of the ISN contract," which was presented at Maj. Gen. Baldwin's request. Besides Lt. Col. Baxter, briefing attendees included CO Mohn, Mr. Carter, a representative of the Comptroller, and several J-6 representatives. Lt. Col. Baxter had asked that Mr. Krebs and another J-8 representative be allowed to attend the briefing, but was told by J-6 that "there was not enough room for more than one J8 representative." (AR4, tab 31; *see* AR4, tabs 79 (AFDW held two meetings with J-6), 82 (Mr. Carter briefed two-star general first week of May)). In his memorandum for the record, Lt. Col. Baxter stated, among other things, that: Maj. Gen. Baldwin is recommending that the Government "[l]et the contract with ISN expire on 31 May 1990;" Mr. Carter "briefed a potential shut down cost of $80K as an upper limit" based on "potential claims for reimbursement of volume discount;" and an AFDW "investigation had determined that the COTR's (Mr. Krebs') actions had been appropriate, with respect to dealing with the contractor, throughout the contract" (AR4, tab 31). Lt. Col. Baxter concluded his memorandum of record by listing several of his

"[p]ersonal impressions," including: "Lt. Gen. Cassity will press for a halt while J8 conducts a full program review;" the IWAC test in late May "will be viewed as a waste of time;" "[a]ll hardware will have to be competed which will mean a certain delay and possibly new vendors;" and he had been "set up in that [he] was not prepared to address any issues except contract management, which was the stated purpose of the meeting" (*id.*).

On or about 16 May 1990, Vincent P. Roske, Jr., J-8's Deputy Director for Technical Operations, submitted to the Joint Chiefs of Staff an "Information Paper" he had prepared for a 17 May 1990 meeting called to address the status and future direction of IWAC (AR4, tab 32; tr. 1/197). Mr. Roske stated in the paper that an informal five-week review of IWAC by J-6 and J-8 had concluded that, "[a]lthough IWAC may satisfy a J-8 requirement, its efficient implementation may be beyond the management capability of J-8" and "DCA is better positioned than the J-8 and the Joint Staff in general to effectively manage the IWAC implementation" (AR4, tab 32 at p. 3).

As a result of a meeting between Joint Chiefs of Staff Chairman Colin Powell, Lt. Gen. Cassity, Maj. Gen. Baldwin, and Maj. Gen. Robinson on or about 17 May 1990, J-8 was "tasked to develop a requirements document and a concept of operations" for the IWAC and DCA was tasked to "manage the [IWAC] project from here on out" (AR4, tab 33). On 21 May 1990, Mr. Roske held a meeting with Lt. Col. Baxter, Mr. Krebs, CO Mohn, and others "to discuss fall-out from the Chairman's meeting" (*id.*).

During the week of 21 May 1990, the IWAC end-users conducted a functional evaluation of IWAC. The evaluation concluded that "IWAC does provide a secured, sophisticated, high-speed network which can serve as the technical baseline for fast turnaround distributed analyses and multi-sided wargaming exchanges among the Joint Staff and the commanders in chief of the unified and specified commands." (AR4, tab 84)

On 24 May 1990, Mr. Krebs notified the AFDW Contracting Office that "the following issues in support of the existing 4 node IWAC network remain outstanding:" (1) final site implementation reports for SAC, TRANSCOM, CENTCOM, J-8, and the IWAC hub; (2) final pre-installation plans for PACOM, LANTCOM and SPACECOM; (3) a technical adjustment configuration for a printer; (4) an equipment inventory at each IWAC location; (5) an accounting of GFE in ISN's possession; (6) the replacement of the 19.2 bridge with the 224 bridge; (7) an interface for a SAC VSI/Datapoint link; (8) any outstanding hardware component documentation; and (9) any necessary legal certification for transfer of licensing agreements from vendors (SR4, tab 12B).

The same date, 24 May 1990, Mr. Krebs advised AFDW's Contracting Office by separate memorandum that to carry out his COTR duties and certify that ISN's invoiced

amounts are correct, he "will need more detailed documentation of all expenses" with respect to invoices "1218-6009-002, 003, 004, 005, and 005A." Mr. Krebs stated that "[d]etailed documentation is to be presented in the same manner as for the previous invoices" and include other direct costs (ODCs), supplies, materials and subcontractors, travel expenses, and manpower. Mr. Krebs indicated that he had delivered the invoices to Mr. Carter earlier that day. (SR4, tab 12A; *see* SR4, tab 12c) The record in this appeal does not contain copies of those invoices.

Partial Termination for Convenience

On 31 May 1990, CO Jack Bynane, who was the deputy director of AFDW's Contracting Office and the only person at AFDW possessing contract termination authority (tr. 6/144), notified ISN by telephone and a letter transmitted by facsimile that, pursuant to the contract's Termination for Convenience clause, all deliverables not specifically called for and funded by DO No. 6009, as modified by modifications one through four, including dedicated T-1 lines, were being terminated that date and "[t]his action will be finalized with a modification to the delivery order containing termination settlement instructions" (R4, tab 21). On 12 June 1990, CO Bynane issued to ISN Mod. No. 05, effective 31 May 1990, entitled "Notice of Partial Termination" terminating DO No. 6009 "in part" for convenience. Mod. No. 05 stated that ISN was to "[s]top all work performed under delivery order 6009," except for nine deliverables, which were the issues identified by Mr. Krebs on 24 May 1990 as "outstanding." Among the nine deliverables set forth to be completed were the final pre-installation plans for PACOM, LANTCOM, and SPACECOM, and replacement of the 19.2 bridge with the 224 bridge. Mod No. 5 additionally stated that: ISN was to settle with its subcontractors and suppliers; notify the CO of completed items still on hand and arrange for their delivery or other disposal; and invoice for completed items in the usual way, without including them in its termination settlement proposal. (SR4, tab 10)

After DO No. 6009 was terminated, Motorola, CLI, and VSI billed ISN to recoup their discounts. CLI and VSI, respectively, threatened or filed lawsuits (SR4, tab 18A; AR4, tabs 35, 36, 41, 116). Sprint billed to recover early termination penalties (R4, tab 45b; AR4, tab 37). DataBeam billed ISN to recoup quantity discounts on delivered systems and for the four color printer shelves which were being shipped. Mr. Gammon of Databeam advised ISN on 26 June 1990:

> The only open issue at this time is the high speed data bridge that was discussed and agreed upon during our last meeting at DataBeam in which Mr. Krebs and yourself met with us in Lexington. This bridge, at a cost of $35,000, will be available for delivery in September of this year. Due to the commitment that this bridge was needed, DataBeam moved

> forward with the development of this product and have [sic] incurred expenses with the expectation of delivering the unit for use in the IWAC network. Please let me know the current status of the need for this bridge and how we should handle the project which is now partially complete.

(R4, tab 63b at ex. 2d)

Invoices and Termination for Convenience Proposal

On 12 July 1990, ISN submitted to AFDW a "revised" invoice No. 1218-6009-002 (invoice 2) in the amount of $904,949.99, which transferred some items billed previously on invoice 1 as "major equipment" at 12% markup, to "ODCs," at 21.1% markup, and included Sprint circuit charges as ODCs with 21.1% markup (R4, tab 24). CO Mohn advised ISN on or about 2 August 1990 that AFDW disputed ISN's 21% markup on ODCs and the Sprint circuit charges. She indicated, however, that AFDW planned to pay the undisputed portions of invoice 2 pending resolution of the "loading rates." By letter dated 6 August 1990, Ms. Hendricks advised Ms. Mohn:

> With regard to the Sprint communication lines, there is nothing in the contract or in our records to support Mr. Krebs' statement that a "straight pass-through" was subsequently negotiated between him, Mr. Carter and Mr. Neubecker. I first became aware of this issue on May 9, 1990, when Ken Carter called to ask me if I had any knowledge of an agreement for a straight pass-through that might have been made with Mr. Krebs by Mike Rogers (ISN's former Director of Contracts), Mr. Neubecker, and Mr. Simons in the October 89 timeframe. At that time (May 9), Ken had no record of such an agreement but said that Mr. Krebs recalled it. I checked ISN's records and spoke with each of the ISN people, including Mr. Rogers, and found no evidence that such an agreement had ever been made. When you and I discussed this matter on May 21 during Mr. Carter's absence, you told me that this was not an issue and that you had "no problem" with ISN's markup on Sprint services.
>
> ISN's position is that the Sprint communications lines were not included in the network hardware items for which a reduced markup was requested and negotiated, and are therefore to be treated like all "other" ODCs. We ask that you review your records in this matter as soon as possible and

> provide us with any documentation you have of a formal agreement to the contrary. In the absence of such records please approve for payment the "disputed" portions of the subject invoice.

(SR4, tab 12D; AR4, tab 78) On 14 August 1990, CO Mohn authorized payment of $712,694.01 of invoice 2 not in dispute, and the Government paid that amount on 11 September 1990 (AR4, tab 59; compl. ¶ 7; answer ¶ 7).

On 12 September 1990, Ms. Hendricks submitted to CO Mohn a termination proposal for $439,801.61, the "amount by which ISN's costs exceed" the $3,400,378.95 "value" of DO No. 6009. Ms. Hendricks advised that: ISN's proposal reflects "a diligent and successful effort" to "minimize the total additional cost to the Government;" the bulk of the additional cost stems from two items – loss of volume discounts and cancellation of the Sprint leases; and the Government is liable for the lost equipment discounts arising from its decision not to proceed with a 13-node network and for the Sprint costs, which are "the portions of the [circuit] leases . . . unexpired at the time of termination" and for which ISN "is still liable." ISN's proposal included costs for DataBeam's 224 bridge and its prospective installation, and for DataBeam's printer shelves. (AR4, tab 46)

On or about 14 September 1990, ISN submitted a new invoice No. 1218-6009-003 (invoice 3) for $440,690.68. The only document appended to invoice 3 was a "Material Inspection and Receiving Report" listing equipment which was "shipped" to the Joint Staff on 31 May 1990. (R4, tab 29A at 2) By letter dated 18 October 1990, CO Mohn returned invoice 3 to ISN "for backup documentation and a complete breakdown of labor and materials." (*Id*. at 1)

On 21 September 1990, after a "preliminary review of the ISN IWAC termination proposal," Mr. Krebs informed CO Mohn that ISN had not been instructed to order the printer shelves, and the 224 bridge "is not required due to the current status of the IWAC system." Mr. Krebs added that the "bridge was planned as an ISN proposed technical solution," but "its development was not specifically for IWAC." (SR4, tab 12E)

After "discussions" with "Government contracts people," on 1 October 1990, ISN requested that DataBeam refrain from delivering the 224 bridge and withdraw its $35,000 product development cost claim for the 224 bridge (R4, tab 63a at ex. 1c). By letter dated 9 October 1990, DataBeam stated it would charge a "development and restocking fee" of $25,000 if delivery of the bridge was canceled (R4, tab 63a at ex. 1d). DataBeam said it had planned to develop the bridge in 1991 but "accelerated this project" at "the request of Mr. Krebs" (*id*.).

000034

On 22 October 1990, the Government issued Mod. No. 06 to DO No. 6009, which "further increase[d] the partial termination [of DO No. 6009] effected by" Mod. No. 05 by "deleting" the item in Mod. No. 05 calling for replacement of the 19.2 bridge with the 224 bridge (SR4, tab 11). On 31 October 1990, Ms. Hendricks confirmed receipt of Mod. No. 06, and requested a meeting with COs Mohn and Bynane pursuant to FAR 49.105(c) to (1) discuss the method and format for a revised termination proposal and (2) obtain a justification for the the Government's withholding of what Ms. Hendricks described as "disputed amounts" under ISN's invoices (R4, tab 30).

During December, ISN submitted directly to Mr. Krebs (rather than to AFDW's Accounting and Finance Office as specified by DO No. 6009) a revised invoice 3 dated 11 December 1990 for $641,491.88 with documentation appended similar to that supplied for invoice 1. This invoice sought $248,870.58 for labor, $9,894.07 for major equipment, $165,982.67 for ODCs, $10,145.43 for travel, $9,946.15 in interest on invoice 3, and the amount not paid under invoice 2, plus interest on that sum. While the revised invoice indicated that the labor, travel and ODCs sought were for the period "4/01/90 to 5/31/90," the documentation appended indicated that the labor and travel costs were for the period "ending 9/30/90." It, therefore, was not clear whether ISN's revised invoice 3 included only "pre-termination" costs or included both pre- and post-termination costs. Further, the documentation appended to the invoice indicated that the ODCs included U.S. Sprint circuit charges for January, February and March of 1990, with an ISN markup of 21.1% as was disputed with respect to invoice 2. The same month, during December 1990, ISN also submitted to Mr. Krebs invoice No. 1218-6009-777-001 (invoice 777-001), dated 14 December 1990, which covered post-termination costs of $484,516.35 and a $160,221.77 increase to major equipment charges previously billed on invoice 2 for the period ending 31 May 1990. ISN thus again appeared to be seeking both pre- and post-termination costs in one invoice. (R4, tabs 32, 33; SR4, tab 12J)

On 12 December 1990, ISN personnel met with COs Mohn and Bynane to discuss the format for the termination proposal, unpaid invoice amounts, special terms negotiated or allegedly negotiated, and circumstances surrounding issuance of DO No. 6009 (*see* R4, tabs 30, 31, 34; SR4, tab 13J; tr. 3/134-40). Eight days later, on 20 December 1990, ISN submitted a revised termination proposal, in the amount of $1,286,230.00, using the total cost method and the contract's labor and burden rates "in accordance with the instructions given . . . on 12 December." The revised proposal included all costs previously invoiced for unterminated work and all costs related to the termination. The proposal stated that it "is therefore contingent on payment in full for ISN's invoice [3] and [the] payment of the amounts which were improperly withheld from invoice [2]." The proposal was based on a net amount of $4,053,662.00, and therefore exceeded DO No. 6009's funded value by $653,283.00. (R4, tabs 34, 34a)

000035

ISN stated that $385,236.00 of the claimed cost was due to the loss of volume discounts on major system components and cancellation of the Sprint circuits. It further stated that $160,222.00 of the claimed cost constituted an increase in ISN's fee on major equipment items from 0.9% to 10.0% (the same fee percentage awarded for equipment on previous DOs under ISN's contract) because the special handling rate of 11.1% G&A plus 0.9% fee had been agreed to "in anticipation of installing the entire JCS/IWAC VTC network." (R4, tab 34)

On 3 January 1991, Mr. Krebs requested CO Mohn obtain from ISN a complete accounting of equipment in ISN's possession that still needs to be delivered to J-8 and arrange for ISN to turn over the appropriate equipment no later than 10 January 1991 (SR4, tab 12H; tr. 2/114-15). The next day, on 4 January 1991, CO Mohn sent ISN a memorandum requesting it deliver nine equipment items listed in the memorandum (R4, tab 35). By letter dated 15 January 1991, Ms. Hendricks advised Ms. Mohn that ISN previously had delivered three of the nine items listed, had "boxed up" the remaining listed items, and was awaiting further instructions regarding where and to whom she would like the items delivered (R4, tab 36). In another letter dated 24 January 1991, Ms. Hendricks advised Ms. Mohn that ISN had located one of the items she had reported had been installed previously, and the item would be boxed and returned with the others as soon as ISN received delivery instructions (R4, tab 37). On 28 January 1991, Ms. Mohn notified ISN by letter that it was to deliver the items to Mr. Krebs (R4, tab 38).

During February of 1991, Ms. Hendricks instructed Donald Miller to deliver the equipment to Mr. Krebs. On 1 March 1991, Mr. Miller loaded the equipment into ISN's van, prepared a receipt (which listed the 29 equipment items he was delivering, contained a line for signature by the Government agent receiving that equipment, and was sent by facsimile to Mr. Krebs), and called Mr. Krebs by telephone to coordinate access to the Pentagon South Parking Lot. Mr. Krebs indicated that "something else had come up," he could not meet Mr. Miller, the delivery would need to be made another time, and he would get back to Mr. Miller when his schedule would permit. When Mr. Krebs canceled the delivery, Mr. Miller unpacked the van and returned the equipment to his ISN office. On 12 March 1991, Mr. Krebs sent the unexecuted "equipment receipt" he had received from Mr. Miller to CO Mohn stating that he "will not accept" five items of equipment set forth on that list "because they are not applicable to the IWAC technical solution." Mr. Krebs never contacted Mr. Miller about rescheduling the delivery. Mr. Miller testified he believes AFDW subsequently advised him at a meeting that Mr. Krebs lacked storage space for the equipment and needed to resolve that issue. Between 1 March 1989 and 1 May 1992, Mr. Miller stored the equipment in his ISN office and instructed others not to use that equipment. However, because Mr. Miller was working off-site subsequent to June 1991, some inadvertent use of the equipment occurred. In all cases, the equipment removed from his office was returned and repackaged for delivery to the Government when it was explained the equipment belonged to the Government. On

1 May 1992, Mr. Miller moved the equipment from his office to a secure storage area with access by only one individual, Ron Austin. (AR4, tab 52; tr. 3/276-88; SR4, tab 12L) At trial, when asked "[d]id you ever cancel a delivery request by ISN," Mr. Krebs testified:

> No. I don't think of any instance. The only thing I refused delivery on, and it was clearly documented, that there was some equipment ordered by mistake by ISN which I didn't want the Government to have to pay for. I did not want equipment that was not proper for use in the IWAC delivery order to be delivered to the Government. So that would be the only equipment I would even consider rejecting.

(Tr. 2/89, 119) We find that ISN attempted to deliver the equipment to Mr. Krebs, as directed by CO Mohn, and Mr. Krebs canceled the delivery after ISN had loaded the equipment into a van for delivery to the Pentagon.

DCAA audited ISN's termination proposal on 22 January 1991 and issued its report (not in the record) on 1 March 1991, questioning many of the claimed costs (R4, tab 67 at 2; compl. ¶ 17; answer ¶ 17). By letter to CO Bynane dated 22 March 1991, ISN challenged DCAA's findings, stating that most of the questioned costs related to whether certain labor hours "belong to the FFP delivery order or the termination costs" (R4, tab 39). Ms. Hendricks explained that:

> The JCS/IWAC Network was extensively reconfigured/ redesigned during the month of May 1990 prior to the termination notice. The network was changed to conform to the new transmission speed mandated by the Government. . . . Documentation previously prepared based on the design prior to May 1990 utilizing full T1 network transmission speed and equipment configuration, now had to be redone. Because of the termination, the price of the delivery order was never adjusted to reflect the cost impact of these Government directed changes.
>
> The additional documentation costs which were incurred after the date of partial termination were necessary in order to complete the documentation to the reconfigured/redesigned JCS/IWAC network. We were required to continue this documentation as stated in the notice of partial termination and such costs are reasonable and should be allowable . . . .

(*Id.*)

On 3 April 1991, CO Mohn notified ISN that another CO, Capt. Dean Hufford, would be negotiating the termination settlement (R4, tab 40). By letter to CO Mohn dated 9 April 1991, ISN demanded AFDW immediately pay invoice 3, which it said sought payment for "pre-termination" costs. ISN stated that invoice 3 was submitted in December of 1990 and never returned to ISN as a defective invoice. (R4, tab 41) CO Hufford replied that ISN had conditioned its termination for convenience proposal on payment of the pre-termination amounts, invoice 3 clearly was "part of the termination proposal," and ISN had been advised to include in the termination proposal only "costs associated with the actual termination action" (R4, tab 42).

In September and October 1991, at the Government's request, ISN provided back-up for its labor charges under invoice 3 and all other labor charges it invoiced under DO No. 6009 (R4, tabs 47, 49).. More than a year after ISN submitted its initial termination proposal, by letter dated 23 October 1991, ISN submitted a certified CDA claim to CO Mohn for $1,383,110.93, which requested "payment of the claimed amounts, plus CDA interest," or a final CO's decision (R4, tab 48). The claimed amounts included: unpaid balances on invoices 2 and 3 for pre-termination costs, plus interest on those balances; post-termination costs shown on invoice 777-001 for labor, ODCs, travel, lost discounts, restocking charges, and increased fee due to a reduced purchase volume of equipment; additional interest on unpaid billed costs; and labor costs for termination negotiations (R4, tab 48 at 2; *see* R4, tab 50). CO Mohn received the CDA claim on 31 October 1991 (R4, tab 48; compl. ¶ 25; answer ¶ 25).

On 29 November 1991, CO Hufford sent ISN 30 "factfinding questions" which he desired be answered by 5 December 1991 (R4, tab 51). Four days later, on 3 December 1991, CO Mohn returned to ISN its CDA claim, asserting that the claim was premature because termination negotiations had not occurred (R4, tab 52). On 24 January 1992, CO Hufford notified ISN that: COTR Krebs had "questioned all the hours" of labor which ISN had incurred after DO termination for additional documentation preparation and which were discussed in Ms. Hendrick's 22 March 1991 letter; no response had been received from ISN to his "factfinding questions;" he desired a response to the questions by 31 January 1992; and he was scheduling negotiations for the second week of February. (R4, tab 54) On 17 March 1992, CO Mohn notified ISN that: AFDW had not received responses to its "factfinding questions;" the CO will unilaterally determine the allowability of ISN's costs if no responses are received; and negotiations are being rescheduled for April 1992 (R4, tab 56). By letter dated 20 March 1992, ISN responded to each of the 30 "factfinding questions," by stating where ISN believed the questions had been addressed previously and setting forth additional information with respect to seven of the questions (R4, tab 57).

On 23 March 1992, ISN resubmitted its October 1991 CDA claim, asserting that AFDW's CO had had no right to refuse to accept a properly certified claim (R4, tab 57 at 4, tab 58). In April 1992, CO Mohn became the deputy director of AFDW's Contracting Office and the termination contracting officer (TCO) (tr. 6/144-45).

On 4 June 1992, ISN submitted another invoice 3 in the amount of $632,163.39 (R4, tabs 61, 61a; SR4, tab 13I). ISN explained that: the period had been corrected to end on "9/30/90 instead of 5/31/90" since "[t]he hours invoiced included work on the non-terminated portion of the order;" and the invoice total had been reduced by $9,328.49 to reflect the 2 April 1990 payment for site surveys at Stuttgart and Colorado Springs, which had been mistakenly recorded where ISN's accountants had tracked the costs, rather than against DO No. 6009 where AFDW had instructed the costs be invoiced (R4, tab 61).

On 8 June 1992, Mr. Krebs notified CO Hufford that, after review of ISN's June 1992 invoice 3, he was able to validate $243,324.50 in labor expenses and AFDW was authorized to release the funds. He said that fringe benefits and overhead charges under invoices 2 and 3 "still need to be resolved." (AR4, tab 62) In a memorandum dated 9 June 1992 to the Joint Staff, which referenced DO Nos. 6001 through 6004 and Nos. 6007 through 6009, Mr. Krebs reported that, subject to fringe benefit and overhead exceptions, all invoices supporting IWAC's implementation had been validated and CO Hufford had been advised to make payment (AR4, tab 61). Although, at the time, he and Mr. Krebs were responsible for payments to ISN, CO Hufford did not pay the validated amounts. He considered ISN's invoices to be part of its termination proposal, and to be settled in conjunction with the termination proposal (tr. 4/203-07).

On 27 August 1992, ISN officials met with CO Hufford. About two weeks later, on 14 September 1992, ISN's president sent position papers and other documentation to CO Hufford concerning eight termination issues to assist him in reaching a position on those issues. (R4, tabs 63, 63a-63g)

On 18 September 1992, DOD's Washington Headquarters Services Installation Accounting Branch issued a $330,000.00 MIPR to AFDW to cover "probable liability" for IWAC termination costs (AR4, tab 54 at 3). On 29 September 1992, CO Hufford unilaterally issued Mod. No. 07 to DO No. 6009 increasing its funding by $330,000.00. (AR4, tab 54 at 2; R4, tab 10g) Mod. No. 7 stated it was for internal Government purposes only and an administrative modification obligating funds to cover probable liabilities. (AR4, tab 54 at 2) The funds added to the DO by the Mod. were "expiring end-of-fiscal-year funds" which were being "preserved" for settlement considerations (tr. 6/129-31).

000039