> ENHANCE CINC PARTICIPATION IN THE DETAILED SUPPORTING ANALYSIS OF THE JOINT STRATEGIC PLANNING PROCESS **FOR THE FOLLOWING SITES JCS/J8, CENTCOM, TRANSCOM AND SAC**. SEE ATTACHMENT (1) FOR EQUIPMENT.

(R4, tab 10 at 2; SR4, tab 5A at 2) (emphasis added) The second pages additionally list Mr. Krebs as "POINT OF CONTACT" and contain accounting and appropriation data, which is typed in the computer-generated format known as BCAS (tr. 6/63) and matches typing on the remainder of the second page and on page one of the DO (R4, tab 10; SR4, tab 5A at 2).

ISN, through Ms. Hendricks, contends that the version of DO No. 6009 contained in appellant's Rule 4 file supplement (AR4, tab 63), is the DO ISN received (tr. 3/69-70; app. br. at 19, proposed finding 45). The second page of ISN's DO lists the DO amount as $3,029,000 and the "point of contact" as Mr. Krebs, but does not mention the four sites which are set forth on the second pages of the Government's DOs. Instead, ISN's second page provides, in BCAS format, as follows:

> CONTRACTOR TO PROVIDE EQUIPMENT, LABOR, TOOLS, MATERIALS, SUPPLIES, SERVICES AND PERSONNEL TO SUCCESSFULLY IMPLEMENT THE NETWORK AND VIDEO TELECONFERENCING HARDWARE COMPONENTS TO ACCOMPOLISH [sic] AN IWAC VIDEO CONFERENCING NETWORK THAT WILL PROVIDE THE TECHNICAL BASELINE TO ENHANCE CINC PARTICIPATION IN THE DETAILED SUPPORTING ANALYSIS OF THE JOINT STRATEGIC PLANNING PROCESS. SEE ATTACHMENT (1) FOR EQUIPMENT LIST.

ISN's second page also contains the same accounting and appropriation data listed on the Government's second pages, but that data is set forth in typeface, rather than in the BCAS format. (AR4, tab 63 at 2)

ISN's DO No. 6009 has only one attachment, a nine-page document labeled with the contract number, the DO number, and the designation "Attachment (1)." It is entitled "Equipment List" and each page bears the heading "[IWAC] Bill of Materials." (AR4, tab 63) Apart from the labeling, title, numbering of the pages, and the fact that there are no summary sheets, the document is the same as the Bill of Materials submitted by Mr. Rogers on 13 September 1989, minus its last page. We attribute the omission of the last page to a copying error because, when Ms. Hendricks sent AFDW a copy of ISN's

DO No. 6009 on 25 April 1990, the "Attachment (1)" Equipment List was the same as that contained in appellant's Rule 4, tab 63, except it included the missing last page, *i.e.*, was 10 pages in length (*see* R4, tab 19d). We find that the 10-page Equipment List was, in fact, "Attachment (1)" to ISN's DO No. 6009.

The Government points to the typewritten accounting and appropriation data on page two of ISN's DO No. 6009 as evidence that AFDW did not generate that page. ISN counters that page two of Mod. No. 03 to DO No. 6009, which contains accounting and appropriation data, also was typewritten (SR4, tab 8A). The Government suggests the existence of typewriting on this DO modification should be given no weight because the modification was a "correction" of a prior modification and did not obligate funding (tr. 6/198-99). We note, however, that Mod. No. 04 to DO No. 6009 (below), which added $220,000 to the DO, also contains accounting and appropriation data which clearly was not in the BCAS format and appears to have been typewritten (R4, tab 10d at 2). Thus, the Government's contentions concerning BCAS do not persuade us that the second page of ISN's DO was not generated by AFDW. After evaluating the testimony, in light of the chronological course of events, which we elaborate upon below, we find that ISN's DO No. 6009 is the correct one.

DO No. 6009 -- Performance

ISN received DO No. 6009 on or about the date it was issued. At or about the same time, it received copies of each of the June 1989 MIPRs and of the 6 September 1989 MIPRs identified above. The MIPRs totaled $3,108,000, exceeding the $3,029,000 stated amount of the DO. (*See* R4, tabs 19, 19(d); tr. 3/74)

Upon receipt of DO No. 6009, Ms. Hendricks called Mr. Carter to register her concern that the order, which was issued for $3,029,000, had an equipment list attached with a value of $4,796,709.12. While the equipment list was for 13 sites, Mr. Carter indicated that the order was only for the initial sites and that JCS would be adding more money for the additional equipment. Mr. Carter advised that the price stated on the DO was "just -- the money for the first four sites to get started with." Essentially, when Ms. Hendricks expressed concern about how ISN was to know what work it was to perform, Mr. Carter said:

> [C]ontinue to do this work the way that you've done the other work for JCS. You can bill at the rates that are in the contract and, you know, you'll be paid for your work, . . . they've got lots of money, they'll put more money on it.

Ms. Hendricks did not understand how she was to set up DO No. 6009 for purposes of ISN's contracting and accounting records. She had no ISN proposal to perform work

which corresponded with the $3,029,000 amount set forth on the DO and the $3,029,000 amount set forth did not correspond with the 13-site equipment list appended to the DO. Ms. Hendricks, therefore, brought the DO to the attention of ISN's president. (R4, tab 19 at 2; tr. 3/44-45, 69-72, 77, 100, 108, 110-13, 228-31)

Because there were discussions that ISN should send a letter to AFDW concerning DO No. 6009, Mr. Neubecker sent Ms. Hendricks a memorandum on 20 September 1989 stating, among other things, that:

> After discussions with our staff and the COTR, I want to make sure that we send to Ken Carter a letter that he can concur with.
>
> "It is understood that task 6009 of contract No. F4964288D0054 effective September 14, 1989 is for the initial installations at J-8, CENTCOM, TRANSCOM and SAC, along with the network HUB at the Pentagon.
>
> The services will include U.S. SPRINT circuits for these initial installations, labor, travel, per diem and other direct costs associated with the installation of the initial sites and labor, travel, per diem and other direct costs for site visits or site surveys to SAC, TRANSCOM, RACCOM, HQ ROK, and SOCOM.
>
> The equipment will include VTC and network equipment, test equipment and installation equipment required to support the initial IWAC network installation. The VTC and network equipment is as requested by the letter dated 14 September 1989 from Mr. Krebs".

(SR4, tab 13B) On 21 September 1989, Ms. Hendricks responded to Mr. Neubecker's 20 September memorandum as follows:

> I am waiting for a call back from Joanne Mohn. I need to advise her (1) of the probable overextension of currently MIPR'd funding on 6009, and (2) of the understanding that 6009 is for "initial installations at J-8, etc." as per your memo of 9/20.
>
> As soon as I have clarified these points with her I will set up 6009, provided that you give me a breakdown of the

total estimated cost (labor, materials, comm. circuits, travel, and misc. ODC's [other direct costs]) for performing these initial installations. . . . This information is essential for setting the project up in Jamis and for establishing the labor and ODC budgets (so that you can begin ordering the equipment).

I advised both you and Steve Simons on 9/18, and again on 9/20, that I needed this information. . . . [T]he format must include:

1. Total estimated labor, broken down by category, hours, and fully burdened contractual rates.
2. Total equipment (items subject to the 12% handling charge) broken down by item, quantity, and burdened unit price.
3. Communications Services (dedicated SPRINT circuits) burdened at 11.1% G&A and 10% fee.
4. Travel (TDY & local) burdened at 11.1% G&A and 10% fee.
5. Miscellaneous ODC's – tools, supplies, rental of test equipment, materials (other than equipment items cited in (2) above) burdened at 11.1% G&A & 10% fee.

. . . .

You are reminded that in any event, the total estimated cost of all sites should not exceed $3,001,050.46, which (according to my calculations) is the actual remaining available MIPR'd funding for D.O. 6009.

If you cannot provide me with the detailed breakdown required for ISN budgetary management purposes in a timely fashion, I recommend that you "ballpark" the figures for each of the cost categories above and obtain [ISN's president's] written authorization to use the rough figures to set up the job . . . . [I]f I am consulted on the advisability of risk approval, I will recommend against it. The budget figures must be determined at project onset, and this particular project has a history of being overtaken by events.

(SR4, tab 13C) (emphasis in original)

On 21 September 1989, Mr. Neubecker advised CLI by letter that "ISN intends to purchase 26 of the Rembrandt T-1 codecs from your company over the next year, based on the enclosed letter from The Joint Chiefs" and "[p]lease make sure the price per unit remains the same during the next year as stated in your proposal" (R4, tab 11). The enclosed letter referenced was Mr. Krebs' 14 September 1989 letter of intent (*see* tr. 4/125-28). Mr. Neubecker sent similar letters to DataBeam, VSI, and U.S. Sprint that day or the next day (SR4, tabs 15B, 17B, 19A). DataBeam responded on 25 September 1989 with the quote it had supplied in August 1989, stating that quantity discounts had been provided based upon a purchase of 13 units during a year's period and, if the actual quantity was less, a pricing adjustment would be required. (SR4, tab 15C; tr. 1/117-22)

On 25 September 1989, Ms. Hendricks informed Mr. Carter that, based on the MIPRs and work performed by ISN to date for JCS, there was not $3,029,000.00 in funding remaining for DO No. 6009. Mr. Carter replied that he knew he did not have that much funding remaining and that AFDW would add more funding. He added that JCS has "lots of money," "they're going to put more money on it as [ISN] need[s] it," and she should not "worry about it." (Tr. 3/72-75; AR4, tab 102)

The same day, 25 September 1989, Mr. Carter sent Ms. Hendricks by facsimile a revised "14 September 1989" IWAC Hardware Component Requirements List. This list differed from that attached to Mr. Krebs' letter of intent by omitting 1 item of hardware and setting forth varying "initial" and "total" quantities for several of the 12 remaining hardware items. (*Compare* R4, tab 19f *with* R4, tabs 9, 19, 19e)

On 27 September 1989, Ms. Hendricks prepared a contracts information sheet (CIS), with the notation that its "Special Provisions" were approved by ISN's president that date (SR4, tab 20C; tr. 3/171-73). On the CIS, Ms. Hendricks identified DO No. 6009 as covering four sites and funded in the amount of $3,029,000.00 (SR4, tab 13D at 26-27). She noted that "[m]ajor equipment" was to be billed at cost plus 12% handling charge (treated internally as 11.1% G&A and 0.9% fee) and that "[c]ommunication lines, supplies, and miscellaneous ODCS" were to be "invoiced at cost plus 11.1% G&A, and 10% fee <u>on top</u> of G&A" (*id.* at 27) (emphasis in original). Under "Special Provisions," Ms. Hendricks wrote:

> 1. This is a fully-funded firm-fixed-price [DO] which according to discussion with AFDW Contracts is considered partial funding for the overall JCS/IWAC VTC project. The current funding of $3,029,000 is verbally understood to cover VTC installation at four (4) sites, which ISN has priced internally at $2,970,498. The

> burdened budget figures and PM contract ODC budgets shown in the Billing Instructions above are for the four initial sites . . . . The delta between the total burdened budget and the D.O. value is to be allocated to cost addressed in Note 2, following.
>
> 2. According to AFDW Contracts, funding on this order also applies to labor and travel costs incurred in support of JCS prior to 9/14/89, where such costs exceed the amounts funded on previously issued JCS orders. . . .
>
> . . . .
>
> 3. To minimize the substantial risk involved with ambiguous/changing requirements and "verbal understandings" under a FFP order, <u>ISN must put AFDW contracts on formal notice as to exactly what we intend to provide for the fixed price of $3,029,000</u>. This is to be done by letter to Ken Carter from ISN contracts . . . .
>
> This letter must include an itemized list of the major equipment subject to a 12% handling charge. . . .
>
> In the event that the baseline price for the four initial sites, adjusted for the value of transfers from other JCS tasks, comes to <u>less</u> than the $3,029,000 funded for D.O. 6009, we will recommended [sic] that the balance be applied to changes and additions to the baseline as defined in our letter. If the adjusted total price exceeds the $3,029,000 funded, we must advise AFDW of the shortfall.

(*Id.* at 28-29) (emphasis in original)

Ms. Hendricks never sent to AFDW a letter describing what work ISN would perform for $3,029,000.00. Ms. Hendricks testified during trial that generation of the letter was overtaken by events, *i.e.*, "work was going pretty smoothly," "everybody was happy," "nobody seemed to be upset," and she had become "uncomfortable with the risk" of sending a letter that might upset the Government (tr. 3/239-40). Ms. Hendricks added during trial that, having "a beautiful piece of work like this in ISN's statement of credentials" was of importance to ISN, a company graduating from the 8(a) program, because it would provide the company "an entree to commercial work" (tr. 3/221). She explained that this was "the Joint Chiefs, we jump when the Joint Chiefs say jump," and

"AFDW even more so than ISN is going to jump when the Joint Chiefs say jump" (tr. 3/266).

On 28 September 1989, DOD's Washington Headquarters Services Installation Accounting Branch issued MIPR No. DJAM90084 to AFDW's Contracting Office in the amount of $170,000.00. The MIPR stated that "[f]unds are provided for the services and purchase of equipment to accomplish an IWAC video conferencing network as stated in the attached SOW." (SR4, tab 6C) The record copy of the MIPR does not include any SOW.

The record does contain an undated "Pricing Memorandum," signed by Mr. Carter and CO Dillon, stating that the purpose of an AFDW "negotiation" on an unspecified date with unspecified individuals was to add additional funds for IWAC services and, based on the negotiations and a Technical Evaluation by JCS/J-8, "[a]dditional funds in the amount of $170,000.00 is determined to be fair and reasonable" (SR4, tab 6B at 3-4). The pricing memorandum references an ISN "proposal" for "$170,000.00 Additional Funds," which was "submitted by ISN on 28 March 1989," "forwarded to the using activity for Technical Evaluation on *23 March 1990,*" and "found technically acceptable" on 17 April 1989 (*id.*) (emphasis added). However, there is no such proposal or evaluation in the record. We find that the pricing memorandum does not report an actual negotiated transaction (*see* tr. 7/184-88).

On 30 September 1989, AFDW issued unilaterally Mod. No. 01 to DO No. 6009 signed by CO Dillon. The modification did not alter or change the supplies and services ISN was to furnish under the DO, but stated simply:

> TOTAL PRICE OF DELIVERY ORDER INCREASED BY $170,000.00. CHANGE TOTAL PRICE OF DELIVERY ORDER TO READ $3,186,397.55.

(SR4, tab 6A)

Mod. No. 01 listed five funding cites, four as before and a new cite -- DJAM90084. Unlike DO No. 6009, the funding cites listed included dollar designations. These dollar designations, however, did not correspond to the MIPRs given ISN. The modification stated that the amount of funding allocable to MIPR Nos. DJAM90061 and DJAM90062 was not $500,000 each, as reflected in the MIPRs provided ISN, but was $485,588.00 and $422,809.55, respectively. The total funding set forth, including MIPR No. DJAM90084 for $170,000.00, was now $3,186,397.55, as reflected on Mod. No. 1. (*Id.*)

000020

On 19 October 1989, AFDW unilaterally issued Mod. No. 02 to DO No. 6009. The modification, signed by CO Charles Thompson, did not alter the DO's price, but simply added a DOD security classification form. (R4, tab 10b)

In a memorandum to Mr. Neubecker dated 27 November 1989, Mr. Krebs confirmed the scheduling of a meeting for 4 December 1989, wherein ISN was to "provide specific accountability for the actual IWAC expenses, to date," which were deemed "necessary for additional site installation planning" (AR4, tab 24, ¶ 2) (emphasis in original). Mr. Krebs stated in this memorandum that the parties needed to: resolve connectivity issues concerning Hawaii, Germany, Korea and Panama; schedule site visits to Hawaii, Korea and Panama; and, "[f]or the purpose of this meeting, . . . finalize an IWAC site installation schedule" (*id.* at ¶¶ 3, 6, 7).[4]

An internal ISN contract summary prepared for the month of November 1989 indicated that the current funding level for DO No. 6009 was $3,029,000 and that ISN had expended $2,058,918 to date (AR4, tab 111 at 1). The "project description" for the summary stated that: "JCS/IWAC is a FFP contract that is incrementally funded by the customer as needed;" "[w]e are presently funded to design and install a VTC Hub at the Pentagon and three remote sites;" "present funding is $3,029,000 minus $58,552 which was set aside to cover any cost overruns in previous tasks;" "[t]here are approximately nine more remote sites to be designed and installed along with expansion at the Hub to accept the additional sites;" the extra sites are "scheduled for completion in FY90;"and "the cost projection for the additional sites is approximately $11,000,000" (*id.* at 2). Among the attachments to the summary was a listing of accomplishments, which stated that ISN had provided "VTC capability between PENTAGON J-8 and CENTCOM, FL, in order to provide a demonstration of the system to the JCS," and a document prepared by Mr. Neubecker entitled "JCS/IWAC Schedule 12-4-89," which contained site survey and installation dates for 11 sites, other than the Pentagon hub and CENTCOM (*id.* at 3-4; *see* tr. 4/67-69).

On or about 20 December 1989, ISN submitted invoice No. 1218-6009-001 (invoice 001) dated 20 December 1989 to AFDW in the amount of $2,054,738.28, for "JCS/IWAC VTC Installations (4 Sites)," for the period "Initial to 11/30/89" (AR4, tab 57). ISN's invoice 001 contained (*id.* at 3, 4, 6) its internal charge numbers for "equipment+handling cost only" (01218-6009-002) (002 equipment) and "miscellaneous ODCs only" (01218-6009-003) (Misc. ODCs). A "Requisition List" included with ISN's invoice lists 16 requisitions of 002 equipment totaling $1,593,648.20, plus a 12% markup, for a grand total of $1,784,885.98 (*id.* at 6-7). The list included 43 requisitions of Misc. ODCs totaling $198,105.27, plus 21.1% markup (11.1% G&A and 10% fee), for a grand total of $242,104.45 (*id.*). ISN, however, only billed $1,743,932.00 under the 002 equipment portion of the invoice and $68,836.85 under the Misc. ODC portion (*id.* at 3,

4). On dates not specified in the record, Mr. Krebs validated invoice 001, DCAA approved it for provisional payment (subject to later audit), and AFDW paid ISN (*id.* at 1; *see* AR4, tab 78 at 1).

On 19 January 1990, Mr. Krebs validated ISN's previous invoice No. 1218-04-001 dated 1 August 1989, for IWAC site survey expenses of $9,328.49 incurred prior to the issuance of DO No. 6009 (R4, tab 61c). On 8 February 1990, AFDW's Accounting and Finance Office returned the invoice to ISN because no DO number had been referenced and it could not identify the appropriate payment account (R4, tabs 61, 61b at last page). On 12 February 1990, Mr. Carter advised Ms. Hendricks to identify the invoice as one for DO No. 6009 (R4, tab 61e). On 13 February 1990, she returned the invoice, so marked (R4, tab 61d), and directed ISN personnel to transfer the costs internally to DO No. 6009 (R4, tab 61e). The invoice was paid, with "interest," in the amount of $9,414.53 on 2 April 1990 (R4, tab 61 at 2, tab 61f).

Beginning at least in early February 1990, the Comptroller, J-6 (the Joint Staff's Command Control and Communications Directorate (tr. 1/253)), J-8 and the Defense Communications Agency (DCA) (which, by the time of trial had become the Defense Information Services Agency (tr. 6/153)) were reviewing IWAC implementation and funding issues. One option being considered was having DCA be responsible for the communication circuits. (AR4, tab 50 at 1; tr. 2/54-56, 6/153)

On 23 February 1990, Mr. Neubecker advised both Mr. Krebs and Mr. Carter by letter that, "[i]f labor hours and equipment procurement necessary to support installation of [the IWAC] network" are reduced: the "network will consist of J-8, CENTCOM, SAC and TRANSCOM"; there will be "insufficient documentation, and reduced . . . support for a network that will operate marginally, if at all"; "delays affecting . . . installation and the implementation of the network [will] occur"; "Joint Staff will be liable to pay existing monthly recurring circuit costs"; "[m]onthly recurring circuit charges will be raised by the carrier to accomodate [sic] a 9 node reduction in services"; ISN vendors (Motorola, CLI, VSI, Network Equipment Technologies, Inc., and DataBeam) "are costing their equipment for a minimum 13 node network"; "[c]harges for existing and future hardware procurement shall increase to accomodate [sic] a hardware acquisition of less than a block of 13 sites"; ISN IWAC "personnel will be reassigned and could be lost to the IWAC program permanently"; and ISN "will graduate from the 8(a) program and may not be able to perform under the contract vehicle being used," meaning AFDW could "have to compete [a contract] causing up to a year delay" in IWAC work (R4, tabs 13, 13a). According to ISN's calculations, if the IWAC "contract" was "stopped," the Government's remaining obligation could exceed $1.7 million (R4, tab 13a at 4).

On 6 March 1990, Mr. Krebs advised Mr. Carter and the AFDW Contracting Office that an "[e]valuation of design and implementation alternative connectivity

schemes for the IWAC network [wa]s being accomplished within the Joint Staff" and "[s]ome of the options being considered provide for less than a full 13 node IWAC implementation." Mr. Krebs requested that AFDW provide to J-8 by 9 March 1990 the following data – the "[c]ontractual arrangements between ISN and their subcontractors," a "[d]etailed accounting of estimated costs," and "[c]ertification of the circuit shut-down costs after 1 year." (AR4, tab 96)

In a 13 March 1990 memorandum for J-8 that evaluated the information Mr. Neubecker supplied on 23 February 1990, CO Mohn stated:

> a. I agree if the work is descoped (a reduction in labor hours and equipment), increased costs will occur for existing capabilities. This is due to volume discounts not being applied to smaller quantities of equipment and costs being amortizied [sic] over a shorter period of time.
>
> b. Agree that termination or suspension of work with US Sprint will result in increased costs to support a scaled down network.
>
> c. The costs identified . . . totaling $1.7M obviously represent a worst case scenario of a termination or suspension. If what we are talking about is simply a suspension of work for a definitive period of time (such as two months) the incurred costs during the suspension again should be much lower than the $1.7M. . . .

(AR4, tab 25)

By letter to Mr. Carter dated 15 March 1990, a copy of which was sent to Mr. Krebs, Mr. Neubecker stated:

> It has come to our attention that the Government may not transfer funds to continue the IWAC Network project in a timely manner. If the funds are not available as of March 30, ISN will be forced to take steps to phase down the program.
>
> . . . .
>
> We have begun to temporarily reassign personnel from the IWAC program in an attempt to ensure current funds will cover resources to complete the TRANSCOM installation.

> This will allow ISN to concentrate resources on the physical installation of TRANSCOM. Further reassignments will be necessary to ensure ISN does not work at risk. Hopefully, no unforeseen problems will occur during the TRANSCOM installation that will require additional materials or labor hours.
>
> . . . .
>
> Unless ISN is notified by March 16 that funding will be provided by March 30th, ISN will have to plan for a phase down of the program and the following planned tasks will not be completed:
>
> - As built documentation for SAC, CENTCOM, TRANSCOM and the J8/Hub
> - Hub design drawing package . . .
> - Complete requirements package for Hub build-out for RFQ
> - Blue . . . room audio/video drawings and costs
> - Preliminary Installation Package for PACOM
> - Preparation of purchase orders for PACOM

(R4, tab 17 at 1) Mr. Neubecker appended to his letter two letters from VSI and CLI requesting that orders be issued promptly with respect to the full network installation expected (R4, tabs 17a, 17b).

On 21 March 1990, AFDW unilaterally issued Mod. No. 03 to DO No. 6009. Mod No. 3, which was effective 20 February 1990 and signed by CO Dillon, provided:

> A. THIS MODIFICATION ISSUED TO CORRECT THE DELIVERY ORDER AS FOLLOWS:
>
> | | |
> |---|---|
> | (1) MIPR DJAM 90061 | $457,027.85 |
> | (2) MIPR DJAM 90062 | $445,351.10 |
> | (3) MIPR DJAM 90078 | $2,108.000.00 |
> | TOTAL | $3,010,378.95 |
>
> THIS IS THE CORRECT ORIGINAL FUNDING OF THIS ORDER.

000024

B. THE CORRECT CUMULATIVE TOTAL SHOULD READ $3,180,378.95, INCLUDING MODIFICATION P00001.

(R4, tab 10c)

In a memorandum dated 22 March 1990 to Mr. Simons and Mr. Neubecker, Ms. Hendricks reported on a meeting she had attended on 21 March 1990 with CO Mohn and Mr. Carter. She stated:

> Joanne confirmed that JCS is "pausing to regroup" on the JCS/IWACS VTC program. The direction came from Joint Chiefs level; JCS Comptroller is involved. Some of the things they plan to consider are whether the J-8 IWACS VTC system is in consonance with overall JCS plans and whether it is cost-effective. They want to test the sites installed . . . to see if they are operational and generally acceptable, and will then make a decision as to whether to continue. Joanne said there is no cause for alarm at this point; she feels they will probably opt to continue, but of course could not guarantee that.
>
> What AFDW Contracts needs from ISN is a complete accounting of the money they have funded for all JCS tasks. This includes awarded value by [DO], what has been expended, and what has been delivered -- particularly with regard to hardware. They need an itemized list of the equipment that has been procured (ordered) versus what has been received and delivered. They also need to see what has been billed and paid against each order. For the completed T&M orders they want to see the amount of any residual funds available for reallocation.
>
> For 6009, they need to see itemized costs incurred, cost to complete the initial sites (including outstanding commitments) versus the currently funded amount. . . . Incidentally, I did get AFDW to issue a mod to 6009 to correct the total funded amount to $3,180,378.95.

(SR4, tab 13F)

000025

By letters to Mr. Neubecker dated 21 and 27 March 1990, DataBeam's director of sales, Peter Gammon, supplemented the information he had provided Mr. Neubecker and Mr. Krebs during a March 1990 meeting at DataBeam's Kentucky Headquarters. Mr. Gammon advised that DataBeam would have a high speed 224 Kbps data bridge (224 bridge) available in September 1990, to replace the 19.2 bridge (above), which worked but was deemed "just too slow" by IWAC users. (AR4, tab 28; SR4, tab 15J; *see also* tr. 2/179-82) Mr. Gammon stated that, on an interim basis, DataBeam would ship one 19.2 bridge for use with the IWAC network and, when the high speed 224 bridge is delivered, take the low speed 19.2 "bridge back and provide a full (100%) credit toward the new unit." (SR4, tab 15J) Mr. Gammon further advised that, on receipt of a purchase order, DataBeam would manufacture the color printer shelf for use above the existing cabinet, which Mr. Krebs had approved during their March meeting. He stated that the lead time to manufacture "at least the first (4) units" will be four weeks so time is of the essence. (AR4, tab 28)

On 2 April 1990, Ms. Hendricks submitted an accounting to CO Mohn of the funding and expenditures for the JCS program (AR4, tab 95). She stated, in part:

> The current unexpended funding for D.O. 6009 is $118,015.95, less the $9,328.49 invoiced for EUCOM Site Survey which was approved for payment out of D.O. 6009. This leaves an unspent balance of $108,687.46 as of the end of March. If you will issue modifications to deobligate the residual funds from D.O. 6001, 6006, 6007 and 6008 [which she identified as $24,399.72] and reallocate them to 6009, there would be a balance of $133,087.18 on D.O. 6009. This will fund labor for an additional month (thru April 90) but will not cover additional equipment purchases.

(*id.* at 1) The first attachment to Ms. Hendricks' accounting identified DO No. 6009 as funded in the amount of $3,180,378.95, with a "price" of $3,062,363.00 (AR4, tab 95 at 3). The term "price" referred to ISN's "expenditures," as invoiced (tr. 3/215). The second attachment to the accounting showed labor, equipment, circuits, travel, and material (which included test equipment) DO No. 6009 expenses totaling $3,062,363.00. (AR4, tab 95 at 4). The fourth attachment to the accounting entitled "JCS/IWAC 4 SITE EQUIPMENT INVENTORY MATRIX" listed 34 equipment items, in various quantities, totaling $1,982,642.87 (the amount included for "equipment" on the first attachment). The fourth attachment also contained four end notes stating that certain equipment had been "received for Install at Future Sites;" and that other equipment had been "added" or "upgraded" at the Government's request. (*Id.* at 6)

000026

Ms. Hendricks was not surprised that AFDW had requested a complete accounting of the money funded for all JCS tasks on 21 March 1990. At trial, with respect to her 2 April 1990 response which accounted for the funding, she testified:

> [W]e had treated this as a bank account and they were spending against it. We were doing the job as we went along and we were keeping track of what we were spending. We're billing labor to them at the rates in the contract and we were billing hardware to them at the negotiated rates for the major equipment and then the stated rates for the smaller ODCs. We were keeping track of this, how much money was being spent on the project and we were letting them know how much they had left. We were treating the funding as being their money for them to spend as they wished.
>
> Now, apparently there was a question, there's always a question as to where additional funds are going to come from, so if they were having trouble getting money, there are certain things that you can do. On this particular contract it seemed to me since the money, the MIPR'ed funds, were allocated across several delivery orders that – and it was work that was done for JCS and it was all done on the IWAC program, that [AFDW] could take these other delivery orders that had been issued for site surveys where there was residual money on them. . . .
>
> And I'm telling Ms. Mohn you can take the money out of that pocket and put it in the other pocket, or you know, go through all your handbags and find all the spare change you have and here is some money and this will keep us going for a little longer, we have some more money to spend.

(Tr. 3/88-90)

On 6 April 1990, DOD's Washington Headquarters Services Installation Accounting Branch issued MIPR No. DJAM 0 0051 in the amount of $168,000 and MIPR No. DJAM 0 0052, in the amount of $52,000, to AFDW, for a total of $220,000 (SR4, tab 9C). Both MIPRs provided the funds were for IWAC "PER THE ATTACHED STATEMENT OF WORK." The two MIPRs admitted into the appeal record, however, did not contain any SOWs. (*Id.*)

000027

An undated Pricing Memorandum signed by Mr. Carter and CO Dillon states on its first page that ISN submitted a proposal on 28 March *1989* in the amount of $220,000; a technical evaluation was received from JCS/J8 on 17 April *1989* recommending AFDW accept the proposal, and there was a negotiation to add funds for IWAC services. While the second page of the memorandum states ISN's proposal was forwarded for technical evaluation on 23 March *1990,* it again refers to AFDW receiving the evaluation on 17 April *1989*. The memorandum concludes that additional funds in the amount of $220,000 are fair and reasonable to the Government. (SR4, tab 9B) The record in this appeal does not contain any such proposal or evaluation. We find that the pricing memorandum does not report an actual negotiated transaction.

On or about 16 April 1990, AFDW held an IWAC briefing for Maj. Gen. Baldwin, deputy director of J-6, to assist the Joint Staff's senior leadership with a decision on how or whether to proceed with IWAC (AR4, tab 29; *see also* AR4, tab 31; tr. 2/54, 7/139-40). CO Mohn prepared a briefing chart for the meeting, which listed IWAC "TASKINGS TO DATE" under DO Nos. 6001 through 6004 and 6006 through 6009 and stated -- "Two types of task orders issued: (1) Firm fixed price and (2) NTE level of effort" (AR4, tab 29 at 4; tr. 7/140). The chart did not specify which of the DOs were considered "Firm fixed price." All were listed as having an "NTE AMOUNT," with a separate column for "ACTUAL" expenditures. DO No. 6009 was entered twice on the chart. The first entry indicated that the DO covered EUCOM/SPACECOM site surveys, with NTE and actual amounts of "$9,328." The second entry indicated that the DO covered "JCS/IWAC VTC," with a NTE amount of "$3,180,378" (DO No. 6009's contractually obligated funding as of 16 April 1990) and an actual amount of "$3,062,363," stated to be the "[t]otal expenditures on IWAC project thru end of March 90." (AR4, tab 29 at 4)

In a 19 April 1990 memorandum to Mr. Krebs, Mr. Neubecker stated that the 224 bridge would be available by 1 September and, in the meantime, DataBeam would supply the 19.2 bridge. He added that the "Databeam Table" for "color printer" approved during their March visit to DataBeam would "be available to procure when funds for equipment are made available." (AR4, tab 30) On 23 April 1990, ISN ordered four color printer shelves, at a price of $700 each, from DataBeam (R4, tab 63b).

On or about 26 April 1990, AFDW issued unilateral Mod. No. 04 to DO No. 6009, signed by CO Dillon (R4, tab 10d at 1). Mod. No. 4 cited both DJAM 0 0052 and DJAM 0 0051, listed Mr. Krebs as the point of contact, and stated that:

> A. TOTAL PRICE OF DELIVERY ORDER INCREASED BY $220,000.00. CHANGE TOTAL PRICE OF DELIVERY ORDER TO READ $3,400,378.95.