# In the United States Court of Federal Claims

No. 04-632 C

(Filed October 28, 2005)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * | * | |
| INFORMATION SYSTEMS AND NETWORKS CORPORATION, | * | |
| | * | Motion for Summary Judgment; |
| *Plaintiff,* | * | Contracts; Small Business Act of |
| | * | 1953, 15 U.S.C. 631 *et seq*. |
| v. | * | (2002); Interpretation of |
| | * | Settlement Agreement Related to |
| THE UNITED STATES, | * | Tripartite Section 8(a) Contract |
| | * | |
| *Defendant.* | * | |
| * * * * * * * * * * * * * * * * | * | |

*Norman J. Singer*, Bethesda, MD, for plaintiff.

*James W. Poirier*, Attorney, United States Department of Justice, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, *Franklin E. White, Jr.*, Assistant Director, Washington, DC, for defendant.

## OPINION

**BUSH**, *Judge*

This contract dispute is currently before the court on Defendant's Motion for Summary Judgment Concerning Amended Complaint. For the reasons set forth herein, defendant's motion is granted.

## BACKGROUND

### I. Factual Background[1]

Information Systems and Networks Corporation (plaintiff or ISN) is a Maryland corporation with its principal place of business in Bethesda, Maryland. ISN describes itself as a "small, minority owned business" which is "experienced . . . in the field of computer/telecommunications/security systems integration engineering." Compl. ¶ 4. In this breach of contract action, ISN claims that the United States Department of the Air Force (Air Force) failed to pay plaintiff in full for technological products and services that ISN developed for use by the Air Force. The circumstances under which ISN contracted with defendant are worthy of a brief explanation.

Like many other small businesses, ISN's relationship with the federal government began with its participation in a special program conducted under the auspices of the Small Business Act of 1953 (the Act), 15 U.S.C. § 631 *et seq*. (2000). That federal statute seeks to

> aid, counsel, assist, and protect . . . the interests of small-business concerns in order to preserve free competitive enterprise [and] to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government . . . be placed with small-business enterprises.

*Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 2005 WL 2347854, at *1 (Fed. Cir. Sep. 27, 2005) (quoting 15 U.S.C. § 631(a)). Through section 8(a) of the Act, Congress has vested the Small Business Administration (SBA) with authority to "enter into contracts with any procurement agency of the Federal Government to furnish required goods or services, and, in turn, to enter into subcontracts with small businesses for the performance of such contracts." *Id.* (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 463 (1980)); *see also* 15 U.S.C. § 631(f)(2). Today, SBA uses that statutory authority "to assist eligible small disadvantaged business

[1]/ Although the parties have filed competing proposed findings of fact, the following facts are undisputed, unless otherwise indicated.

concerns [to] compete in the American economy through business development."[2] *Id.* (quoting 13 C.F.R. § 124.1 (2005)); *see also* 13 C.F.R. §§ 124.1-124.603 (2005) (implementing section 8(a) programs). Typically, when a government agency's solicitation of a contract is placed in the section 8(a) program, bidding is limited to businesses which are "unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of the United States, and which demonstrate[ ] potential for success." *Id.* (quoting 13 C.F.R. § 124.101); *Chapman Law Firm v. United States*, 63 Fed. Cl. 519, 521 n.2 (2005) (citing 15 U.S.C. § 637(a)(1)(c)). A section 8(a) contract can be awarded in several ways, including

> [a]s a tripartite agreement in which the procuring activity, SBA and the Participant all sign the appropriate contract documents. There may be separate prime and subcontract documents (i.e., a prime contract between the procuring activity and SBA and a subcontract between SBA and the selected 8(a) concern) or a combined contract document representing both the prime and subcontract relationships . . .

13 C.F.R. § 124.508(a)(1). "A subcontractor, such as plaintiff, participating in this SBA program generally is referred to as a 'section 8(a) contractor' and this

---

[2]/ As this court recently explained,

> the original Small Business Act of 1953 . . . did not contain a "section 8(a)." However, section 207(c) and section 207(d) empowered the SBA to enter into contracts with government agencies and to subcontract to small business concerns, 67 Stat. at 236. An amendment to the Small Business Act added section 8(a) and provided that the SBA could enter into contracts with government agencies and subcontract to small business concerns. . . . In 1978, section 8(a)(1)(C) was amended to include language, for the first time, which provided that the SBA could subcontract with "socially and economically disadvantaged small business concerns" . . . . "Section 8(a)" is codified at 15 U.S.C. § 637(a)(1)(B) (2000).

*M.G. Constr., Inc. v. United States*, 67 Fed. Cl. 176, 178 n.1 (2005) (internal citations omitted).

program is generally referred to as the 'section 8(a) program.'" *Harris Sys. Int'l, Inc. v. United States*, 5 Cl. Ct. 253, 255 n.2 (1984).

Here, in September 1988, the Air Force District of Washington (AFDW), sought a "small business set-aside procurement" to assist it in creating an "Internetted Warfighting Analysis Capability (IWAC)" program.[3] Def.'s Mot. at 7; Pl.'s Resp. at 2. Acting under section 8(a) of the Act, the AFDW entered into an indefinite-quantity contract with the SBA, for provision of the labor, tools, and other services necessary to the project (the prime contract). *See* 15 U.S.C. § 637(a)(1)(a). The prime contract was identified as No. F49642-88-D-0054. The SBA, which had previously approved ISN's participation in the section 8(a) program, then subcontracted with plaintiff for performance of the work. *See* 15 U.S.C. § 637(a)(1)(b); 13 C.F.R. § 124.204(a). That agreement was identified as subcontract No. 3-88-1-2885. The parties agree that, to memorialize those contracts, which appeared in the same physical document, "ISN, the SBA, and defendant entered into a Tripartite Agreement . . . covering both the Subcontract between the SBA and ISN as well as the Prime Contract between the defendant and the SBA." Pl.'s Resp. at 3, 6; *see* Def.'s App. at 002. Under the terms of the tripartite agreement, the Air Force was solely responsible for administering the subcontract, on behalf of SBA, and it alone was entitled to request performance from ISN, through the issuance of "delivery orders." Pl.'s Resp. at 3-4; Def.'s App. at 033. Plaintiff, in turn, was permitted to make claims under the contract to the Air Force directly, rather than through the SBA.[4]

On September 14, 1989, the AFDW issued delivery order No. 6009 to ISN, and plaintiff began work on the IWAC project. On June 12, 1990, however, the AFDW partially terminated delivery order No. 6009, for the convenience of the government, pursuant to a standard contract provision which permitted it to do so.[5]

---

[3]/ According to plaintiff, the requested network "would permit military commanders of the unified and specified commands to participate, realtime, in wargaming and analysis." Pl.'s Resp. at 2-3.

[4]/ The tripartite agreement established these conditions through standard Federal Acquisition Regulation (FAR) provisions.

[5]/ The government may cancel all, or part, of a contract for convenience "when changed circumstances justify the reallocation of risk to the contractor. When such circumstances exist,

(continued...)

ISN promptly ceased work on the project, and billed the Air Force for work already performed.[6] Not surprisingly, ISN and the AFDW disagreed on the value of the completed portions of the delivery order. On October 23, 1991, ISN filed a certified claim under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 601 *et seq.* (2000), seeking reimbursement of its costs. By May 21, 1993, however, no decision on the claim had been issued by the contracting officer. ISN then filed an appeal with the Armed Services Board of Contract Appeals (ASBCA or Board) on that date, based on the deemed denial of its claim. *See* 41 U.S.C. §§ 605(c)(5), 609(a)(1). On July 10, 2002, the Board decided in ISN's favor on the issue of entitlement, and it directed the parties to negotiate a settlement.[7]

On April 14, 2003, the parties signed a settlement agreement and release which provided, in relevant part,

> [t]his modification is issued to provide payment to the Contractor, Information Systems Network Corp. (ISN) after full and complete negotiations concluded on 21 March 2003 and decision of ASBCA Case # 46119, for the amount of $1,664,879.00 including both entitlement and quantum and have also decided to settle, for now and for all times, any and all claims and any other matters arising under or related to subject contract. By signing the SF30, the Contractor, ISN, agrees to full settlement of the claims as described in this paragraph.

Def.'s App. at G. The settlement agreement, which was set forth in a contract

---

[5](...continued)
the contract may be terminated by the government without incurring the consequences of breach . . . ." *Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed. Cir. 1988).

[6]/ Following a termination for convenience, a contractor is entitled to a settlement which will "fairly compensate the contractor and . . . make the contractor whole for the costs incurred in connection with" work performed under the contract. *Nicon, Inc. v. United States*, 331 F.3d 878, 885 (Fed. Cir. 2003); *Gen. Dynamics Land Sys., Inc.*, ASBCA No. 52283, 02-1 BCA ¶ 31,659 (Nov. 20, 2001); *see also* 48 C.F.R. 52.249-2 (2004).

[7]/ ISN subsequently submitted a separate claim to the contracting officer "regarding the quantum portion" of its original claim. Compl. ¶ 21. However, the parties eventually came to an independent agreement on quantum, and therefore, the claim regarding quantum was never the subject of a contracting officer's decision.

modification, Standard Form 30, referred explicitly to contract No. F49642-88-D-0054, the prime contract between the Air Force and SBA. *Id.* at F. Defendant contends, however, that within the settlement agreement, the prime contract number was simply used as a shorthand method of describing the entire tripartite agreement between the Air Force, SBA, and ISN.

Despite the settlement agreement, ISN filed another CDA claim against the United States on August 1, 2003, less than four months after receiving payment from the AFDW. In the new CDA claim, plaintiff sought to "address issues not contained in the settlement of the Delivery Order." Compl. ¶ 25. After the contracting officer failed to make a timely decision on the new claim, plaintiff filed the current lawsuit. Before this court, ISN alleges that it is "entitled to the reallocation of the indirect costs and profit under the Contract and unrelated to Delivery Order 6009." *Id.* ¶ 26. Plaintiff contends that although it has settled all claims related to the prime contract and the cancelled delivery order, it has not released claims which are based upon its subcontract with SBA. ISN argues that the subcontract, too, was breached by the United States, and that plaintiff is entitled to more than $886,640 in damages as a result of that breach.

On March 10, 2005, defendant filed a motion for summary judgment alleging that ISN's breach of contract claim is barred by the 2003 settlement agreement. The government contends that ISN "gave the United States a complete release from all claims related to the contract as part of its bargain with the United States. The release covers the allegations in the amended complaint." Def.'s Mot. at 2. Defendant asserts that the settlement agreement is not ambiguous, that its plain meaning must be enforced, and that the claim must be rejected. In the alternative, defendant argues that even if ISN's breach of contract claim is not barred, plaintiff has failed to state a claim upon which relief can be granted. The United States maintains that although ISN seeks to recover its "costs and profits" under the subcontract, "no provision of the contract requires the United States to pay such" amounts. *Id.* at 3.

On June 29, 2005, plaintiff filed an Amended Opposition to Defendant's Motion for Summary Judgment Concerning Amended Complaint. ISN disagrees with both of the government's contentions. Plaintiff claims that although the 2003 settlement released the United States from liability under the prime contract, it did not release defendant from liability under subcontract No. 3-88-1-2885. And, although plaintiff concedes that the subcontract includes no provisions for the

payment of costs and profit, it argues that the prime contract, which does include those terms, was incorporated fully into its agreement with SBA. ISN contends, therefore, that summary judgment in defendant's favor is not appropriate.

## DISCUSSION

### I. Standard of Review

Defendant has filed a motion for summary judgment on the complaint under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In the capacity of opposing the moving party's motion, the non-moving party has the burden of providing sufficient evidence to show that a genuine issue of material fact indeed exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it will make a difference in the result of a case under the governing law. *See Anderson*, 477 U.S. at 247-48. Any evidence presented by the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. *Id.* at 255. Summary judgment pursuant to RCFC 56 can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed. Cir. 1984). When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. If the non-moving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied.

## II. Analysis

### A. Jurisdictional Threshold

Contract disputes in which the government is a party are resolved under the CDA. The CDA authorizes a contractor to bring an action directly on a claim in this court or to file an appeal with the agency board of contract appeals. 41 U.S.C. §§ 606, 609(a). The CDA requires that a contractor submit its claim to the contracting officer prior to commencing suit. *Id.* § 605(a). Indeed, for this court to take jurisdiction over such a suit, the contractor, as a prerequisite, must have presented a written claim to the contracting officer. *See id.* § 605(a); *England v. Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004) ("We have held, based on the statutory provisions [of the CDA], that the jurisdiction over an appeal of a contracting officer's decision is lacking unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim.") (citing *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996)).

Here, the parties agree that ISN submitted a certified claim to the contracting officer on August 1, 2003, and that the contracting officer failed to issue a final decision denying the claim within sixty days of filing. The contracting officer's deemed denial grants the court jurisdiction to hear this lawsuit. *See Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1302 n.2 (Fed. Cir. 1996) (noting that failure by the contracting officer to issue a decision on a claim within sixty days will be deemed to be a decision by the contracting officer denying the claim, and will authorize the commencement of the appeal or suit on the claim) (citing 41 U.S.C. § 605(c)(5)). ISN's instigation of this lawsuit on April 9, 2004 also falls within the one-year limitations period during which a party can commence a lawsuit, once a contracting officer has denied its claim. 41 U.S.C. § 609(a)(3). Having addressed the jurisdictional issues that pertain to this matter, the court turns to the substantive issues raised in defendant's motion for summary judgment.

### B. Standard of Contract Interpretation

The dispute presented here centers on the proper interpretation of the April 2003 settlement agreement. There is no question that a settlement agreement is a contract, and that its interpretation is a question of law. *Musick v. Dep't of Energy*, 339 F.3d 1365, 1369 (Fed. Cir. 2003) (citing *Greco v. Dep't of Army*, 852 F.2d

558, 560 (Fed. Cir. 1988)); *Gresham, Smith & Partners v. United States*, 24 Cl. Ct. 796, 801 (1991). Contract interpretation is thus suited to resolution by summary judgment. *Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 813 n.1 (Fed. Cir. 1988); *P.R. Burke Corp. v. United States*, 58 Fed. Cl. 549, 554 (2003) (citations omitted).

As with any contract, the court's inquiry into the scope of the April 2003 settlement agreement begins with an examination of the document's own language. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). It is well settled that, in interpreting the language of a contract, its terms must be accorded their plain and ordinary meaning. *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998); *Aleman Food Servs., Inc. v. United States*, 994 F.2d 819, 822 (Fed. Cir. 1993) (citing *Gould*, 935 F.2d at 1274). In other words, the contractual language must be given the meaning that a "reasonably intelligent person acquainted with the contemporaneous circumstances" would reach. *Allied Tech. Group, Inc. v. United States*, 39 Fed. Cl. 125, 138 (1997). In fact, if the language of the contract is unambiguous, so that there is only one reasonable interpretation of it, the plain language of the contract is controlling. *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1473 (Fed. Cir. 1997); *Bristol-Myers Squibb Co. v. United States*, 48 Fed. Cl. 350, 355 (2000) (citations omitted).

A contract is deemed ambiguous, by contrast, where there are two reasonable interpretations that are consistent with the contract language. *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993) (citations omitted). In cases in which an ambiguity arises from a contractual provision, the court must interpret it in a way which is reasonable and internally consistent. *Brunswick Corp. v. United States*, 951 F.2d 334, 337 (Fed. Cir. 1991) (citation omitted). The joint intent of the parties, if ascertainable, is decisive. *See Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) (record was uncontroverted that, at the time of contracting, both parties intended to use a particular building material, and so, court interpreted contract to require use of that material, despite ambiguity which suggested that use of less expensive product might be appropriate). Indeed, "[i]t is the general law of contracts that in construing ambiguous and indefinite contracts, the courts will look to the construction the parties have given to the instrument by their conduct before a controversy arises." *Id.* (quoting *United States v. Cross*, 477 F.2d 317, 318 (10th Cir. 1973)); *see also Highway Prods., Inc. v. United States*, 530 F.2d 911, 917 (Ct.

Cl. 1976) ("Where there is an ambiguity in the contract instrument, it is appropriate to go outside the formal documents and ascertain the intent of the parties . . . ."). It should be noted, however, that the mere fact that the parties may disagree with regard to the interpretation of a specific provision does not, in and of itself, render that provision ambiguous. *See Cmty. Heating & Plumbing*, 987 F.2d at 1579; *Brunswick Corp.*, 951 F.2d at 337 (citation omitted).

When the meaning of contract terms is not immediately plain, this court relies on several rules to assist in its contract interpretation, and to reveal whether an ambiguity truly exists. *W&F Bldg. Maint. Co. v. United States*, 56 Fed. Cl. 62, 69 (2003). "Before making a conclusive determination about an agreement's ambiguity, or lack thereof, the court should consider the context in which the agreement was executed." *Id.* In other words, the court must attempt to read the contract's various provisions as a harmonious, integrated whole, *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965), interpreting these provisions in their larger contractual context, rather than in isolation. *See Gaston & Assocs., Inc. v. United States*, 27 Fed. Cl. 243, 249 n.7 (1992); *see also* John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 156 (3d ed. 1995) (explaining that an attempt to interpret a contract word, term, or clause in isolation from the other parts of the contract document may distort its meaning and fail to capture the parties' intent). The court will also seek an interpretation that accommodates all of the document's terms, and accordingly avoids a conflict between them. *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992); *Hol-Gar Mfg. Corp.*, 351 F.2d at 979.

A corollary of the court's goal of harmonizing all contract provisions is that the court will not adopt an interpretation which renders a contract term nugatory. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983) (court would not interpret "Disputes clause" of contract as creating privity between subcontractor and government, because another clause expressly disclaimed that privity; to do so would render express clause meaningless); *see Arizona v. United States*, 575 F.2d 855, 863 (Ct. Cl. 1978) (adhering to the rule that the court will avoid an interpretation that renders a portion of the contract "useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result") (citations omitted). Finally, if an ambiguity exists and extrinsic evidence does not establish clearly the parties' intent, the ambiguity will be construed against the drafter of the language, under the doctrine of *contra proferentem*. *See Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc.*, 105 F.3d

629, 634 (Fed. Cir. 1997) (citing *Kaiser Aluminum Corp. v. Matheson,* 681 A.2d 392, 398 (Del. 1996)). "[I]t is well established that if a [contract] is ambiguous and the contractor follows an interpretation that is reasonable, this interpretation will prevail . . . ." *Interstate Gen. Gov't Contractors, Inc. v. Stone*, 980 F.2d 1433, 1434 (Fed Cir. 1992) (quoting *United Pacific Ins. Co. v. United States*, 497 F.2d 1402, 1407 (Ct. Cl. 1974)).

Keeping in mind the above-stated principles, the court must discern the scope of the relevant settlement agreement, and whether there exists any ambiguity in its terms. ISN carries a particularly heavy burden to demonstrate an ambiguity here because, generally, a contractual release will operate to discharge the government from all claims arising under the applicable agreement. *W&F Bldg. Maint.*, 56 Fed. Cl. at 68 (where plaintiff signed contract modification which represented that it was a "full and final" release of claims, "plaintiff carrie[d] a heavy burden when arguing" that claim against defendant survived); *see also Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1203 (Fed. Cir. 1994) (finding that because a valid release was executed, plaintiff's claim for contract damages was barred); *Kenbridge Constr. Co. v. United States*, 28 Fed. Cl. 762, 765 (1993) (citations omitted). Indeed, in the case of government contracts, "[a] contractor's execution of a release that is complete on its face reflects the contractor's unqualified acceptance and agreement with its terms and is binding on both parties." *Kenbridge Construction*, 28 Fed. Cl. at 765 (quoting *Clark Mech. Contractors, Inc. v. United States*, 5 Cl. Ct. 84, 86 (1984)); *Johnson, Drake & Piper, Inc. v. United States*, 531 F.2d 1037, 1047 (Ct. Cl. 1976) (noting that "absent special vitiating circumstances, a general release bars claims based upon events occurring prior to the date of the release."). Further, it is clear that "[e]xceptions to releases of claims are strictly construed against government contractors." *Gresham*, 24 Cl. Ct. at 801 (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1394 (Fed. Cir. 1987)); *Dureiko v. United States*, 209 F.3d 1345, 1356 (Fed. Cir. 2000) (noting that exceptions to releases are strictly construed against contractors). There are, however, special and limited circumstances under which a claim may be prosecuted, despite the execution of a release. *Mingus Constructors*, 812 F.2d at 1395. These circumstances include mutual mistake, conduct of the parties acknowledging claims after a release, obvious mistake or oversight, and fraud or duress. *Id.*

"In interpreting the release, [the court must] first ascertain whether its language clearly bars the asserted claim." *Dureiko*, 209 F.3d at 1356 (citing *King*

*v. Dep't of the Navy*, 130 F.3d 1031, 1033 (Fed. Cir. 1997)). Again, if the provisions are clear and unambiguous, they must be given their plain and ordinary meaning. *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996); *Alaska Lumber & Pulp. Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993). The parol evidence rule forbids the admission of additional evidence when the applicable language is complete and unambiguous, and when there is no contention that the contract was executed as a result of fraud, accident or mistake. *See McAbee Construction*, 97 F.3d at 1435. On the other hand, if the agreement is found to be ambiguous as to the scope of its coverage, the court must construe the terms to give effect to the parties' intent at the time they executed the release, a task which may implicate questions of fact. *Dureiko*, 209 F.3d at 1356 (citing *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed. Cir. 1988)). In such a case, the introduction of parol evidence to determine that intent is appropriate. *Cray Research, Inc. v. United States*, 41 Fed. Cl. 427, 436 (1998) ("If a written contract is unclear, or not integrated, prior or contemporaneous extrinsic evidence that does not contradict the written language of the contract may be introduced to establish its meaning."); *see also Dureiko*, 209 F.3d at 1356 (finding the phrase "demolition and removal" contained in a release to be ambiguous because the phrase could refer to the government's removal of debris in conjunction with the removal of mobile homes, or the removal of *any* debris). To perform this analysis, the court will examine the relevant contract documents which contain the parties' respective rights and obligations. *See SIPCO Servs. & Marine, Inc. v. United States*, 41 Fed. Cl. 196, 213 (1998). The provisions of these documents will be interpreted in conformity with above-cited contract principles.

Here, the settlement agreement, which is written on a Standard Form 30, clearly identifies the contract subject to the agreement as "No. F49642-88-D-0054." Pl.'s App. at 56. The record is uncontroverted that this number was used to identify the prime contract between the United States and SBA. As plaintiff notes, "[t]he settlement agreement clearly sets forth the Prime Contract number, but nowhere is the Subcontract number or the Subcontract itself mentioned." Pl.'s Resp. at 5. Were the court to read that portion of the SF-30 in isolation, ISN would indeed be correct that the settlement agreement relates only to those claims which are based on the prime contract itself. However, the court must consider the contract number reference in the agreement in the larger contractual context. *Gaston & Assocs.*, 27 Fed. Cl. at 249 n.7. Here, as defendant correctly points out, another clause of the settlement agreement provides for the release of "any and all

claims and any other matters *arising under or related to*" the prime contract. Pl.'s App. at 57 (emphasis added). Only by reading those two provisions together can one discern the reach of the settlement agreement.

Defendant argues that the phrase "arising under or related to" bars plaintiff's current claim. The United States concedes that the prime contract and subcontract are distinct legal agreements, but insists that the contracts are "related," and that the settlement agreement effectively covers claims based on either contract. Defendant points out that "[t]he release reaches all claims 'related' to the tripartite agreement, and, even assuming . . . that the complaint alleges a claim only against the SBA, that claim is nonetheless 'related' to the tripartite agreement." Def.'s Reply at 1-2. In support of that contention, defendant argues that

> in any contractual setting, it is difficult to imagine how a subcontract could not be "related" to a prime contract. Second, in this contractual setting, the rights and obligations of the prime contract and the subcontract were not only 'related' in the ordinary sense, the rights and obligations of the prime contract and the subcontract were identical or nearly identical.

*Id.* at 6. To further demonstrate the interconnection between the two documents, the United States emphasizes that, because no part of the prime contract or the subcontract vested SBA with the right to issue delivery orders to ISN, "there was never any scope of work required by the subcontract with SBA beyond the scope of work defined by the delivery orders issued by the Air Force pursuant to the prime contract." *Id.* at 7-8.

The settlement agreement's plain language makes the United States' interpretation the only reasonable interpretation. The term "related" is defined as "having relation to, or relationship with, something else . . . [or] having mutual relation or conne[ct]ion." OXFORD ENGLISH DICTIONARY 549 (2d ed. 1989). The arguments presented by defendant support the conclusion that the prime contract and the subcontract are connected. The record is clear, for example, that the obligations created under the prime contract and the subcontract were virtually identical to one another. That fact is not a mere coincidence. As plaintiff concedes, the terms of the prime contract "were included verbatim in the Subcontract." Pl.'s Resp. at 12. And, as the United States points out, "the prime

contract and the subcontract create overlapping rights and obligations . . . ." Def.'s Reply at 7. The subcontract required ISN to fulfill all of the demands created under the prime contract, on behalf of the SBA. That document also entitled plaintiff to direct payment, from the Air Force, under the terms of the prime contract. Similarly, SBA delegated its authority to administer the subcontract entirely to the Air Force, and only that entity was able to issue delivery orders to ISN. Each of these provisions of the prime and subcontract demonstrates their inextricable interrelationship.

Further, ISN's standing to file a claim against the United States, based on rights embodied in the prime contract, is dependent on the terms of the subcontract and the tripartite agreement. Those documents create the privity between ISN and defendant which is essential to plaintiff's standing to bring this claim. *See and compare Precision Materials, Inc v. United States*, 1979 WL 16475, at *6, nn. 6,7 (Ct. Cl. Dec. 6, 1979) (in section 8(a) contract, special clause of tripartite agreement served "to place plaintiff in privity with" government agency, rather than SBA alone, "for purposes of the subject procurement").

Confronted with these essential connections between the two documents, ISN claims that "[t]he fact that the Subcontract was to be performed in accordance with the terms of the Prime Contract was only to assure that the terms of the Subcontract did not exceed those of the Prime Contract." Pl.'s Resp. at 12. That argument, however, fails to account for the unique relationship between the agreements which is a natural consequence of the section 8(a) program. It is critical to recognize that SBA's role in the section 8(a) scheme is not that of an actual contractor, but instead, as a provider of "technical and managerial support to a section 8(a) contractor in the performance of a subcontract." *Harris Systems*, 5 Cl. Ct. at 256 (citing 15 U.S.C. § 637(a)(7)). Indeed, "in all . . . contracts funneled through the SBA, the work [is] to be performed by the nominal subcontractor, which, for all practical purposes, [is] the real contractor." *Brother's Cleaning Serv., Inc. v. United States*, 38 Fed. Cl. 106, 107 (1997). As this court has explained,

> [t]he nominal prime contracting parties are the SBA and the [procuring agency]. It is well-understood, however, that the real party in interest in a Section 8(a) contract is the minority small business. The regulations make this clear.

*Id.* at 108 (citing 13 C.F.R. § 124.320(a)). In other words, tripartite agreements created under section 8(a) are, in effect, direct contracts between a procuring government agency and a small-business contractor. To conclude, under these circumstances, that the subcontract is not related to the prime contract, despite the documents' shared terms, obligations, and overarching purpose, would require a bizarre interpretation of the phrase "arising under or related to." *See Arizona*, 575 F.2d at 863. Indeed, were the court to find this claim unrelated to the prime contract, it would be difficult to imagine *any* claim which could be deemed "related to" that agreement. Such a reading would violate the settled rule that the court's interpretation must not render a contract term nugatory. *Johnson Controls*, 713 F.2d at 1555. The court finds, therefore, that ISN's interpretation of the settlement agreement is not reasonable.

In addition, the court notes that, here, ISN has presented no legal authority for its unusual position that a prime contract and a subcontract are not "related" to one another. Plaintiff's reliance on the fact that the documents at issue carry distinct identifying numbers is not persuasive. According to plaintiff,

> [t]he fact that the parties did not include Subcontract No. 3-88-1-2885 within the definition of 'subject contract' is evidence that they did not intend for ISN to waive its claims under Subcontract No. 3-88-1-2885 . . . . Therefore, it is uncontroverted that ISN never waived its right to bring its claims for indirect costs and profit pursuant to the Subcontract.

Pl.'s Resp. at 9. However, even assuming, as ISN urges, that the two contracts are distinct agreements, that argument does little, if anything, to show that the two contracts are not "related." In this case, the prime contract and the subcontract worked together to create one contractual relationship between the United States and ISN. *See generally Brother's Cleaning Service*, 38 Fed. Cl. at 108. It would be unreasonable to conclude that the parties agreed to a settlement of one of those agreements, but not the other. Plaintiff's argument to that effect must be rejected.

In sum, ISN's contention that the settlement reaches only those claims based on the prime contract itself is unreasonable because it contradicts the plain and ordinary meaning of that document's terms. Because only one reasonable

interpretation of the disputed contract exists, plaintiff has not met its burden to demonstrate an ambiguity within the contractual language, and the doctrine of *contra proferentem* cannot be applied in ISN's favor. *See Blinderman Constr. Co. v. United States*, 39 Fed. Cl. 529, 538 (1997) (stating that "contra proferentum comes into play only if the non-drafting party's interpretation of the contract is reasonable."). Nor has ISN made an allegation of fraud, accident, or mistake, which would permit the court to construe its terms against the government. *See Mingus Constructors*, 812 F.2d at 1395 (claim may be considered, despite release, in cases of fraud or mistake). And again, "[e]xceptions to releases of claims are strictly construed against government contractors." *Gresham*, 24 Cl. Ct. at 801. Plaintiff has introduced no authority to show that this rule should be altered simply because the contract at issue here was facilitated by SBA. ISN received a settlement payment from the United States in exchange for its agreement to a broadly-worded, generalized release of its claims. While the company had the opportunity to refuse that agreement, or to except claims from it, it failed to do so. Absent an allegation of fraud, mutual or obvious mistake, duress, or acknowledgment of the claim following the release, the court must enforce the plain meaning of the agreement. *See Clark Mech. Contractors, Inc v. United States*, 5 Cl. Ct. 84, 86 (1984) (stating that where contractor had a right to reserve claims from operation of a release, but failed to do so, it is not improper to bar claims based on events which occurred prior to the execution of the release, absent vitiating or aggravating circumstances).

Because there is only one reasonable interpretation of the April 2003 settlement agreement, the court agrees with defendant that it is unambiguous, and that its plain meaning controls this dispute. As such, there is no genuine issue of material fact regarding the complete bar on claims "arising under or related to" the prime contract. Under the plain meaning of the settlement agreement's terms, subcontract No. 3-88-1-2885 is related to the prime contract between the United States and SBA. It follows that plaintiff's breach of contract claim, which is based on the subcontract, is barred by the April 2003 settlement agreement. Accordingly, defendant's motion for summary judgment is granted.

Because the court has concluded that the claim presented here is barred by plaintiff's release, the court does not reach defendant's alternate ground for dismissing the complaint.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

(1) Defendant's Motion for Summary Judgment Concerning Amended Complaint, filed on March 10, 2005, is **GRANTED**;

(2) The Clerk's office is directed to **ENTER** final judgment for defendant **DISMISSING** plaintiff's Amended Complaint, filed November 30, 2004, with prejudice; and

(3) Each party shall bear its own costs.

s/Lynn J. Bush
LYNN J. BUSH
Judge